### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                                     Plaintiff,<br><br>                    v.<br><br>VIRTU FINANCIAL INC. and<br>VIRTU AMERICAS LLC,<br><br><br>                                     Defendants. | Civil Action No. 1:23-cv-8072<br><br><br>JURY TRIAL DEMANDED |

### COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Virtu Financial Inc. ("VFI") and Virtu Americas LLC ("VAL") (collectively "Defendants"), alleges as follows:

### SUMMARY

1.      This matter relates to false and misleading statements by Defendant VFI and its subsidiary VAL, an SEC registered broker-dealer that processes approximately 25% of market orders placed by retail investors in the U.S., and VAL's associated failure to establish, maintain, and enforce policies and procedures reasonably designed to prevent the misuse of material, nonpublic information ("MNPI").

2.      Defendants repeatedly — and falsely — told their institutional customers and the public that VAL used "information barriers" and "systemic separation between business groups" in order to safeguard these customers' MNPI.  In fact, VAL did not place this information behind

information barriers that safeguarded MNPI. During a 15-month period, virtually all employees at VAL and its affiliate broker-dealers could access MNPI regarding its customers' trades, which included the name of the customer, the name of the security purchased by the customer, the side (buy or sell), the execution price, and the execution volume.

3.      Defendants provided access to this information, regardless of whether the employee had a valid business need for such information. Such trading information, when collected in this form, constitutes MNPI, and access to such MNPI could be valuable to a trader. For example, a trader could observe that VAL had executed the orders of a large institutional customer throughout the day, understand that the same customer may follow a similar trading pattern over the next day or days, and take advantage of such information by trading ahead of the customer's subsequent orders.

4.      Specifically, from at least January 2018 through April 2019 (the "Relevant Period"), VAL maintained a primary database for daily business operations and a backup database (collectively, the "FS Database") that contained all post-trade information generated from VAL's customer orders — including, among other things, specific customer-identifying information, the security name, the side (buy or sell), and the execution price and volume.

5.      Due to the lack of effective information barriers during the Relevant Period, anyone at VAL, including proprietary traders at VAL and its affiliates, was able to directly access the FS Database and its MNPI using a widely known and frequently shared generic username and password. This was so even though VAL purported to prohibit proprietary traders from accessing post-trade information from VAL's customers to prevent the risk of misconduct. Despite specific discussions of the deficiency occurring no later than August 13, 2018, VAL did not fix it until at least April 2, 2019.

2

6.    During the Relevant Period, VAL made materially misleading statements, and omissions which rendered other statements materially misleading, to at least six customers regarding the purported information barriers at VAL. VAL's parent, VFI, also made similar materially misleading statements and omissions, which rendered other statements materially misleading, regarding purported information barriers in two public presentations and a press release.

7.    Before VAL implemented appropriate information barriers in the FS Database in April 2019, Defendants also issued a letter to VAL customers falsely stating that VAL maintained procedures to segregate and protect sensitive customer data, when VAL did not do so. Throughout the Relevant Period, in addition to disseminating these materially misleading statements and omissions, which rendered other statements misleading, VAL and VFI took further steps described herein to engage in a practice or course of conduct that operated or would operate as a fraud or deceit upon purchasers. Their conduct violated Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(2)–(3)].

8.    VAL also failed to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the misuse of MNPI. This was particularly important given the nature of VAL's business. It operated both a proprietary trading business, in which it bought and sold securities in its own account and for its own benefit, as well as a trade execution business for its large institutional customers, whereby it executed buy or sell orders from customers, typically for a commission.

9.    Notwithstanding these dual businesses, VAL failed to establish, maintain, and enforce reasonably designed policies and procedures to ensure that proprietary traders at VAL and its affiliates could not access VAL customers' MNPI, including by failing to impose

3

reasonable information barriers.  Indeed, VAL could not track who logged into the system that stored its customers' MNPI, could not track what information was extracted from the database by proprietary traders, and ultimately cannot determine to this day whether its traders abused the trust placed in Defendants by customers who relied on them to handle their MNPI.  By failing to establish, maintain, and enforce policies and procedures reasonably designed to prevent the misuse of material nonpublic customer information, VAL's conduct violated Section 15(g) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78o(g)].

