**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>        v.<br><br>VIRTU FINANCIAL, INC. and<br>VIRTU AMERICAS LLC,<br><br>                    Defendants. | **Civil Action No. 1:23-cv-8072-JGK** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE COMPLAINT**

Lorin L. Reisner
Andrew G. Gordon
Jessica S. Carey
Paul D. Brachman
Daniel H. Levi
Emily M. Hoyle
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Tel.: (212) 373-3000

*Attorneys for Virtu Financial, Inc. and Virtu*
*Americas LLC*

Dated:  December 4, 2023

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ............................................................1

BACKGROUND ..............................................................................3

ARGUMENT ..................................................................................4

I.   The Complaint Fails to State a Claim under Section 15(g) Because Documents
     Referenced by and Incorporated in the Complaint Establish that VAL's Written
     Policies and Procedures Complied with the Applicable Statutory Requirements. ..............4

     A.   The Court May Properly Consider Documents Referenced by or
          Incorporated in the Complaint. ........................................................ 4

     B.   The Complaint Should Be Dismissed Because Those Incorporated
          Documents Demonstrate That VAL Established, Maintained and Enforced
          Written Policies and Procedures in Accordance with Section 15(g). ................... 5

          1.   VAL Established Written Policies and Procedures Reasonably
               Designed to Prevent the Misuse of MNPI in Accordance with
               Section 15(g). ....................................................................5

          2.   VAL Maintained and Enforced Its Policies and Procedures in
               Accordance with the Requirements of Section 15(g). ........................7

          3.   The Hypothetical Possibility That Traders Could Access Non-
               Permissioned Post-Trade Data Through the FS Database Does Not
               Establish a Violation of Section 15(g). .......................................9

II.  The Claims Asserted under Section 17(a) Should Be Dismissed Because the
     Complaint Fails to Plead Falsity as a Matter of Law. ......................................11

     A.   Defendants' Statements Regarding Policies and Procedures to Safeguard
          Sensitive Client Information Were Accurate. ....................................... 12

     B.   Defendants' Statements Regarding Access to Customer Information Were
          Accurate. ............................................................................ 14

     C.   Defendants' Statements Regarding Maintenance and Enforcement of
          Information Barriers Were Accurate. ............................................... 15

III. The SEC's Section 17(a) Claim Is Time-Barred to the Extent It Seeks Civil
     Penalties and Disgorgement in Reliance on Statements Made Outside the
     Limitations Period and for which the Complaint Contains No Allegation of
     Related Activity within the Limitations Period. ...........................................15

IV.   The SEC's Section 17(a) Claim Against VFI Seeking Civil Penalties and
Disgorgement Associated with Customers D, E and F Also Should Be Dismissed
Because It Is Based on an Unsupportable Allegation of Secondary Liability. .................17

V.    The Complaint Fails to State a Section 17(a)(2) Claim to the Extent It Relies on
Statements Made to Customers That Did Not Place Orders through VAL during
the Relevant Period. ....................................................................................................18

VI.   The SEC's Section 17(a) Claim Against VFI Is Fatally Flawed and Should
Be Dismissed. ...........................................................................................................19

      A.    The SEC Has Failed to Allege That VFI Engaged in Conduct Beyond
            Misrepresentations as Required under Section 17(a)(3). ..................................... 19

      B.    VFI Is Not Liable for VAL's Statements under Section 17(a)(2). ..................... 22

CONCLUSION...............................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
    456 F. Supp. 2d 576 (S.D.N.Y. 2006).......................................................................13

*Barilli* v. *Sky Solar Holdings, Ltd*.,
    389 F. Supp. 3d 232 (S.D.N.Y. 2019).......................................................................14

*Bassaw* v. *United Indus. Corp*.,
    482 F. Supp. 3d 80 (S.D.N.Y. 2020).........................................................................10

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007)....................................................................................................4

*Betts* v. *Shearman*,
    2013 WL 311124 (S.D.N.Y. Jan. 24, 2013), *aff'd*, 751 F.3d 78 (2d Cir. 2014).....................10

*In re Bibox Grp. Holdings Ltd. Sec. Litig*.,
    534 F. Supp. 3d 326 (S.D.N.Y. 2021).......................................................................18

*SEC* v. *Cohen*,
    332 F. Supp. 3d 575 (E.D.N.Y. 2018) ...............................................................16, 17

*Edison Fund* v. *Cogent Inv. Strategies Fund, Ltd*.,
    551 F. Supp. 2d 210 (S.D.N.Y. 2008).....................................................................4, 5

*In re Fairway Grp. Holdings Corp. Sec. Litig*.,
    2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015), *report and recommendation adopted*, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015)...........................................12

*SEC* v. *Farnsworth*,
    2023 WL 5977240 (S.D.N.Y. Sept. 14, 2023)....................................................18, 19, 21

*In re Ferroglobe PLC Sec. Litig.*,
    2020 WL 6585715 (S.D.N.Y. Nov. 10, 2020)..........................................................13

*SEC* v. *Glantz*,
    1995 WL 562180 (S.D.N.Y. Sept. 20, 1995)............................................................21

*SEC* v. *Hurgin*,
    484 F. Supp. 3d 98 (S.D.N.Y. 2020).........................................................................22

*In re Gabelli & Co., Inc. & Gamco Invs., Inc*., Exchange Act Release No. 1457,
    1994 WL 68462 (Dec. 8, 1994) ...................................................................................9

*SEC* v. *Kelly*,
   817 F. Supp. 2d 340 (S.D.N.Y. 2011) ......................................................................22

*Kokesh* v. *SEC*,
   581 U.S. 455 (2017) ...............................................................................................16

*McDaniel* v. *Wells Fargo Investments, LLC*,
   717 F.3d 668 (9th Cir. 2013) ...................................................................................9

*In re Philip Morris Int'l Inc. Sec. Litig.*,
   2021 WL 4135059 (S.D.N.Y. Sept. 10, 2021) .........................................................14

*Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank A/S*,
   11 F.4th 90 (2d Cir. 2021) ...............................................................................11, 14

*Pub. Pension Fund Grp.* v. *KV Pharm. Co.*,
   679 F.3d 972 (8th Cir. 2012) ...................................................................................20

