## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

               Plaintiff,

      v.

VIRTU FINANCIAL, INC. and
VIRTU AMERICAS LLC,

             Defendants.

**Civil Action No. 1:23-cv-8072-JGK**


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Lorin L. Reisner
Andrew G. Gordon
Jessica S. Carey
Paul D. Brachman
Daniel H. Levi
Emily M. Hoyle
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Tel.: (212) 373-3000
lreisner@paulweiss.com

*Attorneys for Virtu Financial, Inc. and Virtu
Americas LLC*

Dated:  February 12, 2024

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ......................................................................................................3

ARGUMENT..........................................................................................................4

I.   The Amended Complaint Fails to State a Claim under Section 15(g) Because
     Documents Referenced by and Incorporated in the Amended Complaint Establish
     That VAL's Written Policies and Procedures Complied with the Applicable
     Statutory Requirements...................................................................................5

     A.   The Court May Properly Consider Documents Referenced by or
          Incorporated in the Amended Complaint......................................................5

     B.   The Amended Complaint Should Be Dismissed Because Those
          Incorporated Documents Demonstrate That VAL Established, Maintained
          and Enforced Written Policies and Procedures in Accordance with Section
          15(g)........................................................................................................5

          1.   VAL Established Written Policies and Procedures Reasonably
               Designed to Prevent the Misuse of MNPI in Accordance with
               Section 15(g).....................................................................................6

          2.   VAL Maintained and Enforced Its Policies and Procedures in
               Accordance with the Requirements of Section 15(g). .................................8

          3.   The Hypothetical Possibility That Traders Could Access Non-
               Permissioned Post-Trade Data Through the FS Database Does Not
               Establish a Violation of Section 15(g). ....................................................10

II.  The Claims Asserted under Section 17(a) Should Be Dismissed Because the
     Amended Complaint Fails to Plead Falsity as a Matter of Law. .........................12

     A.   Defendants' Statements Regarding Policies and Procedures to Safeguard
          Sensitive Client Information Were Accurate.............................................. 13

     B.   Defendants' Statements Regarding Access to Customer Information Were
          Accurate. ............................................................................................. 15

     C.   Defendants' Statements Regarding Maintenance and Enforcement of
          Information Barriers Were Accurate. ...................................................... 15

III. Section 17(a) Claims Based on Generalizations and Aspirational Statements
     Should Be Dismissed Because They Are Not Actionable as a Matter of Law..................16

IV.    The SEC's Section 17(a)(3) Claim Against VFI Is Fatally Flawed and Should Be Dismissed Because It Fails to Allege That VFI Engaged in Conduct Beyond Misrepresentations as Required under Section 17(a)(3)...................................................19

CONCLUSION...........................................................................................................................23

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Australia & New Zealand Banking Grp. Ltd. Sec. Litig.*,
    2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) ....................................................18, 19

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
    456 F. Supp. 2d 576 (S.D.N.Y. 2006)...................................................................14

*Barilli* v. *Sky Solar Holdings, Ltd.*,
    389 F. Supp. 3d 232 (S.D.N.Y. 2019)...................................................................14

*Bassaw* v. *United Indus. Corp.*,
    482 F. Supp. 3d 80 (S.D.N.Y. 2020).....................................................................11

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007).................................................................................................4, 5

*Betts* v. *Shearman*,
    2013 WL 311124 (S.D.N.Y. Jan. 24, 2013), *aff'd*, 751 F.3d 78 (2d Cir. 2014)....................11

*In re Bibox Grp. Holdings Ltd. Sec. Litig.*,
    534 F. Supp. 3d 326 (S.D.N.Y. 2021)...................................................................19

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..............................................................................16, 17

*Edison Fund* v. *Cogent Inv. Strategies Fund, Ltd.*,
    551 F. Supp. 2d 210 (S.D.N.Y. 2008)......................................................................5

*In re Ferroglobe PLC Sec. Litig.*,
    2020 WL 6585715 (S.D.N.Y. Nov. 10, 2020) .......................................................14

*Grant* v. *Ursula Mgmt., LLC*,
    2021 WL 8382243 (E.D.N.Y. Oct. 6, 2021)..........................................................17

*In re Gabelli & Co., Inc. & Gamco Invs., Inc.*, Exchange Act Release No. 1457,
    1994 WL 68462 (Dec. 8, 1994) .............................................................................10

*SEC* v. *Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011).............................................................20, 22

*Lorenzo* v. *SEC*,
    139 S. Ct. 1094 (2019)............................................................................................21

*McDaniel* v. *Wells Fargo Investments, LLC*,
    717 F.3d 668 (9th Cir. 2013) ...................................................................10

*Menaldi* v. *Och-Ziff Cap. Mgmt. Grp. LLC*,
    277 F. Supp. 3d 500 (S.D.N.Y. 2017)..............................................16, 17

*SEC* v. *Monarch Funding Corp.*,
    192 F.3d 295 (2d Cir. 1999)...........................................................................19

*Ong* v. *Chipotle Mexican Grill, Inc.*,
    294 F. Supp. 3d 199 (S.D.N.Y. 2018)..............................................17, 18

*In re Philip Morris Int'l Inc. Sec. Litig.*,
    2021 WL 4135059 (S.D.N.Y. Sept. 10, 2021)...............................14, 15

*Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank A/S*,
    11 F.4th 90 (2d Cir. 2021) ...............................................12, 14, 15

*Pub. Pension Fund Grp.* v. *KV Pharm. Co.*,
    679 F.3d 972 (8th Cir. 2012) .........................................................................20

*SEC* v. *Rio Tinto plc*,
    41 F.4th 47 (2d Cir. 2022) ...............................................19, 20, 21