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to Exchange Act Sections 21(d), 21I, and 27 [15 U.S.C. §§§78u(d), I(e), and 78aa] and Securities Act Sections 20(b) and 22(a) [15 U.S.C. §§77t(b) and 77v(a)].  In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange.

11.    Venue is proper in this District pursuant to Exchange Act Section 27 [15 U.S.C. §78aa] and Securities Act Section 22 [15 U.S.C. §77v].  Certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred within this District.  As noted in the subsequent paragraphs, Defendants' executive offices are located within this District.

**DEFENDANTS**

12.    **VFI** is a Delaware corporation headquartered in New York, New York.  VFI's

common stock is registered pursuant to Section 12(b) of the Exchange Act.  VFI's common stock

trades on the NASDAQ.

13.    **VAL** is a Delaware limited liability company with principal executive offices in

New York, New York.  It is a broker-dealer registered with the Commission.  VAL is a

subsidiary of VFI and was previously known as KCG Americas LLC prior to VFI's acquisition

of KCG Holdings, Inc. in July 2017.

**FACTUAL ALLEGATIONS**

**A.    VAL and Affiliates' Proprietary Trading and Trade Execution Businesses**

14.    VAL and its affiliates were SEC-registered broker-dealers that operated two

distinct types of businesses: (i) customer-facing trade execution services, which generate MNPI

regarding customers' trade orders and executions; and (ii) proprietary trading operations, which

must be prevented from misusing that same MNPI when trading on VAL's or its affiliates'

behalf.  Because the federal securities laws require broker-dealers to implement and maintain

policies and procedures reasonably designed to prevent the misuse of MNPI, VAL purported to

maintain information barriers, which are a standard method used by broker-dealers and other

financial institutions to prevent the use of MNPI, by VAL and its associated persons.  As detailed

below, following an acquisition that required combining new trade execution services with

existing proprietary trading operations, VAL's failure to implement reasonably designed

information barriers meant that proprietary traders had essentially unfettered access to its

customers' MNPI for approximately 15 months.

**B.      Relevant Background on and Operation of the FS Database**

**1.      Pre-KCG Acquisition**

15.      In July 2017, VFI acquired KCG Holdings, Inc. ("KCG"), which owned a broker-dealer firm with a large trade execution business.  Prior to the KCG acquisition, VFI's operating subsidiaries (collectively "Legacy Virtu") primarily bought and sold securities in Legacy Virtu's own account and for its own benefit.  Legacy Virtu maintained the FS Database for its daily business operations, and it recorded information regarding its trades into the database seconds or milliseconds post execution.

16.      Before the KCG acquisition (and continuing thereafter), Legacy Virtu's employees could access the FS Database through two means.

17.      First, an employee could log into a graphical user interface ("GUI").  Employees accessing the FS Database via the GUI were required to enter their unique log-in credentials, and could access only information necessary for their role at the firm — a process typically known as "permissioning."

18.      Second, an employee could log into the FS Database directly using a username and password, a technique that allowed them to search the database.  These usernames and passwords were not specific to individual employees; instead, employees used the generic "viewonly" as both username and password.  Similarly, employees could access the backup FS Database using the generic "fsviewonly" as both username and password.  Users accessing the FS Database this way could access all data in it, regardless of their role at the firm or business need.  Before the KCG Acquisition, Legacy Virtu did not have a significant trade execution business, so the lack of information barriers did not result in the risk that Legacy Virtu's proprietary traders would access customer MNPI.