*Ramirez* v. *CSJ & Co., Inc.*,
   2007 WL 700831 (S.D.N.Y. Mar. 6, 2007) .............................................................15

*SEC* v. *Rio Tinto plc*,
   2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019) .........................................................22

*SEC* v. *Rio Tinto plc*,
   41 F.4th 47 (2d Cir. 2022) .......................................................................................19

*River Birch Cap., LLC* v. *Jack Cooper Holdings Corp.*,
   2019 WL 1099943 (S.D.N.Y. Mar. 8, 2019) ...........................................................21

*SEC* v. *RPM Int'l, Inc.*,
   282 F. Supp. 3d 1 (D.D.C. 2017) .............................................................................19

*In re Sanofi-Aventis Sec. Litig.*,
   774 F. Supp. 2d 549 (S.D.N.Y. Mar. 30, 2011) ..............................................13, 14

*Staehr* v. *Hartford Fin. Servs. Grp., Inc.*,
   547 F.3d 406 (2d Cir. 2008) .....................................................................................16

*SEC* v. *Stoker*,
   865 F. Supp. 2d 457 (S.D.N.Y. 2012) ......................................................................19

*Tongue* v. *Sanofi*,
   816 F.3d 199 (2d Cir. 2016) ......................................................................................4

*SEC* v. *Wellshire Sec., Inc.*,
   773 F. Supp. 569 (S.D.N.Y. 1991) ....................................................................11, 15

iv

**Statutes**

15 U.S.C. § 77q ............................................................................................. *passim*

15 U.S.C. § 78o(g) ........................................................................................ *passim*

28 U.S.C. § 2462 ................................................................................................. 16

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) .................................................................................... 1, 4

SEC, STAFF SUMMARY REPORT ON EXAMINATIONS OF INFORMATION BARRIERS:
    BROKER-DEALER PRACTICES UNDER SECTION 15(G) OF THE SECURITIES
    EXCHANGE ACT OF 1934 (2012) .................................................................. 10

Defendants Virtu Financial, Inc. ("VFI") and Virtu Americas LLC ("VAL") (together, "Virtu") submit this memorandum of law in support of their motion to dismiss the Complaint filed by Plaintiff Securities and Exchange Commission ("SEC") pursuant to Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

In this action, the SEC alleges that VAL failed to "establish, maintain, and enforce written policies and procedures reasonably designed . . . to prevent the misuse . . . of material, nonpublic information" in violation of Section 15(g) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78o(g), and, as a result, that Virtu made false statements regarding its safeguards for such information in violation of Section 17(a)(2) and (a)(3) of the Securities Act of 1933 ("Securities Act"). The Complaint should be dismissed for several reasons.

*First*, the Section 15(g) claim should be dismissed because the documents referenced by and incorporated in the Complaint conclusively establish that VAL's policies and procedures complied with all applicable statutory requirements. Those documents demonstrate that VAL established written policies and procedures "reasonably designed" to prevent the misuse of material, nonpublic information ("MNPI"), including, among other things, written policies and procedures providing for: (1) prohibitions on the misuse of such information; (2) prohibitions on accessing certain data; and (3) physical and logical information barriers. These documents further demonstrate that VAL maintained and enforced these policies and procedures through, *inter alia*, mandatory training sessions for all employees, establishing supervisory responsibility for allowing access to such data, mandatory annual compliance programs for all employees, and creating multiple channels through which employees could escalate compliance issues. Significantly, the SEC does not allege that *any* Virtu employee actually misused MNPI. The absence of any such allegation of misuse is powerful confirmation that VAL's policies and procedures were effective

and "reasonably designed . . . to prevent the misuse . . . of material, nonpublic information."  15 U.S.C. § 78o(g).

*Second*, the Section 17(a) claims should be dismissed because the challenged statements were accurate and thus not actionable.  Virtu's public statements and client disclosures accurately described Virtu's policies, procedures and practices to protect sensitive client information.  Although the SEC alleges that these statements were misleading because Virtu did not refer to the hypothetical possibility that Virtu employees might access such information in contravention of Virtu's policies and trainings based on a technological issue relating to a single database (that was self-identified, reported to the SEC, and self-remediated by Virtu), the statements at issue accurately described Virtu's information barriers, policies and procedures.  The hypothetical possibility that Virtu employees might be able to access certain post-trade data due to this technological issue did not render Virtu's statements untrue that it maintained and enforced such information barriers, policies and procedures.

*Third*, the Section 17(a)(2) and (a)(3) claims should be dismissed in whole or in part because they are plainly time-barred.  The claims rely on statements made outside the applicable five-year limitations period.  Similarly, Section 17(a)(2) claims linked to customers where there is no allegation whatsoever that "money or property" was obtained during the Relevant Period[1] (let alone within the limitations period) should be dismissed.

*Finally*, the SEC's claims against VFI should be dismissed because (i) the Complaint does not allege that VFI engaged in any conduct beyond the challenged statements (as required by Section 17(a)(3)), (ii) VFI was not the source of those statements (as required by Section 17(a)(2)),

---

[1]    The Complaint defines the Relevant Period as January 2018 through April 2019.

and (iii) secondary liability as to VFI is unsustainable where the primary claims against VAL are time-barred.

## BACKGROUND

VAL is a registered broker-dealer that executes brokerage orders placed by institutional and retail customers, and also operates a proprietary trading business through which it buys and sells securities in its own account.  (Compl. ¶¶ 1, 8, 13.)  VAL is a subsidiary of VFI.  (*Id.* ¶ 13.)

As a registered broker-dealer, VAL was required to "establish, maintain, and enforce written policies and procedures reasonably designed . . . to prevent the misuse . . . of material, nonpublic information."  15 U.S.C. § 78o(g).  Although it never *actually* happened, the SEC alleges that VAL failed to comply with Section 15(g) because VAL's proprietary traders could have—hypothetically—accessed MNPI generated by VAL's customer brokerage business.