*Rombach* v. *Chang*,
    355 F.3d 164 (2d Cir. 2004)...........................................................................16

*SEC* v. *RPM Int'l, Inc.*,
    282 F. Supp. 3d 1 (D.D.C. 2017)..................................................................20

*In re Sanofi-Aventis Sec. Litig.*,
    774 F. Supp. 2d 549 (S.D.N.Y. Mar. 30, 2011) ...........................13, 14, 15

*SEC* v. *Stoker*,
    865 F. Supp. 2d 457 (S.D.N.Y. 2012)...........................................19, 20

*Tongue* v. *Sanofi*,
    816 F.3d 199 (2d Cir. 2016)...........................................................................5

*SEC* v. *Wellshire Sec., Inc.*,
    773 F. Supp. 569 (S.D.N.Y. 1991) ...............................................12, 15

**Statutes**

15 U.S.C. § 77q............................................................................... *passim*

15 U.S.C. § 78o(g) ........................................................................... *passim*

28 U.S.C. § 2462................................................................................19

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)...........................................................................................................1, 4

SEC, STAFF SUMMARY REPORT ON EXAMINATIONS OF INFORMATION BARRIERS:
    BROKER-DEALER PRACTICES UNDER SECTION 15(G) OF THE SECURITIES
    EXCHANGE ACT OF 1934 (2012)..............................................................................................10

Defendants Virtu Financial, Inc. ("VFI") and Virtu Americas LLC ("VAL") (together, "Virtu") submit this memorandum of law in support of their motion to dismiss the Amended Complaint filed by Plaintiff Securities and Exchange Commission ("SEC") pursuant to Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

Following a lengthy multi-year investigation, the SEC alleged in its original complaint that VAL failed to "establish, maintain, and enforce written policies and procedures reasonably designed . . . to prevent the misuse . . . of material, nonpublic information" in violation of Section 15(g) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78o(g), and, as a result, that Virtu made false statements regarding its safeguards for such information in violation of Sections 17(a)(2) and (a)(3) of the Securities Act of 1933 ("Securities Act"). Virtu moved to dismiss, arguing that, among other things, the SEC's complaint failed to state a claim because VAL's policies and procedures complied with the statutory requirements of Section 15(g), and because Virtu's statements about those policies were accurate and thus not actionable under Section 17(a). Nothing in the SEC's newly filed Amended Complaint cures those fundamental defects. The Amended Complaint should therefore be dismissed.

*First*, the Section 15(g) claim should be dismissed because the documents referenced by and incorporated in the Amended Complaint *still* conclusively establish that VAL's policies and procedures complied with all applicable statutory requirements. Those documents demonstrate that VAL established written policies and procedures "reasonably designed" to prevent the misuse of material, nonpublic information ("MNPI"), including, among other things, written policies and procedures providing for: (1) prohibitions on the misuse of such information; (2) prohibitions on accessing certain data; and (3) physical and logical information barriers. These documents further demonstrate that VAL maintained and enforced these policies and procedures through, *inter alia*,

mandatory training sessions for all employees, establishing supervisory responsibility for allowing access to such data, mandatory annual compliance programs for all employees, and creating multiple channels through which employees could escalate compliance issues. As with the initial complaint, no allegations in the Amended Complaint contradict those basic facts, nor could they: the documents speak for themselves. And, significantly, Virtu pointed out in its first motion to dismiss that the SEC had not alleged that *any* Virtu employee actually misused MNPI. No such allegation appears in the Amended Complaint either. The persistent absence of any alleged misuse of MNPI is powerful confirmation that VAL's policies and procedures were effective and "reasonably designed . . . to prevent the misuse . . . of material, nonpublic information." 15 U.S.C. § 78o(g).

*Second*, the Section 17(a) claims should be dismissed because the challenged statements were accurate and thus not actionable. Virtu's public statements and client disclosures accurately described Virtu's policies, procedures and practices to protect sensitive client information. As in the initial complaint, the SEC alleges that these accurate statements were nevertheless misleading because Virtu did not refer to the hypothetical possibility that Virtu employees might access such information in contravention of Virtu's policies and trainings based on a temporary technological issue relating to a single database (that was self-identified, reported to the SEC, and self-remediated by Virtu). But the hypothetical possibility that Virtu employees might be able to access certain post-trade data due to this technological issue for a relatively brief period of time did not render untrue Virtu's statements that it maintained and enforced information barriers, policies and procedures.

*Third*, the Section 17(a) claims should be dismissed to the extent that they are based on non-actionable generalizations and aspirational statements to the general public that would not be

material to any reasonable person. General statements indicating that policies and procedures are designed or intended to protect sensitive client information are not actionable because they do not guarantee an outcome or express absolute assurances regarding the efficacy of the policies and procedures. Likewise, aspirational forward-looking statements about policies a company intends to implement in the future also are not actionable.

*Finally*, the SEC's Section 17(a)(3) claim against VFI should be dismissed because the Amended Complaint, like the initial complaint, does not allege that VFI engaged in conduct beyond the challenged statement themselves, as required for scheme-liability under Section 17(a)(3).

## BACKGROUND

VAL is a registered broker-dealer that executes brokerage orders placed by institutional and retail customers, and also operates a proprietary trading business through which it buys and sells securities in its own account. (Am. Compl. ¶¶ 1, 8, 13.) VAL is a subsidiary of VFI. (*Id.* ¶ 13.)

As a registered broker-dealer, VAL was required to "establish, maintain, and enforce written policies and procedures reasonably designed . . . to prevent the misuse . . . of material, nonpublic information." 15 U.S.C. § 78o(g). The SEC does not allege any misuse of MNPI. Rather, although such misuse never *actually* happened, the SEC alleges that VAL failed to comply with Section 15(g) because VAL's proprietary traders could have—hypothetically—accessed MNPI generated by VAL's customer brokerage business.