6

### 2.    Post-KCG Acquisition

19.    In July 2017, VFI acquired KCG and formed VAL, which mainly operated the customer-facing trade execution business acquired from KCG, and some of KCG's proprietary trading business.  This newly acquired trade execution business meant that VAL bought and sold orders for large institutional customers.  Customers typically paid a commission to VAL each time they executed a trade using its execution services.  No later than January 2018, VAL began storing sensitive customer trade execution information in the FS Database, which also continued to house Legacy Virtu proprietary trade data.

20.    Under VAL's policies and procedures at the time, proprietary traders were supposed to be walled off from access to certain customer trade details (from the trade execution business) to prevent them from having access to MNPI that could potentially provide them a trading advantage.  But, despite its recognition of the need for such policies and procedures, VAL failed to implement them with respect to direct access to the FS Database, one of the primary means of accessing MNPI.

21.    VAL's customer trade execution data that were entered into the FS Database constituted MNPI.  The "consolidated tape," a high-speed electronic system that reports the latest price and volume data on sales of exchange-listed stocks, publicly reports in real-time a subset of the trade information contained in the FS Database.  It does not, however, provide critical additional details that are in the FS Database, namely specific customer identifying information along with the side (buy or sell), the security, price, volume, and the trading algorithm used for each order.

22.    Despite compiling this sensitive customer data in its FS Database, VAL did not review or update the permissioning for direct access to the database to prevent access to customer post-trade information by employees who did not have a business need to access that

data.  Because the generic usernames and passwords for direct access were widely known and shared, virtually all employees, including VAL and Legacy Virtu proprietary traders, effectively had unrestricted access to the MNPI in the FS Database.

23.    During the Relevant Period, proprietary traders at VAL and Legacy Virtu had expertise in creating trading algorithms, known as "strategies," that aim to improve trading revenues.  Each trading strategy was typically automated to incorporate a series of instructions and data, some of which came from the FS Database.  VAL and Legacy Virtu had hundreds of thousands of individual strategies or instances of strategies that ran on a daily basis as part of the proprietary trading business, and many relied on the direct-access method, with its generic "viewonly" or "FSviewonly" login credentials, to source data from the FS Database.

24.    In approximately August 2018, VAL's database developers started to discuss a need to improve the inadequate permissioning for the FS Database, apparently as a result of the due diligence process for VFI's pending acquisition of Investment Technology Group, Inc. ("ITG"), another broker-dealer.  On August 13, 2018, over 20 employees from different departments at Legacy Virtu received an email indicating that the FS Database needed a "revamp" to remediate the permissioning and thus were put on notice.  In December 2018, the topic of remediating the database resurfaced and the main database developer commented, "I was going to start on it this week but have been side tracked."

25.    Nevertheless, despite developers and others becoming aware no later than August 2018 that proprietary traders had access to customers' post-trade MNPI, VAL took no immediate steps to mitigate the risk of misuse of the MNPI.  Instead, VAL continued for another eight months to enter customer post-trade information into the FS Database, continued to allow direct access to such information with the generic login credentials, and issued no statements,

directives, or guidance to proprietary traders that they should cease or limit their direct access to the FS Database. During that period — in which VAL handled approximately 25% of all market orders placed by retail investors in the U.S. — its failure to fix the problem perpetuated the substantial risk (present since at least January 2018) that proprietary traders could access and misuse the MNPI.

26.     The customer-specific, and virtually real-time, post-trade information contained in the FS Database would be valuable to a proprietary trader because it would, among other things, provide insights into which VAL customers were trading in the market (and in what securities) at present, as well as the direction and size of each customer's order flow. Additionally, because large orders by VAL's institutional customers could be broken up into smaller orders placed over one day or several days, such post-trade information could provide further material, nonpublic insight into orders that may be forthcoming in a particular security.

**C.     Defendants Made Materially False and Misleading Statements and Omissions, Which Rendered other Statements Materially Misleading, to Customers and the Public Regarding VAL's Information Barriers**

27.     Defendants made a series of false and misleading statements and omissions, which rendered other statements materially misleading, to customers and the public regarding VAL's purported information barriers. These statements and omissions were material because a reasonable investor would have relied on them when selecting VAL to execute its trades.