Specifically, the Complaint alleges that VAL's proprietary traders could access MNPI through VAL's Financial Systems Database ("FS Database"), which stored historical, post-trade execution information generated from trades executed on behalf of VAL's customers (as well as VAL's own proprietary trade data).  (Compl. ¶¶ 4, 19.)  During the Relevant Period, VAL employees could access the FS Database in one of two ways.  *First*, the employee could log into a graphical user interface ("GUI").  Employees accessing the FS Database through the GUI were required to enter their unique log-in credentials, which were tied to a user's individual status at VAL; these user-permissions blocked any access to data that the user was not permitted to access based on the user's role, function and specific data access needs (*i.e.*, "permissioning").  *Second*, some Virtu employees could access the FS Database directly through shared accounts called "viewonly" and "fsviewonly."  (*Id.* ¶¶ 16–18.)

In or around August 2018, VAL identified the possibility that certain traders could access non-permissioned post-trade data on the FS Database through those two shared accounts.  (*Id.*

¶ 24.)  VAL developers promptly began considering solutions for the technological issue, (*id.*), and successfully implemented a solution in April 2019, (*id.* ¶ 5).

As discussed below, at all times, Virtu's written policies and procedures firmly prohibited employees from accessing non-permissioned data regardless of their ability to access such data. Virtu not only trained employees on those policies, but also implemented other controls designed to detect and prevent suspicious or unusual trading (such as trading involving potential use of customer trade data).  (*Id.* ¶¶ 50–51, 53.)  Tellingly, the Complaint does not allege that any VAL trader *actually misused* any data by accessing the FS Database during the Relevant Period, which demonstrates the effectiveness of those policies and procedures.

## ARGUMENT

A motion to dismiss is properly granted where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 558 (2007).  In deciding a Rule 12(b)(6) motion, courts "must accept as true all of the factual allegations contained in the complaint," but not "legal conclusions couched as factual allegations." *Id.* at 555.

I.    **The Complaint Fails to State a Claim under Section 15(g) Because Documents Referenced by and Incorporated in the Complaint Establish that VAL's Written Policies and Procedures Complied with the Applicable Statutory Requirements.**

A.    **The Court May Properly Consider Documents Referenced by or Incorporated in the Complaint.**

On a Rule 12(b)(6) motion to dismiss, this Court may consider "statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff upon which it relied in bringing suit."  *Tongue* v. *Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016); *Edison Fund* v. *Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 217 (S.D.N.Y. 2008) (Koeltl, J.).

In particular, documents are deemed incorporated in the complaint when, as here, they are "directly quote[d]." *Edison*, 551 F. Supp. 2d at 217.  Accordingly, on this motion, the Court may properly consider, among other documents, VAL's Compliance Manual ("Compliance Manual"); VFI's Confidential Information Policy ("Confidential Information Policy"); Virtu's Sensitive Information, Information Barriers and Client Instructions Training Presentation ("2018 Information Barrier Training"); and Virtu's 2018 Annual Compliance Meeting Presentation ("2018 Compliance Presentation"), each of which is "directly quote[d]" multiple times throughout the Complaint.  (*See, e.g.*, Compl. ¶¶ 44, 50–54.)

## B.     The Complaint Should Be Dismissed Because Those Incorporated Documents Demonstrate That VAL Established, Maintained and Enforced Written Policies and Procedures in Accordance with Section 15(g).

Under Section 15(g), VAL was required to "establish, maintain, and enforce written policies and procedures reasonably designed . . . to prevent the misuse . . . of material, nonpublic information."  15 U.S.C. § 78o(g).  Documents incorporated and referenced in the Complaint demonstrate that VAL fully complied with these requirements.

### 1.     VAL Established Written Policies and Procedures Reasonably Designed to Prevent the Misuse of MNPI in Accordance with Section 15(g).

VAL established written policies and procedures to protect against the misuse of client data that are demonstrably reasonable.  These include prohibitions on misusing MNPI or accessing non-permissioned data, and physical and logical information barriers reasonably designed to prevent the misuse of MNPI.

**Prohibition on Misusing MNPI:**  VAL's policies expressly prohibited employees from misusing MNPI.  VAL's Compliance Manual strictly prohibited "[b]uying or selling securities on the basis of material non-public information," "[d]isclosing insider information to inappropriate personnel" and "[a]ssisting anyone transacting business on insider information through a third

party." (*See* Ex. 1, Compliance Manual at -945.[2])  The Complaint acknowledges that Virtu's policies also instructed employees to "only share [confidential information] within the company for bona-fide purposes." (Compl. ¶ 44 (quoting Ex. 2, Confidential Information Policy at -959).)

**Prohibition on Accessing Non-Permissioned Data Regardless of Physical or Technical Access:** VAL's policies expressly prohibited employees from accessing non-permissioned data, even if they had access to such data. VAL's Compliance Manual instructs that "[e]mployees are not permitted to access proprietary or client information that is not necessary to carry out their job responsibilities." (Ex. 1, Compliance Manual at -913.) That prohibition applied regardless of any ability to access non-permissioned data: "[h]aving physical access or systems access to this type of information does [not] equate to being authorized to access information." (*Id.*; *see also* Compl. ¶ 53 (acknowledging VAL's materials expressly instructed, "**[j]ust because you can access it does not mean that you are authorized to access/use/share it.**") (quoting Ex. 3, 2018 Information Barrier Training at -193) (emphasis added).) VAL's policies also required employees to report any instances of unintentional access to non-permissioned data: "Any instances of unintentional information barrier breaches should be promptly escalated to your supervisor and to Compliance/Legal particularly if it involves information sent or shared externally." (Ex. 3, 2018 Information Barrier Training at -200.)

**Physical and Logical Separation:** VAL implemented information barriers that included physical *and* logical separation. For example, the Compliance Manual provided for "physical and systemic separation between business groups so that the information possessed by one business group is not shared with other business groups who do not have a need to know about the information." (Ex. 1, Compliance Manual at -912.) The Compliance Manual expressly instructed

---

[2]   References to "Ex." refer to exhibits to the Declaration of Lorin L. Reisner.

that "[t]raders may only be assigned to one business, aggregation or trading unit at a time," and that "[t]raders should not share information about their own strategies or their clients' orders or strategies with traders in other units." (*Id.* at -912, -913.) The Complaint recognizes that, under the Compliance Manual, "information barrier processes [established at VAL] include both physical and systemic separation between business groups so that the information possessed by one business group is not shared with other business groups who do not have a need to know about the information." (Compl. ¶ 44 (quoting Ex. 1, Compliance Manual at -912).)