As in the initial complaint, the Amended Complaint alleges that VAL's proprietary traders could access MNPI through VAL's Financial Systems Database ("FS Database"), which stored historical, post-trade execution information generated from trades executed on behalf of VAL's customers (as well as VAL's own proprietary trade data). (Am. Compl. ¶¶ 4, 19.) During the

Relevant Period (defined in the Amended Complaint as January 2018 through April 2019), VAL employees could access the FS Database in one of two ways. *First*, the employee could log into a graphical user interface ("GUI"). Employees accessing the FS Database through the GUI were required to enter their unique log-in credentials, which were tied to a user's individual status at VAL; these user-permissions blocked any access to data that the user was not permitted to access based on the user's role, function and specific data access needs (*i.e.*, "permissioning"). *Second*, some Virtu employees could access the FS Database directly through shared accounts called "viewonly" and "fsviewonly." (*Id.* ¶¶ 17–19.)

In or around August 2018, VAL identified the possibility that certain traders could access non-permissioned post-trade data on the FS Database through those two shared accounts. (*Id.* ¶ 25.) VAL developers promptly began considering solutions for this technological issue, (*id.*), and successfully implemented a solution in April 2019, (*id.* ¶ 5).

As discussed below, at all times, Virtu's written policies and procedures firmly prohibited employees from accessing non-permissioned data regardless of their ability to access such data. Virtu not only trained employees on those policies, but also implemented other controls designed to detect and prevent suspicious or unusual trading (such as trading involving potential use of customer trade data). (*Id.* ¶¶ 53–54, 57.) Tellingly, the Amended Complaint *still* does not allege that any VAL trader *actually misused* any data by accessing the FS Database during the Relevant Period, which demonstrates the effectiveness of those policies and procedures.

## **ARGUMENT**

A motion to dismiss is properly granted where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 558 (2007). In deciding a Rule 12(b)(6) motion, courts "must accept as

true all of the factual allegations contained in the complaint," but not "legal conclusions couched as factual allegations." *Id.* at 555, 572.

## I. The Amended Complaint Fails to State a Claim under Section 15(g) Because Documents Referenced by and Incorporated in the Amended Complaint Establish That VAL's Written Policies and Procedures Complied with the Applicable Statutory Requirements.

### A. The Court May Properly Consider Documents Referenced by or Incorporated in the Amended Complaint.

On a Rule 12(b)(6) motion to dismiss, this Court may consider "statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff upon which it relied in bringing suit." *Tongue* v. *Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016); *Edison Fund* v. *Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 217 (S.D.N.Y. 2008) (Koeltl, J.).

In particular, documents are deemed incorporated in the complaint when, as here, they are "directly quote[d]." *Edison*, 551 F. Supp. 2d at 217 n.1. Accordingly, on this motion, the Court may properly consider, among other documents, VAL's Compliance Manual ("Compliance Manual"); VFI's Confidential Information Policy ("Confidential Information Policy"); Virtu's Sensitive Information, Information Barriers and Client Instructions Training Presentation ("2018 Information Barrier Training"); and Virtu's 2018 Annual Compliance Meeting Presentation ("2018 Compliance Presentation"), each of which is "directly quote[d]" and otherwise referenced multiple times throughout the Amended Complaint. (*See, e.g.*, Am. Compl. ¶¶ 47, 53–58.)

### B. The Amended Complaint Should Be Dismissed Because Those Incorporated Documents Demonstrate That VAL Established, Maintained and Enforced Written Policies and Procedures in Accordance with Section 15(g).

Under Section 15(g), VAL was required to "establish, maintain, and enforce written policies and procedures reasonably designed . . . to prevent the misuse . . . of material, nonpublic

information." 15 U.S.C. § 78o(g). Documents incorporated and referenced in the Amended

Complaint demonstrate that VAL fully complied with these requirements.

       1.     **VAL Established Written Policies and Procedures Reasonably Designed to Prevent the Misuse of MNPI in Accordance with Section 15(g).**

VAL established written policies and procedures to protect against the misuse of client data

that are demonstrably reasonable. These include prohibitions on misusing MNPI or accessing non-

permissioned data, and physical and logical information barriers reasonably designed to prevent

the misuse of MNPI.

**Prohibition on Misusing MNPI:** VAL's policies expressly prohibited employees from

misusing MNPI. VAL's Compliance Manual strictly prohibited "[b]uying or selling securities on

the basis of material non-public information," "[d]isclosing insider information to inappropriate

personnel" and "[a]ssisting anyone transacting business on insider information through a third

party." (*See* Ex. 1, Compliance Manual at -945.[1]) The Amended Complaint acknowledges that

Virtu's policies also instructed employees to "only share [confidential information] within the

company for bona-fide purposes." (Am. Compl. ¶ 47 (quoting Ex. 2, Confidential Information

Policy at -959).)

**Prohibition on Accessing Non-Permissioned Data Regardless of Physical or Technical**

**Access:** VAL's policies expressly prohibited employees from accessing non-permissioned data,

even if they had access to such data. VAL's Compliance Manual instructs that "[e]mployees are

not permitted to access proprietary or client information that is not necessary to carry out their job

responsibilities." (Ex. 1, Compliance Manual at -913.) That prohibition applied regardless of any

---

[1]    References to "Ex." refer to exhibits to the Declaration of Lorin L. Reisner.

ability to access non-permissioned data: "[h]aving physical access or systems access to this type of information does [not] equate to being authorized to access information." (*Id.*; *see also* Am. Compl. ¶ 57 (acknowledging VAL's materials expressly instructed, "**[j]ust because you can access it does not mean that you are authorized to access/use/share it**") (quoting Ex. 3, 2018 Information Barrier Training at -193) (emphasis added).) VAL's policies also required employees to report any instances of unintentional access to non-permissioned data: "Any instances of unintentional information barrier breaches should be promptly escalated to your supervisor and to Compliance/Legal particularly if it involves information sent or shared externally." (Ex. 3, 2018 Information Barrier Training at -200.)