**1.     November 2018 and March 2019 Public Presentations**

28.     In presentations on November 7, 2018 and March 13, 2019, VFI made materially misleading statements and omissions, which rendered other statements materially misleading, to actual and potential customers and investors. Both presentations stated that "Virtu has established policies and procedures designed to safeguard sensitive client information" including

"[t]echnology access controls to segregate sensitive information" and "[r]eview of approved personnel and permissions."  During the November 2018 earnings call and presentation, VFI's CEO reiterated these statements to the public:

> You see the importance we place on protecting client information in all aspects of our business.  We take this obligation seriously and we recognize and appreciate the natural concerns customers will no doubt have.  *Virtu has established policies and procedures* for our existing client and market-making businesses that are designed to safeguard sensitive client information and will continue to design our policies and procedures with our clients in mind.  These safeguards include physical separation, *logical access control and entitlement reviews*.

(Emphasis added.)  These statements were false and materially misleading because they failed to reference — and were wholly at odds with — the direct access permissioning issues for the FS Database described in detail above.  The statements misled Virtu's customers and the public into believing that Defendants' policies and procedures reasonably designed to safeguard MNPI were effective, enforced, and applicable to all means of accessing the information.  The statements were material because a reasonable investor would have relied on them when selecting VAL to execute its trades.

### 2.     March 2019 Letter to Customers

29.     On or around March 1, 2019, Defendants widely disseminated a letter to existing VAL customers regarding the ITG merger that also contained a false and misleading statement.  Certain customers received the letter from the CEO's "virtu.com" email address.  Others received the letter as a PDF attachment to an email which contained the "Virtu Financial" logo.  Both versions were signed by VFI's CEO and stated: "Prior to merging both Virtu and ITG each maintained our own procedures to segregate and protect sensitive client data."  This statement was materially misleading because it omitted the availability of direct access to the FS Database by Defendants' proprietary traders without appropriate permissioning.  At certain large

customers, multiple employees received the same emailed letter. For example, at one customer, eight of its employees separately received the emailed letter.

### 3.    January 2019 Press Release

30.    In a January 25, 2019 press release, VFI made a similar materially false and misleading statement. In providing an update regarding the acquisition of ITG, the press release stated, "Post closing, Virtu intends to continue to maintain and enforce appropriate information barriers to segment and protect sensitive client data." The statement was misleading because at the time, VAL failed to adequately implement and enforce its information barriers as to the direct access permissioning of the FS Database, and it was material because a reasonable investor would have relied on it when selecting VAL to execute its trades.

### 4.    Responses to Customer Due Diligence Questionnaires

31.    Customers of VAL's execution services periodically sent VAL due diligence questionnaires (DDQs) for VAL to complete and return. Customers used these questionnaires to evaluate or reevaluate whether VAL should be an approved broker-dealer for executing their orders. Some of the questionnaires included specific questions about VAL's information barriers and access controls in place to protect customer trade information, including post-trade information. VAL's compliance department typically received input from multiple departments to respond to the questionnaires.

32.    During the Relevant Period, VAL made false and misleading statements, and omissions which rendered other statements materially misleading, concerning its handling of customer information and information barriers when responding to at least six customer DDQs, and four of these customers continued to place orders using VAL's execution services during the Relevant Period. These statements were false and misleading because they failed to reference —

and were wholly at odds with — the reality of the direct access permissioning described in detail above.  They would mislead reasonable investors into believing that Defendants' policies and procedures were designed to safeguard MNPI and were effective, enforced, and applicable to all means of accessing the information.  The statements were material because as noted above, the questionnaires were used to evaluate or reevaluate whether VAL should be an approved broker-dealer to handle customer orders, and a reasonable investor would have relied on them when selecting VAL to execute its trades.  Although VAL had identified the direct access permissioning issue on or before August 13, 2018, VAL did not take steps to inform its customers of that permissioning issue, even while it was in the process of being remediated.