### 2.   VAL Maintained and Enforced Its Policies and Procedures in Accordance with the Requirements of Section 15(g).

VAL maintained and enforced its policies and procedures through training, establishing supervisory responsibility for permissioning, creating multiple channels for employees to escalate compliance issues, and implementing strategies to detect and prevent abnormal trading patterns.

**Mandatory Training:** Virtu maintained and enforced its written policies and procedures by providing mandatory training on information barriers and the protection of MNPI. As the Complaint acknowledges, VAL provided employees with a training in 2018 on "Sensitive Information, Information Barriers and Client Instructions" that instructed employees that they were not authorized to access, use or share data that was outside the scope of their job responsibilities even if they were technically able to access it:

> "Just because you can access it does not mean that you are authorized to access/use/share it."

(Compl. ¶ 53 (quoting Ex. 3, 2018 Information Barrier Training at -193).)

Thus, employee training sessions delivered a clear and consistent message about Virtu's expectations and employee obligations around sensitive information, including MNPI and client trade data.

7

**Supervisory Responsibility:**  Virtu established supervisory responsibility for determining permissioning status and communicated that responsibility to its employees.  Under Virtu's written policies and procedures, and as conveyed during Virtu's training sessions referenced in the Complaint, supervisors were responsible for ensuring that access to data was "appropriate for employees under their supervision" and "promptly updated when employees are transferred to other business units."  (Ex. 3, 2018 Information Barrier Training at -192; *see also* Ex. 4, 2018 Compliance Presentation at -705.)  Supervisors also were responsible for managing access to the FS Database through permissioning.  Significantly, in order to gain access to the FS Database, employees were first required to submit a request, which was subject to review by the employee's manager and by a member of VAL's Risk Committee.  Documents incorporated in the Complaint establish that this and other logical barriers were in place during the Relevant Period.  (*See* 2018 Compliance Presentation at -705.)

**Mandatory Annual Compliance Meetings:**  Virtu maintained and enforced its written policies and procedures through mandatory Annual Compliance Meetings, which emphasized protecting confidential information and information barriers.  These training sessions reminded employees of the logical and physical barriers in place at VAL, including systems and database entitlements and the need to ensure "sufficient separation between different trading desks, especially customer and non-customer."  (*See* Ex. 4, 2018 Compliance Presentation at -705.)  As the Complaint acknowledges, employees were reminded of their "duty to protect confidential information and discussed the importance of adjusting information barriers."  (Compl. ¶ 53 (referencing Ex. 4, 2018 Compliance Presentation).)

**Escalation and Anonymous Reporting of Compliance Issues:**  Virtu encouraged employees to escalate and report compliance issues and suspicious conduct, and provided clear

instructions for how to do so.  At its Annual Compliance meetings, VAL instructed employees that they "should always take note if [they] believe another market participant is acting in a disorderly manner" and "report these irregularities to the appropriate regulator" or seek assistance from Virtu's Compliance and Legal Departments.  (*See* Ex. 4, 2018 Compliance Presentation at -719; *see also* Compl. ¶ 53.)

**Lockdown Systems:**  The Complaint acknowledges that VAL "had several automated systems and policies in place," including lockdown systems to "detect abnormal trading activity and stop strategies from trading when unexpected activity or potential logic errors were detected based on pre-set parameters."  (Compl. ¶¶ 48, 50.)  Abnormal trading activity included unexpected gains or losses based on the trading strategy at issue.  (*See* Compl. ¶ 50; Ex. 1, Compliance Manual at -936.)

      **3.**      **The Hypothetical Possibility That Traders Could Access Non-Permissioned Post-Trade Data Through the FS Database Does Not Establish a Violation of Section 15(g).**

Although the Complaint acknowledges the existence of VAL's written policies and procedures to prevent the misuse of MNPI and the steps that VAL took to maintain and enforce those policies and procedures, the SEC nevertheless alleges that VAL violated Section 15(g) because VAL traders hypothetically could have accessed non-permissioned post-trade data through the FS Database.  (*See* Compl. ¶¶ 48–61.)

Under Section 15(g), the relevant inquiry is not whether VAL's policies and procedures were perfect, but whether when evaluated in an overall control framework, those policies and procedures were reasonable.  *See McDaniel* v. *Wells Fargo Investments, LLC*, 717 F.3d 668, 676–77 (9th Cir. 2013) (Section 15(g) "calls on securities firms to decide *for themselves* how best to" prevent misuse of MNPI); *In re Gabelli & Co., Inc. & Gamco Invs., Inc.*, Exchange Act Release

No. 1457, 1994 WL 684627, at *2 (Dec. 8, 1994) (same).[3]  Here, VAL's written policies and procedures—and the measures it has taken to maintain and enforce them—clearly satisfy the applicable standard as a matter of law.  The motion to dismiss should be granted because the only plausible inference from the Complaint and the documents referenced therein is that VAL established, maintained and enforced written policies and procedures reasonably designed to prevent the misuse of MNPI.  *See Bassaw* v. *United Indus. Corp.*, 482 F. Supp. 3d 80, 86 (S.D.N.Y. 2020) ("where only one inference may be drawn as to . . . reasonableness," then "it becomes a question of law that can be resolved on a motion to dismiss"); *Betts* v. *Shearman*, 2013 WL 311124, at *10–11 (S.D.N.Y. Jan. 24, 2013) (granting motion to dismiss where conduct was "objectively reasonable under the circumstances"), *aff'd*, 751 F.3d 78 (2d Cir. 2014).

Although the Complaint alleges that VAL "had no policies and procedures in place [to] directly address the FS Database," (Compl. ¶ 44), documents referenced or incorporated in the Complaint show that VAL's written policies and procedures applied company-wide and addressed all databases, including the FS Database.  (*See* Ex. 1, Compliance Manual at -901 ("All U.S. employees are expected to be familiar with and to comply with the policies set forth in this manual.").)  In other words, VAL's policies prohibited precisely the hypothetical misuse of customer trade data that is alleged by the SEC.  Notably, Section 15(g) does not require that every separate database have its own separate policy or procedures.