**Physical and Logical Separation:** VAL implemented information barriers that included physical *and* logical separation. For example, the Compliance Manual provided for "physical and systemic separation between business groups so that the information possessed by one business group is not shared with other business groups who do not have a need to know about the information." (Ex. 1, Compliance Manual at -912.) The Compliance Manual expressly instructed that "[t]raders may only be assigned to one business, aggregation or trading unit at a time," and that "[t]raders should not share information about their own strategies or their clients' orders or strategies with traders in other units." (*Id.* at -912, -913.) The Amended Complaint recognizes that, under the Compliance Manual, "information barrier processes [established at VAL] include both physical and systemic separation between business groups so that the information possessed by one business group is not shared with other business groups who do not have a need to know about the information." (Am. Compl. ¶ 47 (quoting Ex. 1, Compliance Manual at -912).)

## 2.  VAL Maintained and Enforced Its Policies and Procedures in Accordance with the Requirements of Section 15(g).

VAL maintained and enforced its policies and procedures through training, establishing supervisory responsibility for permissioning, creating multiple channels for employees to escalate compliance issues, and implementing strategies to detect and prevent abnormal trading patterns.

**Mandatory Training:**  Virtu maintained and enforced its written policies and procedures by providing mandatory training on information barriers and the protection of MNPI.  As the Amended Complaint acknowledges, VAL provided employees with a training in 2018 on "Sensitive Information, Information Barriers and Client Instructions" that instructed employees that they were not authorized to access, use or share data that was outside the scope of their job responsibilities even if they were technically able to access it:

> "Just because you can access it does not mean that you are authorized to access/use/share it."

(Am. Compl. ¶ 57 (quoting Ex. 3, 2018 Information Barrier Training at -193).)

Thus, employee training sessions delivered a clear and consistent message about Virtu's expectations and employee obligations around sensitive information, including MNPI and client trade data.

**Supervisory Responsibility:**  Virtu established supervisory responsibility for determining permissioning status and communicated that responsibility to its employees.  Under Virtu's written policies and procedures, and as conveyed during Virtu's training sessions referenced in the Amended Complaint, supervisors were responsible for ensuring that access to data was "appropriate for employees under their supervision" and "promptly updated when employees are transferred to other business units."  (Ex. 3, 2018 Information Barrier Training at -192; *see also* Ex. 4, 2018 Compliance Presentation at -705.)  Supervisors also were responsible for managing access to the FS Database through permissioning.  Significantly, in order to gain access to the FS

Database, employees were first required to submit a request, which was subject to review by the employee's manager and by a member of VAL's Risk Committee. Documents incorporated in the Amended Complaint establish that this and other logical barriers were in place during the Relevant Period. (*See* 2018 Compliance Presentation at -705.)

**Mandatory Annual Compliance Meetings:** Virtu maintained and enforced its written policies and procedures through mandatory Annual Compliance Meetings, which emphasized protecting confidential information and information barriers. These training sessions reminded employees of the logical and physical barriers in place at VAL, including systems and database entitlements and the need to ensure "sufficient separation between different trading desks, especially customer and non-customer." (*See* Ex. 4, 2018 Compliance Presentation at -705.) As the Amended Complaint acknowledges, employees were reminded of their "duty to protect confidential information and discussed the importance of adjusting information barriers." (Am. Compl. ¶ 58 (referencing Ex. 4, 2018 Compliance Presentation).)

**Escalation and Anonymous Reporting of Compliance Issues:** Virtu encouraged employees to escalate and report compliance issues and suspicious conduct, and provided clear instructions for how to do so. At its Annual Compliance meetings, VAL instructed employees that they "should always take note if [they] believe another market participant is acting in a disorderly manner" and "report these irregularities to the appropriate regulator" or seek assistance from Virtu's Compliance and Legal Departments. (*See* Ex. 4, 2018 Compliance Presentation at -719; *see also* Am. Compl. ¶ 57–58.)

**Lockdown Systems:** The Amended Complaint acknowledges that VAL "had several automated systems and policies in place," including lockdown systems to "detect abnormal trading activity and stop strategies from trading when unexpected activity or potential logic errors were

detected based on pre-set parameters." (Am. Compl. ¶¶ 51, 53.) Abnormal trading activity included unexpected gains or losses based on the trading strategy at issue. (*See* Am. Compl. ¶ 53; Ex. 1, Compliance Manual at -936.)

### 3. The Hypothetical Possibility That Traders Could Access Non-Permissioned Post-Trade Data Through the FS Database Does Not Establish a Violation of Section 15(g).

Although the Amended Complaint acknowledges the existence of VAL's written policies and procedures to prevent the misuse of MNPI and the steps that VAL took to maintain and enforce those policies and procedures, the SEC nevertheless alleges that VAL violated Section 15(g) because VAL traders hypothetically could have accessed non-permissioned post-trade data through the FS Database. (*See* Am. Compl. ¶¶ 51–60, 73–75.)