33.    These misstatements were also material to customers' decision whether to route their orders to VAL.  VAL's customers consider their post-trade information sensitive, nonpublic, and material, and are concerned that this information could be used to engage in trading abuses including front-running if their information is not adequately protected.

34.    In a January 2019 questionnaire, an investment adviser customer ("Customer A") asked VAL: "Do any cash traders, research sales and/or proprietary traders see electronic order flow information, whether this is intraday or post-trade?  What safeguards do you have in place to maintain the confidentiality of our order flow?" VAL misleadingly responded: "No. The Firm employs information barrier processes and procedures as part of its oversight functions, such as procedures to approve and review systems entitlements for all of the Firm's business units, including Electronic Execution Services."  These statements were materially false and misleading because VAL did not employ reasonable, meaningful information barrier processes with respect to direct access to the FS Database.  Moreover, the shared usernames and passwords, by their nature, bypassed any requirements to approve or review system entitlements.

12

35.     In another January 2019 questionnaire, an investment adviser customer
("Customer B") asked what policies and procedures VAL had in place to protect "client
confidential information."  VAL misleadingly responded that it had "encryption/password
protection" and "access controls" in place.  These statements were materially false and
misleading because customer confidential information in the FS Database did not have adequate
password protection and there were no reasonable, meaningful access controls in place for direct
access.  Customer B received VAL's responses and continued to use VAL's execution services
through the rest of the Relevant Period, paying commissions on those transactions.

36.     In a November 2018 questionnaire, an investment adviser customer ("Customer
C") asked who at VAL had access to "real-time *and post trade*" information (emphasis added).
In its response, VAL listed certain categories of employees who had access to Customer C's
post-trade information, but failed to include others on that list, including proprietary traders, who
could access the very same information through direct access to the FS Database:  "Electronic
Execution Services Sales and supervisory personnel as well as certain support personnel in
technology, operations, finance, compliance and legal may have access to systems containing
[Customer C's] post trade information."

37.     Moreover, VAL responded to Customer C that it "employs information barrier
processes and procedures as part of its oversight functions, which include processes to approve
and review systems entitlements for the Firm's business units."  VAL repeated the same sentence
in a separate question that asked about "oversight" at VAL.  These statements were materially
misleading because they falsely implied that the systems entitlements for the FS Database were
subject to ongoing review and approval, when in fact there were no reasonable, meaningful
systems entitlements in place for direct access to the FS Database throughout the relevant period

13

beyond the generic and widely shared "viewonly" credentials.  Customer C received VAL's responses and continued to use VAL's execution services through the rest of the Relevant Period and paid commissions on those transactions.

38.     In an August 2018 questionnaire, an investment adviser customer ("Customer D") asked VAL to confirm that "[o]nly employees with a need to access confidential information in order to provide required services have access to such confidential information."  VAL falsely replied "Yes."  This statement was materially false and misleading because virtually any employee, including proprietary traders, could access the FS Database via direct access.

39.     In a July 2018 questionnaire, an investment adviser customer ("Customer E") asked about changes or violations to the firm's privacy policy, to which VAL inaccurately answered that it "maintains information barrier policies and procedures that are designed to segregate client orders to those business units within the firm that have a need to know of the information."  This statement was materially false and misleading because business units within VAL or Legacy Virtu that did not have a need to know of customer information nevertheless could access the information in the FS Database via direct access.

40.     In a March 2018 questionnaire, an investment adviser customer ("Customer F") asked who at VAL had access to its information.  VAL misleadingly responded, "Our policies provide that only personnel whose job function requires access to real time and historical order and execution information are permissioned to see this information."  VAL stated that those personnel "currently consist[] of the business supervisors, client service personnel, risk management, sales coverage, compliance and other similar personnel with a bona fide business need to know such information." Customer F also asked about information barriers specifically, to which VAL responded, "We do maintain information barriers between our aggregation units

14

which are designed to prevent the sharing of customer order and trade information with individuals who are not authorized to receive and/or who have not bona fide business purpose for accessing such data." Neither response was accurate with respect to direct access to the FS Database. VAL's answers were materially misleading because they would lead a reasonable investor to believe that other personnel, including proprietary traders, were not permitted to see customer trade execution information.