Similarly, although the Complaint claims that VAL's trainings "did not constitute policies and procedures reasonably designed to protect MNPI" because they "did nothing to stop proprietary traders from [hypothetically] accessing post-trade information if they attempted to do

---

[3]     SEC, STAFF SUMMARY REPORT ON EXAMINATIONS OF INFORMATION BARRIERS: BROKER-DEALER PRACTICES UNDER SECTION 15(G) OF THE SECURITIES EXCHANGE ACT OF 1934 (2012), at 6–7 ("Broker-dealers must make judgment calls between the need for information against the restrictions required[.]").

so," (Compl. ¶ 53), VAL's training programs underscored the prohibition on accessing non-permissioned data and misusing MNPI, and were an integral part of how these policies were reinforced to employees. VAL instructed its employees that "[j]ust because you can access [MNPI] does not mean that you are authorized to access/use/share it." (*See* Ex. 3, 2018 Information Barrier Training at -193.) VAL's trainings thus expressly addressed the hypothetical misuse of data raised by the SEC. And, to backstop its written policies and trainings, VAL employed lockdown systems to detect aberrational trading patterns that would indicate misuse of customer trade data by employees.

Significantly, the SEC does not allege anywhere that any Virtu employee actually accessed, let alone misused, MNPI during the Relevant (or any other) Period. The absence of any such allegation of actual (as opposed to hypothetical) misuse of MNPI through the FS Database is powerful and conclusive evidence that VAL's many policies and procedures were effective, and therefore reasonably designed, maintained and enforced in accordance with Section 15(g).[4]

## II.   The Claims Asserted under Section 17(a) Should Be Dismissed Because the Complaint Fails to Plead Falsity as a Matter of Law.

The SEC's Section 17(a) claims should be dismissed because they are based on statements that were accurate, not misleading, and therefore not actionable as a matter of law. Accurate statements of fact, standing alone, are not actionable under the securities laws. *Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021). Moreover, a company's accurate statements describing its plans or actions are not made false simply because the plans were unsuccessful. *See SEC* v. *Wellshire Sec., Inc.*, 773 F. Supp. 569, 576 (S.D.N.Y. 1991) ("fraud by hindsight" does not constitute a violation of the securities laws); *In re Fairway*

---

[4]   Although Virtu believes there is no proper basis for the SEC's characterization of the historical, post-trade data stored in the FS Database as MNPI, the Court need not reach this issue as Virtu accepts that characterization for the purposes of this motion.

*Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *14 (S.D.N.Y. Aug. 19, 2015), *report and recommendation adopted*, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015) (statements that a company had a "proven ability to replicate [its] store model," and "infrastructure investments to support growth," were accurate at the time they were made and thus not actionable).

### A.    Defendants' Statements Regarding Policies and Procedures to Safeguard Sensitive Client Information Were Accurate.

The SEC first challenges statements asserting that Virtu "established policies and procedures *designed* to safeguard sensitive client information including technology access controls to segregate sensitive information and review of approved personnel and permissions," including "physical separation, logical access control and entitlement reviews."  (Compl. ¶ 28 (emphasis added) (quoting Nov. 7, 2018 and Mar. 13, 2019 public presentations and Nov. 2018 earnings call and presentation); *see also id.* ¶ 29 (quoting Mar. 1, 2019 letter to customers).)  Likewise, the Complaint asserts that VAL made misleading statements in response to customer questionnaires by stating that it had in place "encryption/password protection" and "access controls" to protect client confidential information, (Compl. ¶ 35); maintained "information barrier policies and procedures that are *designed* to segregate client orders," (*Id.* ¶ 39 (emphasis added)); and maintained "information barriers . . . *designed* to prevent the sharing of customer order and trade information with individuals who are not authorized to receive and/or who have no bona fide business purpose for accessing such data," (*Id.* ¶ 40) (emphasis added).

Those statements, however, were accurate when made, and the SEC concedes that policies and procedures "designed" to safeguard client information—including technology access controls, physical separation, and review of approved personnel—were in place.  (*Id.* ¶¶ 44–45.)  Virtu's information barriers included physical separation and logical access controls, alongside entitlement and permissioning reviews.  The challenged statements thus conveyed accurate

historical facts and information about the existence of policies and procedures "*designed*" to prevent access to and misuse of sensitive information and are therefore not actionable.  *See In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 569 (S.D.N.Y. Mar. 30, 2011) (statement was not actionable because it "convey[ed] a clear and accurate historical fact" and "[n]o reasonable investor would have construed this statement to make any representation regarding any of the omitted facts").

The SEC asserts that these accurate statements are nevertheless actionable because Virtu did not refer to the temporary and hypothetical access to non-permissioned post-trade data on the FS Database using direct access.  To plead falsity by "half-truth," the plaintiff must make "specific allegations that the defendant possessed information (1) at the time the challenged statement was made, (2) that concerned the topic referenced in that statement, and (3) that contradicted representations in that statement."  *In re Ferroglobe PLC Sec. Litig.*, 2020 WL 6585715, at *6 (S.D.N.Y. Nov. 10, 2020).  The Complaint does not meet that standard.  That employees *hypothetically* could access the FS Database directly to obtain post-trade customer trade data does not contradict representations in any of VAL's statements that systems were "designed"—and in place—to prevent that from happening.  *See  In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 587 (S.D.N.Y. 2006) ("As a matter of law, no **s**tatements regarding [defendant's] *accurately* reported revenue and income have been rendered materially misleading by failing to disclose that such income was 'unsustainable.'") (emphasis added).

Virtu's written policies and procedures still applied to direct access to the FS Database.  Virtu's written policy prohibited employees from accessing non-permissioned data even if they had physical access to such data.  (Compl. ¶ 53 ("Just because you can access it does not mean you are authorized to access/use/share it").)  Any omitted information about direct access to the

FS Database therefore was not inconsistent with Virtu's statements. *See In re Philip Morris Int'l Inc. Sec. Litig.*, 2021 WL 4135059, at *11 (S.D.N.Y. Sept. 10, 2021) (rejecting allegations of falsity because plaintiffs "failed to plausibly allege that the omitted [information] was inconsistent with Defendants' statements"). Nor could any reasonable customer or investor understand Virtu's statements to mean that every measure taken by Virtu was infallible or immune to any hypothetical risks (such as an employee ignoring policies prohibiting direct access when not permissioned). *See Barilli* v. *Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 252 (S.D.N.Y. 2019) (finding no support for the proposition that "there is a duty to disclose negative facts that do not render disclosed statements misleading"); *Danske Bank*, 11 F.4th at 98 (noting generally that companies "do not have a duty to disclose uncharged, unadjudicated" hypothetical wrongdoing under the securities laws).