Under Section 15(g), the relevant inquiry is not whether VAL's policies and procedures were perfect, but whether, when evaluated in an overall control framework, those policies and procedures were reasonable. *See McDaniel* v. *Wells Fargo Investments, LLC*, 717 F.3d 668, 676–77 (9th Cir. 2013) (Section 15(g) "calls on securities firms to decide *for themselves* how best to" prevent misuse of MNPI); *In re Gabelli & Co., Inc. & Gamco Invs., Inc.*, Exchange Act Release No. 1457, 1994 WL 684627, at *2 (Dec. 8, 1994) (same).[2] Here, VAL's written policies and procedures—and the measures it has taken to maintain and enforce them—clearly satisfy the applicable standard as a matter of law. The motion to dismiss should be granted because the only plausible inference from the Amended Complaint and the documents referenced therein remains that VAL established, maintained and enforced written policies and procedures reasonably

---

[2] SEC, STAFF SUMMARY REPORT ON EXAMINATIONS OF INFORMATION BARRIERS: BROKER-DEALER PRACTICES UNDER SECTION 15(G) OF THE SECURITIES EXCHANGE ACT OF 1934 (2012), at 6–7 ("Broker-dealers must make judgment calls between the need for information against the restrictions required[.]").

designed to prevent the misuse of MNPI. *See Bassaw* v. *United Indus. Corp.*, 482 F. Supp. 3d 80, 87 (S.D.N.Y. 2020) ("where only one inference may be drawn as to . . . reasonableness," then "it becomes a question of law that can be resolved on a motion to dismiss"); *Betts* v. *Shearman*, 2013 WL 311124, at *10–11 (S.D.N.Y. Jan. 24, 2013) (granting motion to dismiss where conduct was "objectively reasonable under the circumstances"), *aff'd*, 751 F.3d 78 (2d Cir. 2014).

Although the Amended Complaint alleges that VAL "had no policies and procedures in place [to] directly address the FS Database," (Am. Compl. ¶ 47), documents referenced or incorporated in the Amended Complaint show that VAL's written policies and procedures applied company-wide and addressed all databases, including the FS Database. (*See* Ex. 1, Compliance Manual at -901 ("All U.S. employees are expected to be familiar with and to comply with the policies set forth in this manual.").) In other words, VAL's policies prohibited precisely the hypothetical misuse of customer trade data that is alleged by the SEC. Notably, Section 15(g) does not require that every separate database have its own separate policy or procedures.

Similarly, although the Amended Complaint claims that VAL's trainings "did not constitute policies and procedures reasonably designed to protect MNPI" because they "did nothing to stop proprietary traders from [hypothetically] accessing post-trade information if they attempted to do so," (Am. Compl. ¶ 58), VAL's training programs underscored the prohibition on accessing non-permissioned data and misusing MNPI, and were an integral part of how these policies were reinforced to employees. VAL instructed its employees that "[j]ust because you can access [MNPI] does not mean that you are authorized to access/use/share it." (*See* Ex. 3, 2018 Information Barrier Training at -193; Am. Compl. ¶ 57.) VAL's trainings thus expressly addressed the hypothetical misuse of data raised by the SEC. And, to backstop its written policies and

trainings, VAL employed lockdown systems to detect aberrational trading patterns that would indicate misuse of customer trade data by employees.

Significantly, the SEC still does not allege that any Virtu employee actually accessed, let alone misused, MNPI during the Relevant (or any other) Period. The absence of any such allegation of actual (as opposed to hypothetical) misuse of MNPI through the FS Database in the initial complaint was powerful and conclusive evidence that VAL's many policies and procedures were effective, and therefore reasonably designed, maintained and enforced in accordance with Section 15(g).[3] The SEC's continued failure to allege any actual misuse of MNPI in the Amended Complaint only further confirms the effectiveness of VAL's policies and procedures.

## II. The Claims Asserted under Section 17(a) Should Be Dismissed Because the Amended Complaint Fails to Plead Falsity as a Matter of Law.

The SEC's Section 17(a) claims should be dismissed because they are based on statements that were accurate, not misleading, and therefore not actionable as a matter of law. Accurate statements of fact, standing alone, are not actionable under the securities laws. *Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021). Moreover, a company's accurate statements describing its plans or actions are not made false simply because the plans were unsuccessful. *See SEC* v. *Wellshire Sec., Inc.*, 773 F. Supp. 569, 576 (S.D.N.Y. 1991) ("fraud by hindsight" does not constitute a violation of the securities laws).

---

[3] Although Virtu believes there is no proper basis for the SEC's characterization of the historical, post-trade data stored in the FS Database as MNPI, the Court need not reach this issue as Virtu accepts that characterization for the purposes of this motion.

## A. Defendants' Statements Regarding Policies and Procedures to Safeguard Sensitive Client Information Were Accurate.

The SEC first challenges statements asserting that Virtu "established policies and procedures *designed* to safeguard sensitive client information including technology access controls to segregate sensitive information and review of approved personnel and permissions," including "physical separation, logical access control and entitlement reviews." (Am. Compl. ¶ 29 (emphasis added) (quoting Nov. 7, 2018 and Mar. 13, 2019 public presentations and Nov. 2018 earnings call and presentation); *see also id.* ¶ 30 (quoting Mar. 1, 2019 letter to customers).) Likewise, the Amended Complaint asserts that VAL made misleading statements in response to customer questionnaires by stating that it had in place "encryption/password protection" and "access controls" to protect client confidential information, (Am. Compl. ¶ 37); maintained "information barrier policies and procedures that are *designed* to segregate client orders," (*Id.* ¶ 41 (emphasis added)); and maintained "information barriers . . . *designed* to prevent the sharing of customer order and trade information with individuals who are not authorized to receive and/or who have no bona fide business purpose for accessing such data," (*Id.* ¶ 42) (emphasis added).