### 5. Defendants Profited from the Materially False and Misleading Statements

41.     Defendants obtained money or property — in the form of the commissions VAL charged on the trades it executed on its customers' behalf during the Relevant Period — by means of their false or materially misleading misrepresentations in presentations, a letter, a press release, and in responses to customer questionnaires discussed above. VFI, as the parent company, also profited from VAL's false or materially misleading statements: VFI reports its financials on a consolidated basis that includes VFI's equity interests in VAL and other subsidiaries. Had VAL candidly told customers that proprietary traders enjoyed essentially unfettered access to the FS Database (which contained their post-trade information), and that it had no system to track or monitor who was accessing that data, those customers may reasonably have chosen to route their orders to a competitor for execution. VAL's misleading assurances in response to customers' pointed questions about information barriers deprived those customers of an opportunity to make an informed decision about how to protect their trade data, and many continued using VAL's services after receiving those misleading assurances. In other words, VAL received orders that it executed, and therefore commissions when VAL handled the executions of those orders, from customers that it might not otherwise have received if it had disclosed the lack of reasonable information barriers as to the FS Database.

42.     As a result of the conduct described above, VAL and VFI violated Sections

17(a)(2) and 17(a)(3) of the Securities Act.

**D.     VAL Failed to Adequately Establish, Maintain, and Enforce Reasonably Designed Information Barriers to Prevent Proprietary Traders from Misusing Nonpublic Customer Post-Trade Information**

43.     Although VAL purported to establish and maintain certain policies and

procedures to prevent the misuse of MNPI generally, during the Relevant Period it failed to

establish, maintain, and enforce policies and procedures reasonably designed to do so.  As

discussed below, the controls VAL did have in place were not reasonably designed to detect or

prevent the misuse of MNPI from the FS Database.

44.     VAL had no policies or procedures that directly addressed the FS Database and

provided no training or other directives to its employees regarding the expectations for use of

that database and its highly sensitive information, including during the time period VAL was

working on remediating the system.  VFI's Confidential Information Policy during the Relevant

Period stated that customer confidential information included "information that has been entrusted

to the Firm by clients with a reasonable expectation that the information will be kept confidential

and only shared within the company for bona-fide business purposes."  The same policy noted that

such information could include "client orders, recently executed transactions, trading strategies,

and other forms of data."  VAL's Compliance Manual at the time provided that:

> The Firm has established information barrier processes that are intended to segregate information within discrete business units.  The information barrier processes include both physical and systemic separation between business groups so that the information possessed by one business group is not shared with other business groups who do not have a need to know about the information.

During the Relevant Period, the information barriers described in these policies were not

reasonably designed, nor were they adequately implemented or enforced.

45.     Although Defendants appear to have implemented information barriers for the GUI means of accessing the FS Database, the virtually unfettered direct access method was widely used.  Indeed, at times during the Relevant Period, the main FS Database became unresponsive because there were too many concurrent queries being run by employees using direct access.  Due to the volume of these concurrent direct-access logins, traders complained in internal chat messages that they ran into alerts stating that the system had exceeded the number of users allowed.  In a June 2018 chat conversation, one proprietary trader suggested to another that they would be less likely to run into the excessive-user message if they safeguarded the "fsviewonly" username and password for the backup database.  That trader quipped about the prospect of selling "subscriptions" to the generic log-in credentials "for like a buck each."

46.     Rather than limiting the number of simultaneous logins using direct access or disabling direct access until appropriate permissioning was implemented, VAL *increased* the available number of simultaneous direct access logins in an attempt to mitigate the excessive-user issue.  Specifically, as of November 2018, the main FS Database could be accessed simultaneously by 75 users using direct access.  VAL increased the user limit to 125 later that month because of complaints by traders about the concurrent capacity limits.  At that time, VAL was encouraging employees to use direct access to obtain data from the FS Database rather than other databases because of the merger with KCG, which significantly increased the number of employees accessing the FS Database and the number of queries running at any given time.