## B. Defendants' Statements Regarding Access to Customer Information Were Accurate.

Virtu's statements regarding employee access to trade information were also accurate and therefore not actionable. The SEC alleges that VAL made misleading statements in response to customer questionnaires asking about access controls because it failed to disclose that employees had direct access to the FS Database. (*See* Compl. ¶¶ 34–40.) Each of the challenged statements, however, was accurate and not actionable based on the allegations in the Complaint and documents referenced by or incorporated in the Complaint.

As the Complaint acknowledges, Virtu's policies prohibited employees from viewing non-permissioned data, (*id.* ¶ 53), and the SEC has not alleged that there is any reason to believe these policies were not followed. *See In re Sanofi-Aventis*, 774 F. Supp. 2d at 569; *In re Philip Morris*, 2021 WL 4135059, at *11. Moreover, as to several of the challenged statements—including the March 2018 response to Customer F questionnaire, July 2018 response to Customer E

14

questionnaire, and the August 2018 response to Customer D questionnaire—the Complaint alleges that Virtu became aware of contradictory information (on August 13, 2018) only *after* the statements were made.  Because "fraud by hindsight," does not constitute a violation of the securities laws, *Wellshire*, 773 F. Supp. at 576, these statements are not actionable.

### C. Defendants' Statements Regarding Maintenance and Enforcement of Information Barriers Were Accurate.

Virtu's statements regarding its intent to continue to maintain and enforce information barriers similarly are not actionable because they are true.  The Complaint alleges VFI's statement that it "intends to continue to maintain and enforce appropriate information barriers to segment and protect client data" was misleading "because at the time, VAL failed to adequately implement and enforce its information barriers as to the direct access permissioning of the FS Database." (Compl. ¶ 30.)  The Complaint and documents incorporated therein describe Virtu's extensive policies, procedures and training programs concerning client information and information barriers. (Compl. ¶¶ 44–45, 53.)  The mere hypothetical ability to access non-permissioned trade data through direct access did not render untrue Virtu's statements that it maintained and enforced information barriers.  Virtu's statements regarding its future intentions also were true and not misleading.  As the Complaint acknowledges, once Virtu identified a means of accessing non-permissioned data, Virtu worked to remedy the issue, tested various solutions, and ultimately implemented a successful fix.  (Compl. ¶¶ 5, 49.)

### III. The SEC's Section 17(a) Claim Is Time-Barred to the Extent It Seeks Civil Penalties and Disgorgement in Reliance on Statements Made Outside the Limitations Period and for which the Complaint Contains No Allegation of Related Activity within the Limitations Period.

Portions of the SEC's Section 17(a) claim are time-barred and should be dismissed.  *See, e.g.*, *Ramirez* v. *CSJ & Co., Inc.*, 2007 WL 700831, at *2 (S.D.N.Y. Mar. 6, 2007) (granting dismissal of time-barred claims).  Defendants may raise a statute-of-limitations defense in a motion

to dismiss "if the defense appears on the face of the complaint." *Staehr* v. *Hartford Fin. Servs. Grp., Inc*., 547 F.3d 406, 425 (2d Cir. 2008).  Here, it does.

The applicable limitations period to the SEC's Section 17(a) claim for civil penalties and disgorgement is the five-year statute of limitations imposed by Section 2462.  28 U.S.C. § 2462; *Kokesh* v. *SEC*, 581 U.S. 455, 467 (2017).  Dismissal on statute of limitations grounds "applies with particular force to § 2462, which prohibits the court from 'entertain[ing]' actions that accrued more than five years earlier and seeking certain forms of relief."  *SEC* v. *Cohen*, 332 F. Supp. 3d 575, 587 (E.D.N.Y. 2018).  There is particular concern about the timeliness of claims under Section 2462 because "[a]llowing discovery to proceed with respect to claims that appear to be time-barred on the face of a plaintiff's complaint would constitute 'entertain[ing]' those claims, which § 2462 clearly prohibits."  *Id.*

Here, the SEC filed its Complaint on September 12, 2023.  Accordingly, only claims that accrued on or after September 12, 2018 fall within the limitations period.  (*See* Compl. ¶ 22 n.1).  Yet the SEC's Section 17(a) claim relies in part on statements made *prior* to September 12, 2018, without alleging any act within the applicable five-year limitations period.[5]  Specifically, the SEC relies on VAL's: (i) August 2018 response to a questionnaire from "Customer D"; (ii) July 2018 response to a questionnaire from "Customer E"; and (iii) March 2018 response to a questionnaire from "Customer F."  (*Id.* ¶¶ 38–40.)  To the extent the Section 17(a) claim seeking civil penalties or disgorgement relies upon these responses, the Complaint is untimely because it does not allege any act relating to these questionnaires within the applicable five-year limitations period.

---

[5]  During a November 20, 2023 telephone pre-motion conference with the Court, the SEC represented that it was not seeking any monetary penalties for any conduct outside of the five-year limitations period and stated that any statements quoted in the Complaint from outside the period are relevant only to the injunctive relief sought.

16

Although the Complaint alleges that four of the six total customers that received the responses at issue "continued to place orders using VAL's execution services during the Relevant Period," (*id.* ¶ 32), it only asserts that Customers B and C did so and contains no allegation that Customers D, E or F took any act associated with the questionnaires during the Relevant Period. Thus, the Section 17(a) claim for civil penalties or disgorgement is untimely and should be dismissed to the extent it relies on the questionnaire responses to Customers D, E and F.

The court's decision in *Cohen* is particularly instructive.  There, the SEC argued that its claims for disgorgement were not time-barred because they accrued each time defendants received allegedly ill-gotten gains as a result of the challenged transactions.  *Id.* at 591.  The court rejected that argument and dismissed the SEC's claims for disgorgement as untimely, reasoning that, even if the SEC's position was correct, the SEC failed to allege that defendants did, in fact, receive any ill-gotten gains.  *Id.*  As in *Cohen*, the SEC has failed to allege any activity by VAL, VFI or the customers themselves in connection with the allegedly misleading questionnaire responses issued to Customers D, E or F, other than the pre-September 12, 2018 questionnaires and responses. Accordingly, the SEC's Section 17(a) claim for civil penalties and disgorgement associated with Customers D, E and F is untimely and should be dismissed.