Those statements, however, were accurate when made, and the SEC concedes that policies and procedures "designed" to safeguard client information—including technology access controls, physical separation, and review of approved personnel—were in fact in place. (*Id.* ¶¶ 47–48.) Virtu's information barriers included physical separation and logical access controls, alongside entitlement and permissioning reviews. The challenged statements thus conveyed accurate historical facts and information about the existence of policies and procedures "*designed*" to prevent access to and misuse of sensitive information and are therefore not actionable. *See In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 569 (S.D.N.Y. Mar. 30, 2011) (statement was not actionable because it "convey[ed] a clear and accurate historical fact" and "[n]o reasonable

13

investor would have construed this statement to make any representation regarding any of the omitted facts"). That employees *hypothetically* could access the FS Database directly to obtain post-trade customer data does not contradict or render misleading any of VAL's statements that systems were "designed"—and in place—to prevent such access from happening. *See In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 587 (S.D.N.Y. 2006) ("As a matter of law, no statements regarding [defendant's] *accurately* reported revenue and income have been rendered materially misleading by failing to disclose that such income was 'unsustainable.'" (emphasis added)); *In re Ferroglobe PLC Sec. Litig.*, 2020 WL 6585715, at *8 (S.D.N.Y. Nov. 10, 2020) (granting motion to dismiss where allegedly omitted facts "did not contradict [defendants'] public statements, explicitly or implicitly").

Virtu's written policies and procedures applied to direct access to the FS Database and prohibited employees from accessing non-permissioned data even if they had technical access to such data. (Am. Compl. ¶ 57 ("just because you can access it does not mean you are authorized to access/use/share it").) No reasonable customer or investor would have understood Virtu's statements to mean that those policies and procedures were infallible or immune from the hypothetical risk that an employee might defy or ignore such policies prohibiting access to non-permissioned information. Any omitted information about direct access to the FS Database therefore was not inconsistent with Virtu's statements. *See In re Philip Morris Int'l Inc. Sec. Litig.*, 2021 WL 4135059, at *11 (S.D.N.Y. Sept. 10, 2021) (rejecting allegations of falsity because plaintiffs "failed to plausibly allege that the omitted [information] was inconsistent with Defendants' statements"); *Barilli* v. *Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 252 (S.D.N.Y. 2019) (finding no support for the proposition that "there is a duty to disclose negative facts that do not render disclosed statements misleading"); *see also Danske Bank*, 11 F.4th at 98 (noting

generally that companies "do not have a duty to disclose" hypothetical or suspected facts that, if proven, would be material to investors).

### B. Defendants' Statements Regarding Access to Customer Information Were Accurate.

Virtu's statements regarding employee access to trade information were also accurate and therefore not actionable. The SEC alleges that VAL made misleading statements in response to customer questionnaires asking about access controls because it failed to disclose that employees had direct access to the FS Database. (*See* Am. Compl. ¶¶ 36–42.) Each of the challenged statements, however, was accurate and not actionable based on the allegations in the Amended Complaint and documents referenced by or incorporated in the Amended Complaint.

As the Amended Complaint acknowledges, Virtu's policies prohibited employees from viewing non-permissioned data, (*id.* ¶ 57), and the SEC has not alleged that those policies were not followed. *See In re Sanofi-Aventis*, 774 F. Supp. 2d at 569; *In re Philip Morris*, 2021 WL 4135059, at *11. Moreover, as to several of the challenged statements—including the March 2018 response to Customer F questionnaire, July 2018 response to Customer E questionnaire, and the August 2018 response to Customer D questionnaire—the Amended Complaint alleges that Virtu became aware of purportedly contradictory information (on August 13, 2018) only *after* the statements were made. Because "fraud by hindsight," does not constitute a violation of the securities laws, *Wellshire*, 773 F. Supp. at 576, these statements are not actionable.

### C. Defendants' Statements Regarding Maintenance and Enforcement of Information Barriers Were Accurate.

Virtu's statements regarding its intent to continue to maintain and enforce information barriers similarly are not actionable because the SEC pleads no facts showing that these statements were materially false or misleading. The Amended Complaint alleges VFI's statement that it "intends to continue to maintain and enforce appropriate information barriers to segment and

protect client data" was misleading "because at the time, VAL failed to adequately implement and enforce its information barriers as to the direct access permissioning of the FS Database." (Am. Compl. ¶ 31.) The Amended Complaint and documents incorporated therein describe Virtu's extensive policies, procedures and training programs concerning client information and information barriers. (Am. Compl. ¶¶ 47–48, 57.) The mere hypothetical ability to access non-permissioned trade data through direct access did not render untrue Virtu's statements that it maintained and enforced information barriers. Virtu's statements regarding its future intentions also were true and not misleading—and the SEC alleges no facts to the contrary. As the Amended Complaint acknowledges, once Virtu identified a means of accessing non-permissioned data, Virtu worked to remedy the issue, tested various solutions, and ultimately implemented a successful fix. (Am. Compl. ¶¶ 5, 52.)

III.  **Section 17(a) Claims Based on Generalizations and Aspirational Statements Should Be Dismissed Because They Are Not Actionable as a Matter of Law.**

The SEC's Section 17(a) claims based on excerpts from public presentations, press releases and earnings calls also should be dismissed because the challenged statements consist of non-actionable generalizations and aspirational statements upon which no reasonable person would rely. *See Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("[E]xpressions of puffery and corporate optimism do not give rise to securities violations.").

"[G]eneralizations regarding [a company's] business practices" are not actionable under the securities laws because they "are too general to cause a reasonable investor to rely upon them." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009). Specifically, general statements about policies and procedures are not actionable if they "do not profess an opinion on the efficacy" of the policies and procedures at issue, *Menaldi* v. *Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 512 (S.D.N.Y. 2017), or

where the plaintiff's claims "merely quibble with [defendant's] execution of those programs and procedures," *Ong* v. *Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018).