### 1.     VAL Did Not Know Who Was Using the FS Database Through Direct Access

47.     During the Relevant Period, VAL did not know which employees were using the FS Database or in what way.  As a result, VAL lacked necessary information to test for potential misuse of MNPI.  For example, VAL had no system in place to log or track who, or what

strategies, were querying the FS Database using direct access.  Separately, VAL had a code repository that contained, among other things, scripts that were used to query the FS Database, but the FS Database did not automatically capture those scripts.  Instead, the code repository effectively operated on an honor system: the only scripts in the code repository were those a VAL associated person actively and voluntarily deposited.  VAL had no mechanism for reviewing, tracking, or otherwise knowing of scripts traders used but did not deposit.

### 2.     VAL's Automated Systems and Policies Were Not Reasonably Designed, Maintained, or Enforced to Detect or Prevent the Misuse of MNPI in the FS Database

48.     VAL had several automated systems and policies in place during the Relevant Period.  However, these systems and policies were designed to detect and prevent other potential misconduct or erroneous trading.  They were not designed, maintained, or enforced to detect and prevent the misuse of MNPI in the FS Database, and were insufficient to do so.

49.     For example, although VAL database developers had the ability to determine which computers were connecting to the FS Database through direct access, internal chat records demonstrate that developers sought to identify those connections only in instances when excessive log-ins from the same computer were impacting system performance, not as a measure to detect or prevent misuse of MNPI.  Not until the last day in February of 2019 did a VAL database developer create a program to monitor whether any employees were querying customer post-trade information in the FS Database – and even then, the program caused system disruptions and was quickly terminated, meaning that it was not maintained or enforced.

50.     VAL also had "lockdown systems" designed to detect abnormal trading activity and stop strategies from trading when unexpected activity or potential logic errors were detected based on pre-set parameters (known as "caps").  The caps included, for example, the maximum

18

number of open orders, the maximum quantity of any single order placed by the strategy, or the maximum gain or loss anticipated for the strategy. But these systems were not designed to detect or prevent the misuse of customers' post-trade information; instead, they were designed to manage risk by limiting the positions of various trading strategies and were created to address situations that usually represent coding or configuration errors (such as "fat-finger" errors). They did nothing to stop proprietary traders from accessing post-trade information, prevent them from using it as an input for trades in ways that complied with the caps, or prevent them sharing (and trading based on) the MNPI using accounts held outside the Defendants' operations.

51.    VAL had two types of caps: (i) the "Firmwide Hardcaps," which were set by Virtu's senior trading personnel in consultation with Risk Management and were hard-coded into the trading system; and (ii) "Strategy-specific Softcaps," which were configured by traders and had more restrictive parameters for specific trading strategies (*i.e.,* lower thresholds). Once a trader hit a Strategy-specific Softcap, a lockdown was triggered, and the Firm's system generated an alert and automatically locked down the strategy, thus preventing the trade from occurring. However, even if a cap triggered a lockdown, traders were permitted to manually unlock (or "reset") the strategy after reviewing the lockdown alert, and then could resume trading within Firmwide Hardcaps, which were higher. The frequency with which a trader could reset a strategy after triggering Strategy-specific Softcap lockdowns was established by individual trading supervisors. If a trader attempted to reset a strategy after that frequency was exceeded, an automated alert — called a Supervisory Lockdown Alert — was generated in the system for review by the applicable supervisor.

52.    The Supervisory Lockdown Alerts were also ineffective to prevent the misuse of MNPI in the FS Database. For example, for the week of March 5-9, 2018, there were 1.5 million

lockdowns and resets, yet those lockdowns and resets appear to have generated only two supervisory alerts.  Indeed, during the Relevant Period there were many millions of lockdowns and resets, yet only 570 supervisory lockdown alerts were triggered.  Of those, 65% were approved by the same proprietary trading supervisor, who also served as the chief compliance officer designee tasked to review those approvals on a monthly basis.