## IV.   The SEC's Section 17(a) Claim Against VFI Seeking Civil Penalties and Disgorgement Associated with Customers D, E and F Also Should Be Dismissed Because It Is Based on an Unsupportable Allegation of Secondary Liability.

The Complaint acknowledges that it was VAL—not VFI—that responded to the questionnaires from Customers D, E and F.  (*See* Compl. ¶¶ 38–40.)  Accordingly, if the Section 17(a) claim is dismissed against VAL because it is time-barred with respect to Customers D, E, and F, it must also be dismissed to the same extent against VFI.  *See, e.g.*, *In re Bibox Grp. Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326, 338 n.4 (S.D.N.Y. 2021) ("The same statutes of

limitations that apply to primary claims under the 1933 and 1934 Acts also apply to control person claims.").

## V.	The Complaint Fails to State a Section 17(a)(2) Claim to the Extent It Relies on Statements Made to Customers That Did Not Place Orders through VAL during the Relevant Period.

The Section 17(a)(2) claim should be dismissed to the extent it relies on statements made to customers who did not place any orders through VAL during the Relevant Period.  Section 17(a)(2) requires that a plaintiff plead that "money or property" was obtained through the alleged conduct.  *SEC* v. *Farnsworth*, 2023 WL 5977240, at *19 (S.D.N.Y. Sept. 14, 2023) (quoting 15 U.S.C. § 77q).

Here, the Section 17(a)(2) claim relies on questionnaire responses provided by VAL to six of its customers, (*see* Compl. ¶¶ 31–40), but the Complaint identifies only two customers that placed orders during the Relevant Period (or within the limitations period) after receiving the questionnaire responses:  Customers B and C (*see id.* ¶¶ 35–39).  The SEC generally asserts that "four of the[] customers continued to place orders using VAL's execution services during the Relevant Period." (Compl. ¶ 41.)  But for Customers A, D, E and F, the SEC fails to allege that VAL executed any trades on their behalf during the Relevant Period and, by necessary implication, failed to allege that VAL or VFI obtained any commissions or other "money or property" by means of the questionnaire responses to those four customers.  Accordingly, the SEC has failed to state a Section 17(a)(2) claim to the extent it relies upon questionnaire responses to these four customers.

In *Farnsworth*, this Court dismissed the SEC's Section 17(a)(2) claim due to its failure to plead this element, because it had only "vaguely alleged that [defendants] obtained 'bonus payments' and 'increased compensation'" but did not "offer[] any insight into how the compensation could be linked directly or indirectly to the fraud."  2023 WL 5977240, at *19.  As in *Farnsworth*, with respect to VAL's questionnaire responses to Customers A, D, E and F, the

SEC has only vaguely alleged that Virtu profited from the questionnaire responses because such responses, as a general matter, "deprived . . . customers of an opportunity to make an informed decision about how to protect their trade data."  (Compl. ¶ 41.)  It did not allege, however, that money obtained by Virtu "could be linked directly or indirectly" to the questionnaire responses received by these customers.  Moreover, the SEC has alleged that only "four of the[] [six] customers continued to place orders using VAL's execution services during the Relevant Period." (Compl. ¶ 32.)  Accordingly, for two of the six customers, the SEC not only fails to explain how any compensation could be linked to the questionnaire responses they received, but concedes that there could not have been *any* compensation linked to those responses.  (*See id.* ¶ 32.)

The SEC's Section 17(a)(2) claim should therefore be dismissed to the extent that it relies on the questionnaire responses issued to Customers A, D, E and F.

## VI.   The SEC's Section 17(a) Claim Against VFI Is Fatally Flawed and Should Be Dismissed.

### A.   The SEC Has Failed to Allege That VFI Engaged in Conduct Beyond Misrepresentations as Required under Section 17(a)(3).

The SEC fails to allege that VFI engaged in conduct beyond misrepresentations as required to state a claim under Section 17(a)(3).  Under Section 17(a)(3), the SEC must allege that defendants undertook a "deceptive scheme or course of conduct that went beyond the misrepresentations" covered by 17(a)(2),  *SEC*  v. *Stoker*, 865 F. Supp. 2d 457, 467 (S.D.N.Y. 2012), because in the Second Circuit, misstatements and omissions—without more—cannot form the basis for liability, *see SEC* v. *Rio Tinto plc*, 41 F.4th 47, 49, 53 (2d Cir. 2022).

Courts outside the Second Circuit similarly recognize that misstatements alone are insufficient to state a claim under Section 17(a)(3).  *See SEC* v. *RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 31 (D.D.C. 2017) ("Liability may arise under Section 17(a)(2) and 17(a)(3) based on the same set of facts, but only if the plaintiff alleges both that the defendants made misrepresentations in

violation of the statute, and that the defendants undertook a deceptive course of conduct that went beyond the misrepresentations."); *Pub. Pension Fund Grp.* v. *KV Pharm. Co.*, 679 F.3d 972, 987 (8th Cir. 2012) ("We join the Second and Ninth Circuits in recognizing a scheme liability claim must be based on conduct beyond misrepresentations or omissions.").

Here, the SEC fails to allege that VFI engaged in *any* action beyond the misstatements, as required to establish a Section 17(a)(3) claim. The very first paragraph of the SEC's Complaint makes clear that "[t]his matter relates to *false and misleading statements by Defendant VFI*" and "*VAL's* associated failure to establish, maintain, and enforce policies and procedures." (Compl. ¶ 1 (emphasis added).) Throughout the Complaint, the SEC's allegations regarding VFI are focused solely on alleged misrepresentations and omissions, which are insufficient under Section 17(a)(3). (*See id.* ¶¶ 6, 28, 30 (describing alleged misstatements of VFI without reference to other actions).)