*ECA* is instructive. There, plaintiffs alleged that the defendant's statement that it maintained "risk management processes [that were] highly disciplined and designed to preserve the integrity of the risk management process," among others, were misleading because the defendant in fact exercised "poor financial discipline." *ECA*, 553 F.3d at 205–06. The Second Circuit held that such statements were "no more than puffery which does not give rise to securities violations," because they did not, and could not, "guarantee that [the defendant's] choices would prevent failures in its risk management practices." *Id.* at 206; *see also Grant* v. *Ursula Mgmt., LLC*, 2021 WL 8382243, at *3 (E.D.N.Y. Oct. 6, 2021) (investment advisor's statements to client that a "primary goal" of the hedge fund in which plaintiff invested was "safety" and that the fund "utilizes a variety of risk analyses created internally . . . and regularly monitors exposure levels in order to ensure portfolio downside risk stays at controlled level" were not actionable).

The same is no less true here. The statements challenged in the Amended Complaint merely state that VAL maintained policies and procedures intended to prevent the misuse of MNPI, or describe what those policies and procedures were "designed" to accomplish, but do not guarantee their efficacy. (Am. Compl. ¶ 29 (Nov. 2018 & Mar. 2019 VFI presentations: "Virtu has established policies and procedures designed to safeguard sensitive client information" including "[t]echnology access controls to segregate sensitive information" and "[r]eview of approved personnel and permissions."); *id.* (Q3 2018 VFI earnings call statement: "Virtu has established policies and procedures for our existing client and market-making businesses that are designed to safeguard sensitive client information and will continue to design our policies and procedures with our clients in mind. These safeguards include physical separation, logical access

control and entitlement reviews."); *id.* ¶ 30 (VAL/VFI March 2019 letter: "Prior to merging both Virtu and ITG each maintained our own procedures to segregate and protect sensitive client data.").) Because VAL and VFI's general statements "did not . . . make any assurances of efficacy," they are exactly the type of "corporate-speak" that courts in this District consistently and repeatedly have held are not actionable under the securities laws. *Menaldi*, 277 F. Supp. 3d at 513; *see also In re Australia & New Zealand Banking Grp. Ltd. Sec. Litig.*, 2009 WL 4823923, at *11 (S.D.N.Y. Dec. 14, 2009) (dismissing claims based on statements that the company's Audit Committee maintains "a robust process for ensuring prompt resolution of audit issues" and that "Internal Audit provides independent assurance that the design and operation of the risk and control framework across the [company] is effective"); *Ong*, 294 F. Supp. 3d at 232 (dismissing claims because the SEC "does not allege that [defendant] failed to undertake such endeavors, but merely that [defendant] failed to do so adequately" which "do[es] not conflict with [defendant's] statements regarding the . . . procedures that [it] had in place").

Moreover, the November 2018 and March 2019 VFI presentations, Q3 2018 VFI earnings call statement, and VFI's January 2019 press release are not also actionable because they are aspirational generalizations. Those statements referred to what the challenged policies and procedures were *"designed to"* achieve and what Virtu *"intend[ed] to"* do in the future. (Am. Compl. ¶ 29 (Nov. 2018 & Mar. 2019 VFI public presentations: "Virtu has established policies and procedures *designed to* safeguard sensitive client information." (emphasis added)); *id.* (Nov. 2018 VFI CEO's statement: "Virtu . . . *will continue to design* our policies and procedures with our clients in mind." (emphasis added)); *id.* ¶ 31 (VFI Jan. 2019 press release: "Post closing, Virtu *intends to continue to maintain and enforce appropriate information barriers* to segment and protect sensitive client data." (emphasis added)).) Such aspirational statements about Virtu's

business policies are also not actionable. *In re Australia*, 2009 WL 4823923, at *11 (dismissing claims based on company's statements that it would "maintain the strong control and financial governance frameworks established under Sarbanes–Oxley compliance" as "optimistic generalizations, . . . . upon which no reasonable investor could rely"); *Ong*, 294 F. Supp. 3d at 232 (company's statement that its safety programs were "designed to ensure" compliance with applicable regulations were non-actionable, aspirational statements).[4]

## IV. The SEC's Section 17(a)(3) Claim Against VFI Is Fatally Flawed and Should Be Dismissed Because It Fails to Allege That VFI Engaged in Conduct Beyond Misrepresentations as Required under Section 17(a)(3).

The SEC fails to allege that VFI engaged in conduct beyond misrepresentations as required to state a claim for scheme liability under Section 17(a)(3).[5] Under Section 17(a)(3), the SEC must

---

[4]      The SEC does not seek civil penalties or disgorgement from VAL for any alleged violations that occurred prior to September 12, 2018, *i.e.,* outside the applicable five-year statute of limitations. (*See* Am. Compl. at 25 n.1); 28 U.S.C. § 2462. This includes any purported violations premised on VAL's questionnaire responses to Customers D, E and F, as they were each made prior to September 12, 2018. *Id.* at ¶¶ 40–42. To the extent the SEC's Section 17(a)(3) claim for civil penalties or disgorgement against VFI is premised on those same questionnaire responses, those claims also are time-barred because VFI cannot be held secondarily liable for conduct by VAL that is time-barred as against VAL. *See, e.g., In re Bibox Grp. Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326, 338 n.4 (S.D.N.Y. 2021) ("The same statutes of limitations that apply to primary claims under the 1933 and 1934 Acts also apply to control person claims."). The SEC's Amended Complaint does not allege otherwise.