53.      VAL's trainings were insufficient to prevent misuse of MNPI and were not reasonably designed, maintained, or enforced based on the nature and scale of VAL's business. VAL provided a one-time training to certain employees in August 2018 on "Sensitive Information, Information Barriers and Client Instructions."  Among other information, it discussed problematic conduct including "[u]sing common logins or shared passwords without authorization from your supervisor," and noted that "[j]ust because you can access it does not mean that you are authorized to access/use/share it."  Similarly, at a December 2018 Annual Compliance meeting, VAL reminded employees that there is a duty to protect confidential information and discussed the importance of adjusting information barriers when a new business line is added to the company.  Although these trainings mentioned information barriers and protecting customer confidential information generally, they did nothing to stop proprietary traders from accessing post-trade information if they attempted to do so, and they did not constitute policies and procedures reasonably designed to protect MNPI given the nature of VAL's business.

54.      Because VAL failed to establish, maintain, and enforce policies and procedures reasonably designed to protect customers' confidential trade execution information, VAL had no effective way to prevent proprietary traders from accessing and using that MNPI.

55.    As a result of the conduct described above, VAL violated Section 15(g) of the Exchange Act.

## FIRST CLAIM FOR RELIEF

### Violations of Exchange Act Sections 17(a)(2) and 17(a)(3)

56.    The Commission realleges and reincorporates paragraphs 1 through 55 as if fully set forth herein.

57.    Defendants, directly or indirectly, by use of means of instrumentalities of transportation or communication in interstate commerce or by use of the mails, in the offer or sale of securities: (a) knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact, or have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (b) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

58.    By reason of the actions alleged herein, Defendants violated, and unless enjoined will continue to violate, Securities Act Sections 17(a)(2) and 17(a)(3) [15 U.S.C. § 77q(a)(2–3)].

## SECOND CLAIM FOR RELIEF

### Violations of Securities Act Section 15(g)

59.    The Commission realleges and reincorporates paragraphs 1 through 55 as if fully set forth herein.

60.    VAL did not establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of VAL's business, to prevent the misuse of material, nonpublic information by VAL or any person associated with VAL.

61.     By reason of the actions alleged herein, VAL violated, and unless enjoined will continue to violate, Exchange Act Section 15(g) [15 U.S.C. §78o(g)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

(a)     finding that each Defendant violated the aforementioned provisions of the federal securities laws as alleged herein;

(b)     permanently enjoining each Defendant from violating Securities Act Sections 17(a)(2) and 17(a)(3);

(c)     permanently enjoining VAL from violating Exchange Act Section 15(g);

(d)     ordering each Defendant to disgorge all ill-gotten gains, plus prejudgment interest thereon, wrongfully obtained as a result of the false or materially misleading statements described in Paragraphs 28 through 37;

(e)     ordering each Defendant to pay civil penalties pursuant to Exchange Act Section 21(d) [15 U.S.C. § 78u(d)] and Securities Act Section 20(d) [15 U.S.C. § 77t(d)][1]; and,

(f)     granting such other relief to the Commission as the Court may deem just and proper.

---

[1] For purpose of calculating the penalty on the Section 15(g) charge, Plaintiff alleges that the relevant period is September 12, 2018, through the date of remediation in or around April 2019.

22

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: September 12, 2023                    Respectfully submitted,

                                              /s/ Damon W. Taaffe
                                              Damon W. Taaffe (*pro hac vice* to be filed)
                                              U.S. Securities and Exchange Commission
                                              100 F Street, N.E.
                                              Washington, DC 20549
                                              Tel: (202) 551-7420
                                              taaffed@sec.gov

Of counsel:

David A. Becker
Paul Kim
Alexandra M. Arango
David Bennett

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549