The SEC's only attempt to allege that VFI engaged in action beyond the alleged misrepresentations occurs in Paragraphs 7 and 29, where the SEC alleges that "Defendants" disseminated a letter signed by VFI's CEO to existing VAL customers. (Compl. ¶¶ 7, 29.) This action is insufficient to make a Section 17(a)(3) claim. No court in the Second Circuit has held that sending *one* alleged misstatement covered under Section 17(a)(2) is sufficient to give rise to a Section 17(a)(3) claim. Instead, courts require more. Specifically, courts have noted that liability under Section 17(a)(3) is "generally" triggered where the defendant "performed an inherently deceptive act that was *distinct* from an alleged misstatement:  *i.e.*, sham agreements, sham transactions, sham companies, or undisclosed payments to doctors who appeared independent." *Farnsworth*, 2023 WL 5977240, at *18 (emphasis added); *see also SEC* v. *Glantz*, 1995 WL 562180, at *5 (S.D.N.Y. Sept. 20, 1995) (17(a)(3) standard satisfied where defendants manipulated

investment financing, persuaded multiple people to invest and created "fictitious [financial] instruments"). No such allegations are made here.

Further, all that the SEC alleges in Paragraphs 7 and 29 of the Complaint is that "Defendants" disseminated a letter to VAL customer email addresses. Even if VFI was involved in disseminating the letter, as described in Section II, *supra*, disseminating this statement cannot form the basis for a Section 17(a)(3) claim because the letter was true and not misleading. Specifically, the letter contains a statement from the CEO of VFI noting that "[p]rior to merging both Virtu and ITG each maintained our own procedures to segregate and protect sensitive client data." (*Id.* ¶ 29.) This is true and the SEC does not allege otherwise. Dissemination of a *true* statement, without more, is not a deceptive or fraudulent act actionable under Section 17(a)(3). *See River Birch Cap., LLC* v. *Jack Cooper Holdings Corp.*, 2019 WL 1099943, at *5 (S.D.N.Y. Mar. 8, 2019).

Other references to VFI in the Complaint similarly do not describe "deceptive" actions sufficient to state a claim under Section 17(a)(3). The allegation in Paragraph 7 that VFI took "further steps described herein to engage in a practice or course of conduct that operated or would operate as a fraud or deceit upon purchasers" fails to meet the standard as the "steps described" are *exclusively* misstatements, with the possible exception of Paragraph 29, which is insufficient for the reasons described above. Paragraphs 15, 19 and 24 describe VFI's acquisitions, with no suggestion that the transactions were improper. Similarly, the SEC's statement that VFI "profited" from VAL and reported earnings in Paragraph 41 does not contain an allegation that the actions were deceptive or fraudulent.

As the SEC has failed to allege that VFI took part in any deceptive conduct beyond misrepresentations, the Section 17(a)(3) claim against VFI must be dismissed.

21

### B.    VFI Is Not Liable for VAL's Statements under Section 17(a)(2).

The Section 17(a)(2) claim against VFI is fatally flawed to the extent it rests upon statements allegedly made exclusively by VAL without VFI's involvement.  Six of the eleven alleged misstatements in the Complaint relate to statements made by VAL to VAL customers in due diligence questionnaires (the "VAL DDQ" statements).  As explained above, none of these statements give rise to a Section 17(a)(2) violation because those statements were accurate, and three of the statements are time-barred.

Yet even if the VAL DDQ statements *were* timely *and* actually misleading, VAL's DDQ statements cannot form the basis of a Section 17(a)(2) claim against VFI absent *any* VFI involvement.  The law is clear that a defendant cannot be held liable under Section 17(a)(2) for a statement it played no role in making, disseminating or influencing.   "To succeed on a misstatement claim under . . . Section 17(a)(2), the SEC must prove that the defendant made materially false statements or omissions."  *SEC* v. *Kelly*, 817 F. Supp. 2d 340, 345 (S.D.N.Y. 2011); *see also SEC* v. *Rio Tinto plc*, 2019 WL 1244933, at *17 (S.D.N.Y. Mar. 18, 2019) ("The Court agrees with the analysis in *Kelly*, which holds that for an individual to be held liable under Section 17(a), she must be the 'maker' of a statement pursuant to the Supreme Court's decision in *Janus*."); *but see SEC* v. *Hurgin*, 484 F. Supp. 3d 98, 116–17 (S.D.N.Y. 2020).

Here, the SEC has failed to allege that VFI played any role in preparing, influencing, making or disseminating the VAL DDQ statements that partially form the basis for the SEC's 17(a)(2) claim.  Instead, the Complaint acknowledges that the VAL DDQ statements are *between VAL and VAL customers* and does not allege that these communications were made, disseminated or otherwise influenced by VFI.  (*See* Compl. ¶ 31 ("Customers *of VAL's* execution services periodically *sent VAL* due diligence questionnaires (DDQs) for VAL to complete and return.")

(emphasis added).)   As the SEC fails to allege that VFI was involved with the VAL DDQ statements in *any* way, VFI cannot be held liable under 17(a)(2) with respect to these statements.

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed with prejudice in its entirety.

Dated: December 4, 2023
New York, New York

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By: _Lorin L. Reisner_
Lorin L. Reisner
Andrew G. Gordon
Jessica S. Carey
Daniel H. Levi
Emily M. Hoyle
1285 Avenue of the Americas
New York, New York 10019
Tel.: (212) 373-3000

Paul D. Brachman
2001 K Street, NW
Washington, DC 20006-1047
United States
Tel.: (202) 223-7300

*Attorneys for Virtu Financial, Inc. and Virtu Americas LLC*

## CERTIFICATION OF COMPLIANCE

I hereby state that the foregoing Memorandum of Law was prepared on a computer using Microsoft Word. Pursuant to the word count system in Microsoft Word, the total number of words in the Brief, excluding the caption, table of contents, table of authorities, signature block, and this certification is 6,892.

Dated: December 4, 2023
         New York, New York

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By: _____
    Lorin L. Reisner
    Andrew G. Gordon
    Jessica S. Carey
    Daniel H. Levi
    Emily M. Hoyle
    1285 Avenue of the Americas
    New York, New York 10019
    Tel.: (212) 373-3000

    Paul D. Brachman
    2001 K Street, NW
    Washington, DC 20006-1047
    United States
    Tel.: (202) 223-7300

    *Attorneys for Virtu Financial, Inc. and Virtu Americas LLC*