[5]      In the Second Circuit, courts frequently refer to claims under Section 17(a)(1) and (3) of the Securities Act and Rule 10b-5(a) and (c) of the Exchange Act as "scheme liability" claims. *See, e.g., Rio Tinto*, 41 F.4th at 49. "Essentially the same elements are required" under either statute. *SEC* v. *Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).

allege that defendants undertook a "deceptive scheme or course of conduct that went *beyond* the misrepresentations" covered by Section 17(a)(2), *SEC v. Stoker*, 865 F. Supp. 2d 457, 467 (S.D.N.Y. 2012), because in the Second Circuit, misstatements or omissions—without more—cannot form the basis for scheme liability, *see SEC v. Rio Tinto plc*, 41 F.4th 47, 49, 53 (2d Cir. 2022).[6]

Here, the SEC fails to allege that VFI engaged in the "distinct" and "inherently deceptive" conduct beyond misrepresentations that is required for scheme liability. *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011). The very first paragraph of the SEC's Amended Complaint makes clear that "[t]his matter relates to *false and misleading statements by Defendant VFI.*" (Am. Compl. ¶ 1 (emphasis added).) And the SEC's Amended Complaint repeatedly faults VFI for alleged misrepresentations and omissions relating to VAL's policies and procedures. (*See id.* ¶¶ 6, 28, 31, 44 (describing alleged misstatements of VFI, ¶ 28 describing VFI's alleged failure to correct misstatements).) Those alleged misstatements and omissions alone cannot form the basis for scheme liability. *Rio Tinto*, 41 F. 4th at 53–54.

In an attempt to bolster its Section 17(a)(3) claim, the SEC now alleges that VFI "disseminated" the misstatements it allegedly made. (Am. Compl. ¶¶ 6, 28, 31, 44.) That does

---

[6] Courts outside the Second Circuit similarly recognize that scheme liability under Section 17(a)(3) requires more than alleged misrepresentations or omissions. *See SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 31 (D.D.C. 2017) ("Liability may arise under Section 17(a)(2) and 17(a)(3) based on the same set of facts, but *only if* the plaintiff alleges both that the defendants made misrepresentations in violation of the statute, and that the defendants undertook a deceptive course of conduct that went beyond the misrepresentations."); *Pub. Pension Fund Grp.* v. *KV Pharm. Co.*, 679 F.3d 972, 987 (8th Cir. 2012) ("We join the Second and Ninth Circuits in recognizing a scheme liability claim must be based on conduct beyond misrepresentations or omissions.").

not cure the SEC's fundamental pleading defect, however, because the SEC does not allege that VFI did anything more than "disseminate" allegedly misleading statements made by VFI—*not* that VFI disseminated allegedly misleading statements made by *others* with the intent to defraud. That distinction is critical. In *Lorenzo* v. *SEC*, 139 S. Ct. 1094 (2019), the Supreme Court held that "those who do not 'make' statements . . . . but who disseminate false or misleading statements to potential investors with the intent to defraud" can be subject to "scheme" liability, even if they cannot be liable for the misstatement itself. *Id.* at 1099. The defendant in *Lorenzo* did not "make" the misleading statement; instead he engaged in a scheme to defraud by taking another's statement, which he "understood to contain material untruths," and disseminating it with the intent to induce reliance. *Id.* at 1101, 1104.

In *Rio Tinto*, the Second Circuit recognized *Lorenzo*'s narrow holding. But, significantly, neither case stands for the proposition that a defendant can be liable under a misstatement theory for making an allegedly misleading statement and also be liable under a scheme theory for "disseminating" the same statement. To the contrary, *Rio Tinto* expressly held that *Lorenzo* did *not* overrule long-standing Second Circuit precedent holding "that misstatements and omissions cannot form the 'sole basis' for liability under the scheme subsections." 41 F.4th at 53 (citing *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177 (2d Cir. 2005)). Thus, "dissemination" only amounts to distinct conduct necessary for Section 17(a)(3) scheme liability where—unlike here—the disseminator is "not the maker" of the misstatement. *Id.* at 53. Were it otherwise, "the scheme subsections would swallow the misstatement subsections," contrary to "the structure that Congress designed." *Id.* at 54.

The SEC's sole remaining allegation against VFI does not save its scheme claims. The SEC says that Defendants "fail[ed] to review or update permissioning" of the FS Database, (Am.

Compl. ¶ 29), but that is plainly not an inherently deceptive act—rather, the SEC's theory is that VFI's failure to take action on the FS Database made its statements about its security protocols allegedly misleading. Such allegations cannot support a scheme liability claim, because the underlying conduct is deceptive, if at all, "only because of [alleged] subsequent public misrepresentations" about that conduct. *Kelly*, 817 F. Supp. 2d at 344 (rejecting scheme liability claims based on alleged misstatements about underlying business practice that was not "inherently deceptive"). Because the SEC fails to allege VFI engaged in the requisite inherently deceptive conduct beyond merely making the alleged misrepresentations and omissions, the Section 17(a)(3) scheme liability claim must be dismissed.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice in its entirety.

Dated: February 12, 2024
       New York, New York

                    **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

                    By: _____
                    Lorin L. Reisner
                    Andrew G. Gordon
                    Jessica S. Carey
                    Daniel H. Levi
                    Emily M. Hoyle
                    1285 Avenue of the Americas
                    New York, New York 10019
                    Tel.: (212) 373-3000
                    lreisner@paulweiss.com

                    Paul D. Brachman
                    2001 K Street, NW
                    Washington, DC 20006-1047
                    United States
                    Tel.: (202) 223-7300

                    *Attorneys for Virtu Financial, Inc. and Virtu Americas LLC*

23

## CERTIFICATION OF COMPLIANCE

I hereby state that the foregoing Memorandum of Law was prepared on a computer using Microsoft Word. Pursuant to the word count system in Microsoft Word, the total number of words in the Brief, excluding the caption, table of contents, table of authorities, signature block, and this certification is 6,529.

Dated: February 12, 2024
      New York, New York

Lorin L. Reisner