# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

            v.

VIRTU FINANCIAL INC. and
VIRTU AMERICAS LLC,

                              Defendants.

Civil Action No. 1:23-cv-8072 (JGK)

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Damon W. Taaffe (admitted *pro hac vice*)
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
Tel: (202) 551-7420
taaffed@sec.gov

Of counsel:

David A. Becker
Paul Kim
Alexandra M. Arango
David Bennett

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

THE COMMISSION'S ALLEGATIONS ................................................................ 3

STANDARD OF REVIEW ..................................................................................... 6

ARGUMENT .......................................................................................................... 6

    I.    DEFENDANTS VIOLATED SECTION 17(a)(2) OF THE SECURITIES ACT BY MAKING FALSE AND MATERIALLY MISLEADING STATEMENTS ............ 7

        A. A Reasonable Investor Could Find False or Materially Misleading Defendants' Statements Regarding their Policies and Procedures to Prevent the Misuse of MNPI ................................................................................................................ 7

        B. A Reasonable Investor Could Find False or Materially Misleading Defendants' Statements Regarding Employees' Access to MNPI ................................................. 9

        C. A Reasonable Investor Could Find False or Materially Misleading Defendants' Statements about Maintaining and Enforcding Information Barriers ...................... 11

        D. VFI's Misstatements Were Not Mere Puffery .................................................... 12

    II.    VFI VIOLATED SECTION 17(A)(3) OF THE SECURITIES ACT BY MAKING AND DISSEMINATING FLASE AND MATERIALLY MISLEADING STATEMENTS ...................................................................................................... 15

    III.    VAL VIOLATED SECTION 15(g) OF THE EXCHANGE ACT BY FAILING TO DESIGN, MAINTAIN, AND ENFORCE REASONABLE MEASURES TO PROTECT THE MISUSE OF MNPI .................................................................... 20

        A. VAL Did Not Establish, Maintain, and Enforce Reasonably Designed Policies and Procedures to Prevent the Misuse of Material Nonpublic Information ............ 21

        B. The Absence of Evidence Regarding Proprietary Traders' Misuse of MNPI is not Evidence of Absence ........................................................................................ 22

        C. VAL Is Due no Deference on the Objective Question of Whether its MNPI Protections were Reasonable ................................................................................. 23

        D. The Commission Does Not Contend that Perfection is Required ...................... 24

CONCLUSION ...................................................................................................... 24

# TABLE OF AUTHORITIES

**Federal Cases**                                                        **Page(s)**

*Aaron v. SEC*,
    446 U.S. 680, 495 (1980) ................................................................. 11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..................................................................... 6

*Aviles v. S&P Global, Inc.*,
    380 F. Supp. 3d 221 (S.D.N.Y. 2019) ................................................. 20

*BHP Billiton Ltd. Sec. Litig.*,
    276 F. Supp. 3d 65 (S.D.N.Y. 2017) .................................................. 13

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
    556 F. Supp. 3d 100 (S.D.N.Y. 2021) ................................................. 8

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ............................................................ 14

*In re Equifax Sec. Litig.*,
    357 F. Supp. 3d 1189 (N.D. Ga. 2019) .......................................... 13, 14

*In re Ford Fusion and C-Max Fuel Econ. Litig.*,
    No. 13-MD-2450 (KMK), 2017 WL 3142078 (S.D.N.Y. Jul. 2, 2017) ................ 10

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ................................................. 10

*Grant v. Usula Mgmt., LLC.*,
    No. 20-cv-2953 (WFK) (AKT), 2021 WL 8382443 (E.D.N.Y. Oct. 6, 2021) ...... 14

*Hall v. Child.'s Place Retail Stores, Inc.*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008) ................................................. 10

*Kleinman v. Elan Corp.*,
    706 F.3d 145 (2d Cir. 2013) ............................................................ 8

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ............................................................ 18

*Lorenzo v. SEC*,
    139 S. Ct. 1094 (2019) ........................................................ 16, 17, 18, 19

*McDaniel v. Wells Fargo Invs., L.L.C.*,
    717 F.3d 668 (9th Cir. 2013) ........................................................... 23

*McMahan & Co. v. Wherehouse Ent.* ,
    900 F.2d 576 (2d Cir. 1990) ................................................................. 8, 9

*Menaldi v. Och-Ziff Capital Mgmt. Grp. L.L.C.*,
    277 F. Supp. 3d 500 (S.D.N.Y. 2017) ................................................... 15

*Meyer v. JinkoSolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014) ................................................................. 8, 9

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    594 F.3d 347 (2d Cir. 2010) ................................................................. 8, 9

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ................................................................. 12

*Ong v. Chipotle Mexican Grill, Inc.*,
    294 F. Supp. 3d 199 (S.D.N.Y. 2018) ................................................... 15

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015) ................................................... 13

*Richman v. Goldman Sachs Grp., Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012) ................................................... 13

*S.S. Trade Assoc. of Balt.-Int'l Longshoreman's Assoc. Pension Fund v. Olo Inc.*,
    No. 22-cv-8228 (JSR), 2023 WL 4744197 (S.D.N.Y. July 25, 2023) .................................... 7

*SEC v. Amah*,
    No. 21-cv-6694 (KMK), 2023 WL 6386956 (S.D.N.Y. Sept. 28, 2023) ........................ 16, 17

*SEC v. Rio Tinto*,
    41 F.4th 47 (2d Cir. 2022) ................................................................. 16, 17, 18, 19

*SEC v. Terraform Labs Pte. Ltd.*,
    No. 23-cv-1346 (JSR), 2023 8994860, __ F. Supp. 3d __, (S.D.N.Y. Dec. 28, 2023) .... 16, 17

*SEC v. Wellshire Secur., Inc.*,
    773 F. Supp. 569 (S.D.N.Y. 1991) ........................................................ 11

*Set Capital LLC v. Credit Suisse Group AG.*,
    996 F.3d 64, 85 (2d Cir. 2021) ............................................................ 8

*Suarez v. Cal. Nat'l Living, Inc.*,
    No. 17-cv-9847 (VB), 2019 WL 1046662 (S.D.N.Y. Mar. 4, 2019) .................................... 13

*In re Tower Auto. Sec. Litig.*,
    483 F. Supp. 2d 327 (S.D.N.Y. 2007) ................................................... 13

*United States v. Naftalin*,
    441 U.S. 678 (S.D.N.Y. 1979) ............................................................ 6

*Walker v. Thompson,*
    404 F. Supp. 3d 819 (S.D.N.Y. 2019) ........................................................... 6

**Federal Statutes**

15 U.S.C. § 77q(a)(1) ........................................................................ 11, 16, 17, 18

15 U.S.C. § 77q(a)(2) .................................................................................. passim

15 U.S.C. § 77q(a)(3) .................................................................................. passim

15 U.S.C. § 78j(b) ............................................................................................. 11

15 U.S.C. § 78o(g) ..................................................................................... passim

**Rules**

Rule 10b-5 ....................................................................................... 11, 16, 17, 19

Rule 12(b)(6) ....................................................................................................... 6

Plaintiff Securities and Exchange Commission ("Commission") respectfully submits this memorandum of law in opposition to the motion filed by Defendants Virtu Financial, Inc. ("VFI") and Virtu Americas LLC ("VAL") to dismiss the Amended Complaint (ECF No. 34).

## PRELIMINARY STATEMENT

The Commission alleges that during a fifteen-month period from January 2018 through April 2019 (the "Relevant Period"), VAL, a broker-dealer that handled approximately 25% of all market orders placed by retail investors in the United States, failed to establish, maintain, and enforce basic information barriers to prevent its proprietary traders from accessing customers' material nonpublic information ("MNPI"). VAL stored that MNPI, consisting of sensitive post-trade execution data, in its critical FS Database, yet VAL allowed employees to access that database using generic and widely-shared login credentials. VAL had no means of tracking who accessed the FS Database or what information they extracted from it.

As alleged in the Amended Complaint, Defendants violated Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 by making and disseminating false and materially misleading statements about their measures to prevent misuse of customers' MNPI and which employees had access to that information. When one customer asked whether VAL's proprietary traders see customers' post-trade data, VAL falsely answered "No" when in fact proprietary traders could see it easily. When another asked who at VAL had access to post-trade data, VAL misleadingly responded with a list that did not include proprietary traders. And VFI's CEO misleadingly stated on an earnings call that Defendants' policies to protect MNPI included "logical access controls and entitlement reviews," when neither statement was complete or accurate with respect to the direct-access method of using the FS Database. Further, as the Commission alleges, VAL's failure to

1

establish, maintain, and enforce policies and procedures reasonably designed to prevent the misuse of its customers' MNPI violated Section 15(g) of the Exchange Act of 1934.

Defendants' arguments do not justify dismissal. First, they argue that the alleged misstatements were true, but several clearly were not: for example, VAL falsely stated that proprietary traders do not see post-trade data when they could do so easily. Moreover, even literally "true" statements can be materially misleading if they omit the whole truth or are misleading in context. For example, when a customer asked who had access to its MNPI and VAL's response listed some employees with access but not others, the statement was true but also materially misleading. The question whether a statement is misleading is a fact-specific and context-dependent inquiry, and a reasonable person could consider Defendants' statements materially misleading.

Second, Defendants argue that certain of VFI's alleged public misstatements were mere puffery, but that is not so. VFI's misstatements were repeated, specific, and purportedly factual descriptions of Defendants' historical and then-current policies and procedures. They also addressed a subject of vital interest to prospective customers – protection of MNPI – that doubtless could affect investment decisions.

Third, VFI urges that the 17(a)(3) claims against it should be dismissed because there is no "extra" act sufficient to elevate the alleged misstatements into a fraudulent or deceptive scheme. But the Supreme Court and Second Circuit have held that disseminating a misstatement is a distinct act that supports liability under Section 17(a)(3), and the Amended Complaint alleges that Defendants both made and disseminated their misstatements. There is no support for Defendants' illogical proposed rule that, for 17(a)(3) liability to attach to a disseminated misstatement, someone other than the disseminator must have made it. To the contrary, two recent decisions in this

District have recognized that Section 17(a)(3) liability may lie against a party that disseminates its own misstatements. That sensible outcome reflects that a misstatement's deceptive impact does not turn on who crafts it.

Finally, with respect to the VAL's failure to establish, maintain, and enforce reasonable information barriers to protect MNPI, Defendants argue that various other measures amounted to a reasonable system under Exchange Act Section 15(g). They are wrong: VAL's technological access controls were woefully inadequate, a point the Commission will support with expert testimony. Moreover, Defendants' arguments about the efficacy of their other measures raise factual questions that must be explored in discovery. Given the fact-intensive nature of a "reasonable[ness]" inquiry, Defendant's motion should be denied.

## THE COMMISSION'S ALLEGATIONS

VAL is a registered broker-dealer and subsidiary of VFI. (Am. Compl. ¶ 13.) During the Relevant Period, VAL handled approximately 25% of all market orders placed by retail investors in the United States. (*Id.* at ¶ 26.) It operated two types of businesses: (i) customer-facing trade execution services, which generate MNPI regarding customers' trade orders and executions; and (ii) proprietary trading operations, which must be prevented from misusing customers' MNPI when trading on VAL's behalf. (*Id.* at ¶ 14.) Section 15(g) of the Exchange Act required VAL to establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of VAL's business, to prevent such misuse.

For a period of approximately fifteen months in 2018-19, VAL failed to ensure that its proprietary traders could not access, and potentially trade based on, MNPI in VAL's FS Database, which contained post-trade information going materially beyond what was publicly available. (*Id.* at ¶¶ 4, 22.) VAL's employees could access the FS Database through two means.

First, they could log into a graphical user interface ("GUI"). Employees accessing the FS Database via the GUI were required to enter their unique credentials and could access only information necessary for their role at the firm – a process typically known as "permissioning." (*Id.* at ¶ 18.) Second, and more pertinent to this case, employees could access the FS Database directly using a username and password. But direct-access login credentials were not specific to individual employees; instead, employees used generic credentials that were widely shared. Users accessing the FS Database in this way could access all data in it regardless of their role at the firm or business need. (*Id.* at ¶ 19.) Simply put, there was no "permissioning" for direct-access, meaning that VAL could not effectively monitor and detect potential violations of its general policies and procedures, including misuse of MNPI, because VAL did not know who was accessing this data or how they were using it.

This deficiency arose following VFI's July 2017 acquisition of KCG Holdings, Inc. ("KCG"). (*Id.* at ¶ 16.) Prior to the acquisition, VFI did not have a significant trade execution business that would generate customer MNPI, which meant the lack of information barriers governing the FS Database did not result in a risk that its proprietary traders could access such MNPI. (*Id.* at ¶ 19.) Following the KCG acquisition, however, VFI formed VAL, which began handling order flow for large institutional customers, changing the company's risk profile. In January 2018, VAL began storing customer trade execution information in the FS Database, which also continued to house proprietary trade data. (*Id.* at ¶ 20.) Despite channeling this new MNPI into its FS Database, VAL did not review or update the permissioning to exclude employees without a business need to access it. Because the generic logins continued to be widely known and shared, virtually all employees, including proprietary traders, effectively had unfettered access to that MNPI. (*Id.* at ¶ 23.)

During the Relevant Period, VAL's proprietary traders used the FS Database extensively and with the firm's encouragement. Many of their trading strategies were automated to incorporate data from the FS Database, and those strategies relied on the direct-access method, with its generic login credentials, to source data. (*Id.* at ¶ 24.) VAL, however, did not track whether proprietary traders logged into the FS Database using the direct-access method or what information their trading strategies extracted. (*Id.* at ¶ 50.)

VAL did nothing about the permissioning deficiency for approximately seven months, from January through August 2018. (*Id.* at ¶¶ 25-26.) But even after VAL started to discuss a need to improve the permissioning, it took no immediate steps to mitigate the risk of misuse of MNPI. (*Id.* at ¶ 26.) VAL continued to enter nonpublic customer post-trade information into the FS Database; continued to allow direct access to such MNPI with the generic login credentials; and issued no statements, directives, or guidance to proprietary traders that they should cease or limit their direct access to the FS Database. (*Id.*) Consequently, the FS Database remained heavily used; indeed, at times it became unresponsive because traders were running too many concurrent direct-access queries. (*Id.* at ¶ 48.) Rather than mitigate that capacity problem by limiting simultaneous logins using direct access or disabling it until VAL could implement appropriate permissioning, VAL took the opposite approach, *increasing* by 67% the available number of simultaneous logins. (*Id.* at ¶ 49.)

During the fifteen-month period of MNPI vulnerability, several of VAL's prospective customers sought assurances that their MNPI was protected, including from VAL's proprietary traders. Defendants, however, made and disseminated false and materially misleading responses and other public statements on that issue. For example, in a November 2018 questionnaire, a prospective customer asked who at VAL had access to "real-time and post trade" information.

VAL's response listed certain categories of employees who had access, but it failed to include others, including proprietary traders, who could access the very same information. (Am. Compl. ¶ 38.)

In all, the Amended Complaint alleges that Defendants made and disseminated ten false and materially misleading misstatements regarding their policies and procedures to prevent misuse of customers' MNPI, in violation of Sections 17(a)(2) and (a)(3) of the Securities Act. (Am. Compl. ¶¶ 28-42.) Moreover, the alleged deficiencies in safeguarding MNPI in the FS Database demonstrate that VAL failed to establish, maintain, and enforce such reasonably designed information barriers, in violation of Securities Act 15(g).

## STANDARD OF REVIEW

To withstand a Rule 12(b)(6) motion to dismiss, "a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, 'state a claim to relief that is plausible on its face.'" *Walker v. Thompson*, 404 F. Supp. 3d 819, 823 (S.D.N.Y. 2019) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The court must accept the allegations in the pleadings as true and draw all reasonable inferences in favor of the non-movant." *Id.*

## ARGUMENT

Defendants violated Sections 17(a)(2) and 17(a)(3) of the Securities Act by making and disseminating false and misleading statements about their systems for protecting customers' sensitive MNPI, and VAL violated Section 15(g) of the Exchange Act by failing to design and enforce reasonable measures to safeguard that MNPI. Defendants' motion to dismiss should be denied.

## I. DEFENDANTS VIOLATED SECTION 17(a)(2) OF THE SECURITIES ACT BY MAKING FALSE AND MATERIALLY MISLEADING STATEMENTS

Section 17(a)(2) of the Securities Act forbids "obtain[ing] money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77q(a)(2). The Amended Complaint alleges that Defendants violated that provision by making ten distinct false and materially misleading statements regarding their policies and procedures to protect customers' MNPI.

Defendants argue that none of their statements was false or misleading, but that is a paradigmatic factual question turning on how a reasonable investor would have understood them in context. "[I]t is inappropriate to resolve such disputes on a motion to dismiss unless the Court, drawing all reasonable inferences in favor of plaintiff, determines that reasonable minds could not differ on the question of whether the statements alleged in the complaint were misleading in light of the circumstances under which they were made." *S.S. Trade Assoc. of Baltimore-Int'l Longshoreman's Assoc. Pension Fund v. Olo Inc.*, No. 22-cv-8228 (JSR), 2023 WL 4744197, *4 (S.D.N.Y July 25, 2023). Defendants' misstatements easily could have misled reasonable investors regarding Defendants' policies and procedures to prevent the misuse of MNPI, which of Defendants' employees could access MNPI, and Defendants' maintenance and enforcement of information barriers.

### A. A Reasonable Investor Could Find False or Materially Misleading Defendants' Statements Regarding Their Policies and Procedures to Prevent the Misuse of MNPI

Defendants first argue for dismissal of claims regarding certain misstatements about their policies and procedures to prevent misuse of MNPI, on the ground that the statements were "accurate when made," (MTD at 13-15). But "[s]tatements of literal truth 'can become, though

7

their context and manner of presentation, devices which mislead investors.'" *Boston Retirement Sys. v. Alexion Pharmaceuticals, Inc.*, 556 F. Supp. 3d 100, 119 (S.D.N.Y. 2021) (quoting *Kleinman v. Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013)); *see also Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d 64, 85 (2d Cir. 2021) (reversing dismissal of alleged misstatements on the ground that "the law is well settled that so-called 'half-truths' – literally true statements that create a materially misleading impression – will support claims for securities fraud."). "For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990). Put another way, "once a company speaks on an issue or topic, there is a duty to tell the whole truth," *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014), and "the representation must be complete and accurate," *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010).

Here, the "whole truth" is that the measures Defendants referenced provided virtually no protection of the sort Defendants implied. For example, by stating that customers' sensitive information was shielded by "password protection" (Am. Comp. ¶ 37), Defendants misled customers into believing – understandably – that the passwords were not generic and freely shared with the very proprietary traders Defendants purported to exclude. Similarly, telling customers that their MNPI was guarded by "access controls" (*id.*) would cause a reasonable customer to believe – erroneously – that Defendants themselves did not intentionally design and encourage a means of accessing the FS Database that circumvented those purported access controls. And stating that Defendants undertook "review[s] of approved personnel" (*id.* at ¶ 29) was simply false regarding direct access to the FS Database, which Defendants did not review or update (*id.* at ¶¶ 23, 29).

8

Defendants fare no better by emphasizing the word "designed" that appears in multiple alleged misstatements and arguing that they were truthful about what their systems were "designed" to do.  (MTD at 13.)  Defendants again failed to tell "the whole truth," *Meyer*, 761 F.3d at 250, which is that they *also* designed the widely used direct-access login method and generic login credentials and encouraged traders to use them.  (Am. Compl. ¶ 49.)  Stating that Defendants designed password protections and logical access restrictions, but not disclosing that they also designed and encouraged measures that circumvented those very protections, was materially misleading.

Drawing all reasonable inferences in the Commission's favor, Defendants' misstatements tended more to "mislead prospective buyers" than "to accurately inform" them.  *McMahan*, 900 F.2d at 579.  The misstatements assuaged prospective customers' concerns about protecting their MNPI – the concern driving several of them to submit questionnaires – when the whole truth would have exacerbated their concerns, potentially causing them to ask further questions and take their business elsewhere.

B.     **A Reasonable Investor Could Find False or Materially Misleading Defendants'
       Statements Regarding Employees' Access to MNPI**

Defendants next urge dismissal of five alleged misstatements on the ground that Defendants accurately told customers which employees had access to customers' MNPI.  (MTD at 15.)  These misstatements, however, were plainly false or at least misleading: as alleged, contrary to VAL's misstatements to Customers A, C, and F, proprietary traders *did* have access to customers' post-trade data; and contrary to the misstatements to Customers D, E, and F, access to customers' MNPI *was not* limited to groups with a "need to know," because proprietary traders could access it but had no legitimate need for it.  (Am. Compl. ¶¶ 36, 38, 40-42.)

Defendants attempt to avoid this conclusion in two ways, but neither succeeds. First, they argue that "Virtu's policies prohibited employees from viewing non-permissioned data . . . and the SEC has not alleged that those polices were not followed." (MTD at 15.) Defendants' policies, however, are not conclusive: drawing all reasonable inferences in the Commission's favor, a categorical statement that proprietary traders "do not" have access to MNPI implies measures ensuring that they in fact *could not* access it, not a written policy that a proprietary trader might disregard in pursuit of profit. Statements to customers focusing on the written policies may well have prompted follow-up questions such as: "How do you verify that the policies are followed?" And that, in turn, might have revealed another issue that Defendants did not disclose to customers: Defendants did not track who accessed the FS Database or what information they extracted from it. (Am. Compl. ¶ 50.)

Defendants' lack of tracking FS Database access and activities contextualizes their remark that "the SEC has not alleged that the [access] policies were not followed." (MTD at 15.) Defendants themselves caused the lack of records on that issue, and the result hardly establishes that the written policies were followed or effective, a point that the Commission has not conceded and which presents a factual question.

Second, Defendants argue that because they discovered the FS Database permissioning issue only after making the misstatements to Customers D, E, and F, those misstatements should be dismissed as impermissible fraud by hindsight. Not so: "It is not 'fraud by hindsight' when statements . . . were false and misleading when made." *Freudenberg v. E*Trade Financial Corp.*, 712 F. Supp. 2d 171, 191 (S.D.N.Y. 2010); *see also Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 229 (S.D.N.Y. 2008) (rejecting "fraud by hindsight" argument where undisclosed breaches of licensing agreement allegedly existed at the time of misstatements); *In re*

*Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 342 (S.D.N.Y. 2007) (a statement is false and misleading where it is adequately alleged "that Defendants had access to facts contrary to the alleged statement"). Because the Commission alleges Defendants' misstatements about proprietary traders' access to MNPI were factually inaccurate when made (Am. Compl. ¶¶ 40-42), claims about them do not amount to charges of fraud by hindsight.

Defendants' reliance on *SEC v. Wellshire Securities, Inc.*, 773 F. Supp. 569 (S.D.N.Y. 1991), is unavailing. There, the defendant was charged with violating Sections 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 – all provisions requiring scienter, a context in which it naturally matters when a speaker learned of facts contradicting its misstatement. Here, in contrast, Defendants are charged with violating Section 17(a)(2) of the Securities Act, a violation of which requires no scienter. *See Aaron v. SEC*, 446 U.S. 680, 695-97 (1980). Consequently, the date on which Defendants learned of the FS Database permissioning problem is not dispositive and does not preclude negligence in making materially misleading statements, which the Commission alleges.

### C. A Reasonable Investor Could Find False or Materially Misleading Defendants' Statements about Maintaining and Enforcing Information Barriers

Defendants also urge dismissal with respect to VFI's January 2019 press release, which stated: "Post [merger] closing, Virtu intends to continue to maintain and enforce appropriate information barriers to segment and protect sensitive client data." (Am. Compl. ¶ 31.) They argue that their "extensive policies, procedures, and training programs" rendered their statement true, and that "Virtu's statements regarding its future intentions also were true and not misleading." (MTD at 16.)

The Commission agrees that Defendants' statements about their future intentions are not actionable – it has not alleged otherwise. Instead, the Amended Complaint alleged that the press

release was misleading because, by stating its intention to "*continue* to maintain and enforce appropriate" MNPI protections, VFI falsely implied that VAL *currently* had such appropriate protections. (*Id.*) It did not: VAL's permissioning deficiencies were unreasonable when the statement was made. Furthermore, by misstating that it "appropriate[ly]" protected customers' MNPI when it did not, VFI made a representation about efficacy and legal compliance that was contrary to reality.

### D. VFI's Misstatements Were Not Mere Puffery

Finally, Defendants argue that the misstatement claims "based on excerpts from public presentations, press releases, and earnings calls" should be dismissed because they amount to non-actionable puffery, *i.e.*, generalized aspirational statements upon which investors would not reasonably rely. (MTD at 16-19.) Defendants argue puffery only with respect to certain of the misstatements involving VFI – the November 2018 and March 2019 public presentations (Am. Compl. ¶ 29); the November 2018 earnings call (*id.*); and the January 2019 press release (*id.* at ¶ 31). These misstatements, however, were not mere aspirational generalizations; to the contrary, they were repeated, specific, and purportedly factual descriptions of Defendants' historical and then-current policies, procedures, and technological measures to protect MNPI, matters of vital concern to prospective customers.

Statements are not mere puffery where they are "misrepresentations of existing facts," *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000), and "are capable of verification," *In re Ford Fusion and C-Max Fuel Econ. Litig.*, No. 13-MD-2450 (KMK), 2017 WL 3142078, *10 (S.D.N.Y. Jul. 24, 2017). Defendants' assertions that they had logical access controls, conducted entitlement reviews, and reviewed approved personnel and permissions (Am. Compl. ¶ 29) were purely factual and therefore not puffery.

Second, Defendants' misstatements were sufficiently specific that a reasonable investor could interpret them as a basis on which to act. *See Suarez v. California Natural Living, Inc.*, No. 17-cv-9847 (VB), 2019 WL 1046662, *7 (S.D.N.Y. Mar. 5, 2019) (defendants' descriptions of its products as "natural" were not puffery because that term "is an affirmative claim about a product's qualities and is, therefore, not an exaggeration or overstatement expressed in broad, vague, and commendatory language.") (citation omitted). Defendants did not state vaguely that they had measures to safeguard MNPI; instead, they named specific measures (e.g., logical access controls and entitlement reviews) and made representations of efficacy (stating that their information barriers were "appropriate."). (Am. Compl. ¶¶ 29, 31.)

Finally, context is key: courts hold that even if "certain statements, 'viewed in isolation, may be mere puffery,' when the statements are 'made repeatedly in an effort to reassure the investing public' about matters important to the company, those statements may become material to investors.'" *BHP*, 276 F. Supp. 3d at 79 (quoting *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015)); *see also Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 279 (S.D.N.Y. 2012) ("repeated assertions" were not mere puffery). Defendants' misstatements about their policies and procedures to safeguard MNPI occurred repeatedly over the course of months in public presentations, an earnings call, a letter to investors, and responses to customers' questionnaires. (Am. Compl. ¶¶ 29-42.) The message was always the same and the reason for repetition was obvious: customers considered MNPI protections critical, and Defendants recognized that attracting future business required assuaging potential customers' concerns.

The opinion in *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189 (N.D. Ga. 2019), is instructive. There, Equifax made multiple public statements touting the security of the personal data in its custody, including that it employed "strong data security and confidentiality standards"

and maintained "a highly sophisticated data information network that includes advanced security, protections and redundancies." *Id.* at 1206-1207. Following a data breach, investors sued alleging misstatements and Equifax argued mere puffery. The court rejected that defense, reasoning that it "cannot say, as a matter of law, that Equifax's representations . . . were so obviously unimportant to its shareholders that they should be considered immaterial." *Id.* at 1224 (internal quotation marks omitted). Much as protecting customers' MNPI is central to Defendants' business, the court reasoned that "[s]ince data security plays an important part of a business such as Equifax, investors would be even more likely to find these types of misrepresentations important in making their investment decisions." *Id.* Finally, the court reasoned that "the fact that [Equifax's statements] were made repeatedly to reassure investors that Equifax's systems were secure could lead a reasonable investor to rely upon them" (*id.*) – analysis directly applicable to Defendants' repeated statements on the critical subject of MNPI protections.

Defendants' cases are not to the contrary. In *ECA & Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009), the Second Circuit dismissed as mere puffery statements touting the defendant's "highly disciplined" risk management and proclaiming that the defendant "set the standard for integrity." 553 F.3d at 205-06 (internal quotation marks omitted). Those statements were less specific, factual, and verifiable than the ones Defendants made, which pointed to concrete facts and measures that could be verified. Similarly, in *Grant v. Ursula Mgmt., LLC*, No. 20-cv-2953 (WFK) (AKT), 2021 WL 8382443 (E.D.N.Y. Oct. 6, 2021), an investment advisor stated that a "primary goal" of a particular fund was "safety," and that the fund "utilizes a variety of risk analyses created internally . . . and regularly monitors [risk] exposure levels." *Id.* at *3. Again, Defendants' statements here were more factual, specific, and verifiable, and they were repeated more often.

Defendants cite *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500 (S.D.N.Y. 2017), for the proposition that "statements about policies and procedures are not actionable if they 'do not profess an opinion on the efficacy' of the policies and procedures at issue," *id.* at 512, but that formulation distorts the holding. The court's observation was relevant only to deciding whether the defendants' expression of opinion could be actionable on the ground that defendants had been aware of contradictory facts. *Id.* at 512-13. Such a scienter analysis is unnecessary under Section 17(a)(2), and *Menaldi* does not establish that statements about policies and procedures are inactionable unless they opine on efficacy. Such a holding would make no sense: If a company falsely misstates that it has a particular policy or system when it does not, that misstatement could be material even without claiming efficacy.

Finally, Defendants cite *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018), for the proposition that a claim is not actionable where a plaintiff "merely quibbles with [defendant's] execution of [its] programs and procedures." But the Commission's allegations here are far more than "mere[] quibbles" over Defendants' implementation of MNPI protections, and it speaks volumes that Defendants invoke that language to describe the gravity of their fifteen-month firmwide permissioning failure and misstatements about that failure.

In sum, this case presents no occasion to depart from the usual rule that whether a statement is misleading should not be resolved on the pleadings, and Defendants' motion should be denied.

## II. VFI VIOLATED SECTION 17(a)(3) OF THE SECURITIES ACT BY MAKING AND DISSEMINATING FALSE AND MATERIALLY MISLEADING STATEMENTS

The Amended Complaint alleges Defendants violated Section 17(a)(3) of the Securities Act, which prohibits "engag[ing] in any transaction, practice, or course of business which operates

or would operate as a fraud or deceit upon the purchaser" of securities. 15 U.S.C. § 77q(a)(3).

Among other things, it alleges that Defendants repeatedly made and disseminated false and

misleading statements about their policies and procedures for protecting MNPI, a course of

business that would defraud or deceive reasonable customers in their decisions whether to transact

through Defendants.

Defendants do not seek dismissal of the Section 17(a)(3) claim against VAL. As to VFI,

however, they argue that disseminating a misstatement gives rise to a Section 17(a)(3) claim only

when "the disseminator is 'not the maker' of the misstatement" (MTD at 21), as was true in

*Lorenzo v. SEC*, 139 S. Ct. 1094 (2019) and *SEC v. Rio Tinto*, 41 F.4th 47, 49 (2d Cir. 2022).

They argue that Section 17(a)(3) is inapplicable where, as here, a defendant disseminates its own

misstatements.

Defendants are mistaken. Two recent decisions in this District have recognized that a

defendant may be liable under Section 17(a)(3) for disseminating its own misstatements. *See SEC*

*v. Amah*, No. 21-cv-6694 (KMK), 2023 WL 6386956, *11-14 (S.D.N.Y. Sept. 28, 2023) (granting

summary judgment in SEC's favor on claim that defendant violated Section 17(a)(3) by

disseminating its own misstatements); *SEC v. Terraform Labs Pte. Ltd.*, No. 23-cv-1346 (JSR),

2023 WL 8994860, * 18, __ F. Supp. 3d __ (S.D.N.Y. Dec. 28, 2023) (denying parties' cross-

motions for summary judgment on similar allegation). This outcome is entirely consistent with the

Supreme Court's ruling in *Lorenzo*, which held that "disseminating false or misleading information

to prospective investors with the intent to defraud" violates the scienter-based "scheme" provisions

of Securities Act Section 17(a)(1) and Exchange Act Rules 10b-5(a) and (c). 139 S. Ct. at 1100.

The Second Circuit's subsequent opinion in *Rio Tinto* interpreted *Lorenzo* to mean that liability

under Securities Act Sections 17(a)(1) and (3) "requires something *beyond* misstatements and

omissions, such as dissemination" (41 F.4th 49) – exactly what the Commission alleges VFI did here.  (Am. Compl. ¶¶ 29-31, 44.)

To evade the impact of these holdings on VFI's liability under Section 17(a)(3), Defendants urge the Court to invent a nonsensical new rule: That disseminating a misstatement is a fraudulent and deceptive act giving rise to liability under Section 17(a)(3) *unless* the misstatement is the disseminator's own, in which case – somehow – disseminating identical language is not fraudulent or deceptive.  That perplexing logic would have dictated different rulings in *Amah* and *Terraform*, and it would be antithetical to the plain text and reasoning of *Lorenzo* and *Rio Tinto*, which establish that making a misstatement and disseminating it are distinct acts giving rise to liability under different subsections of the securities laws.

In *Lorenzo*, the question was whether Lorenzo, a director of investment at a registered broker-dealer who had not himself made misstatements, could be liable for emailing prospective investors a message that his boss – the "maker" of the misstatements – supplied, approved, and directed him to send.  139 S. Ct. at 1099.  In holding Lorenzo liable for disseminating his boss's misstatements, the Supreme Court held that separate liability for dissemination fit the text of Rules 10b-5(a) and (c) under the Exchange Act, which parallel the language of Securities Act sections 17(a)(1) and (3), respectively.  The Court explained: "It would seem obvious that the words in these provisions are, as ordinarily used, sufficiently broad to include within their scope the dissemination of false or misleading information[.]"  *Lorenzo*, 139 S. Ct. at 1101.  It observed that these provisions "capture a wide range of conduct," and reasoned that there is "nothing [even] borderline" about "relevant conduct . . . consist[ing] of disseminating false or misleading information to prospective investors."  *Id.*  In other words, the Court held that disseminating a misstatement is a violation independent of making it.

Moreover, the Court observed that "Lorenzo signed the e-mails with his own name, he identified himself as 'Vice President – Investment Banking,' and he invited the recipients to 'call with any questions.'" *Id.* at 1099. Consequently, as far as investors knew, Lorenzo *did* both make and disseminate the misstatements – exactly VFI's situation – but that fact was no obstacle to scheme liability. And rightly so: disseminating a misstatement defrauds and deceives regardless of who crafts it.

The Second Circuit's decision in *Rio Tinto* only confirms this conclusion. There, the court held that *Lorenzo* had not abrogated the Second Circuit's holding in *Lentell* that liability under, *inter alia*, Section 17(a)(1) and (3) "requires something *beyond* misstatements and omissions, such as dissemination." *Rio Tinto*, 41 F.4 at 48-49 (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2005) (emphasis in original)). It reasoned that "misstatements or omissions were *not* the sole basis for scheme liability in *Lorenzo*. The *dissemination* of those misstatements was key." *Id.* at 53 (emphasis in original). The Second Circuit distilled the post-*Lorenzo* landscape as follows: "*Lentell* tells us that misstatements alone are not enough for scheme liability, and *Lorenzo* tells us that dissemination is one example of something extra that makes a violation a scheme." *Id.* at 54. This formulation recognizes that misstatements might be *part* of the evidence under Section 17(a)(3) even if they "alone are not enough," and establishes that dissemination can provide the "something extra" necessary for scheme liability. In other words, a party might both make a misstatement and disseminate it, and those acts combined could result in liability under Section 17(a)(3).

Here, the Commission has alleged that VFI both made and disseminated its misstatements, exactly the "something extra" that the Second Circuit endorsed as sufficient for scheme liability.

Defendants' argument, in contrast, is irreconcilable with the text of *Rio Tinto*. The Second Circuit explained that, after *Lorenzo*:

> [T]he scheme subsections can cover conduct that involves a misstatement *even if* the defendant was not the maker of it.

*Rio Tinto*, 41 F.4th at 53 (citation omitted) (emphasis added). Defendants' interpretation, however, would require changing *Rio Tinto*'s language from "even if" to "only if":

> [T]he scheme subsections can cover conduct that involves a misstatement *only if* the defendant was not the maker of it.

Defendants' formulation is materially different and arbitrarily restrictive, relegating scheme liability to cases where the misstatement's maker and disseminator are different. No court has adopted that view, and it makes little sense given that the investor harm from disseminating a misstatement does not depend on who crafted it.

Finally, Defendants attempt to justify their new rule by arguing that if dissemination were the "something extra" needed to satisfy scheme liability where the same person makes and disseminates the statement, then "the scheme subsections would swallow the misstatement subsections,' contrary to 'the structure that Congress designed.'" (MTD at 21 (citing *Rio Tinto*, 41 F.4th at 53).) Not so: the facts in *Lorenzo* itself show that the subsections would retain independent vitality. There also will be situations like Defendants' here, where the same person both makes and disseminates misstatements and faces liability under both subsections, but that is not troubling. The Supreme Court "h[as] long recognized considerable overlap among the subsections of the [Rule 10b-5] and related provisions of the securities laws." *Lorenzo*, 139 S. Ct. at 1102. It also has reasoned that "[e]ach succeeding prohibition was [ ] meant to cover additional kinds of illegalities – not to narrow the reach of the prior sections." *Id.* (quoting *United States v. Naftalin*, 441 U.S. 678, 774 (1979)).

## III.  VAL VIOLATED SECTION 15(g) OF THE EXCHANGE ACT BY FAILING TO DESIGN, MAINTAIN, AND ENFORCE REASONABLE MEASURES TO PREVENT THE MISUSE OF MNPI

The Amended Complaint alleges that, by failing to implement effective information barriers to prevent its proprietary traders from accessing customer MNPI in the FS Database, VAL violated Section 15(g) of the Exchange Act, which required it to "establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of such broker's or dealer's business, to prevent the misuse . . . of material, nonpublic information[.]"  15 U.S.C. § 78o(g).  Not only did VAL enable employees, including proprietary traders, to access the FS Database using generic and widely shared passwords (Am. Compl. ¶ 23) and encourage them to use that method (*id.* at ¶ 49), VAL also did not monitor or record who accessed the FS Database or what data they extracted from it (*id.* at ¶ 50).  This failure happened because, after VFI acquired KCG and VAL began compiling sensitive customer post-trade data in the FS Database, VAL did not review or update the permissioning for direct access to the database.  (*Id.* at ¶ 23.)

Defendants move to dismiss the 15(g) claim, arguing that despite the ease with which proprietary traders could have accessed customer MNPI using the shared generic logins, VAL's policies and procedures to protect MNPI were reasonably designed and enforced as a matter of law.  Their argument faces a demanding standard: although a reasonableness standard is objective, the determination "in the context of a particular case is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss."  *Aviles v. S&P Global, Inc.*, 380 F. Supp. 3d 221, 285 (S.D.N.Y. 2019) (considering reasonableness of reliance).  Defendants' motion does not meet that standard – accepting the allegations as true, they readily

permit a finding that VAL's policies and procedures MNPI were not reasonably designed and enforced.

### A. VAL Did Not Establish, Maintain, and Enforce Reasonably Designed Policies and Procedures to Prevent the Misuse of MNPI

Defendants argue that, notwithstanding the virtually unfettered access to MNPI attainable through generic direct logins to the FS Database, VAL employed other safeguards that made up for the oversight. (MTD at 6-10.) These measures purportedly included written policies forbidding accessing MNPI without need; a training on those written policies; "lockdown systems" to detect aberrational trading patterns; and imposing supervisory liability for permissioning. A robust permissioning system, however, is fundamental for a firm like VAL, which handled approximately 25% of market orders placed by retail investors in the United States. Indeed, the Commission anticipates offering expert opinion on technological access controls' indispensable role in protecting MNPI in this context. Without robust permissioning, VAL's other policies and systems were like castle walls built on quicksand: perhaps helpful, but in context not reasonable, and certainly not as a matter of law.

VAL's position is analogous to that of a bank that designs its jewel vault without a lock on one of its two doors, and without cameras to monitor entry to the vault or activities within it. Such a bank might have other security measures resembling those VAL claims here: policies against employees' entering the vault without a business need; a training on the importance of respecting customers' property; a monitoring system that generates alerts when employees exhibit unusual movement patterns; and supervisory responsibility for granting permission to enter the vault. Despite those measures, however, it would be difficult to call the vault's security reasonable – locked doors are foundational when safeguarding valuable property. The customer MNPI in VAL's FS Database was of great value and should have been protected accordingly.

Indeed, the other policies and procedures VAL discusses only highlight the need for discovery and the impropriety of dismissing the claim. Section 15(g) requires more than "establish[ing]" reasonably designed written policies and procedures to protect MNPI – it also requires "maintain[ing]" and "enforc[ing]" them. 15 U.S.C. §78o(g). Consequently, even if VAL established the measures it describes, discovery is needed regarding whether it appropriately enforced them and whether they were effective in protecting MNPI.

For example, VAL argues that its supervisory lockdown systems would "detect aberrational trading patterns that would indicate misuse of customer trade data by employees" (MTD at 12), but that raises a question of fact. The Amended Complaint (at ¶¶ 53-56) alleges that in one week in 2018, the lockdown system generated 1.5 million lockdowns and resets, but that those aberrations generated only two supervisory alerts. Perhaps that virtually nonexistent alert rate is evidence of a well-functioning and effective oversight system, or perhaps it shows the opposite – discovery and potentially expert analysis are needed on the issue.

Similar factual disputes exist with respect to VAL's single training and compliance meetings. (*Id.* at ¶¶ 57-58.) Those and similar disagreements cannot be resolved on the pleadings.

**B.      The Absence of Evidence Regarding Proprietary Traders' Misuse of MNPI is not Evidence of Absence**

Defendants are mistaken in ascribing significance to the absence of allegations that proprietary traders actually misused MNPI in the FS Database. That absence certainly is not "powerful and conclusive evidence that VAL's many policies and procedures were effective, and therefore reasonably designed, maintained, and enforced in accordance with Section 15(g)." (MTD at 12.) That is so for two reasons.

First, actual misuse of MNPI is not an element of a Section 15(g) violation. If an absence of evidence of misuse were "conclusive" evidence that a system is reasonably designed, then evidence of misuse would be a *de facto* element. It is clear, however, why actual misuse is not an element: Section 15(g) does not require the Commission to wait until an unreasonably designed system is exploited before taking corrective action. A flawed system affording MNPI little protection might not be exploited out of sheer luck, or its design might be incapable of identifying misuse that indeed *has* occurred. In neither case would an absence of evidence of misuse prove the system's reasonableness.

Second, in this case there is not so much an absence of actual misuse of MNPI as there is an absence of any way for anyone – including Defendants – to tell who accessed the FS Database and what they did with the data in it, legitimately or otherwise. That is because, as alleged, VAL did not record in any form who directly accessed the FS Database or what information they extracted from it. (Am. Compl. ¶ 50.) Without such tracking, the absence of evidence of misuse is not evidence of absence.

### C. VAL Is Due No Deference on the Objective Question of Whether its MNPI Protections were Reasonable

Defendants misleadingly suggest that deference is owed to their view that their MNPI protections were reasonable, citing a Ninth Circuit decision holding that "Section 15(g) 'calls on securities firms to decide *for themselves* how best to' prevent misuse of MNPI." (MTD at 10 (quoting *McDaniel v. Wells Fargo Investments, LLC*, 717 F.3d 668, 676-77 (9th Cir. 2013)).) *McDaniel*, however, holds only that broker-dealers have flexibility to choose among objectively reasonable protective measures, not that they may choose an objectively *un*reasonable approach if they deem it "best" or that deference is owed regarding what is reasonable. The problem here is not VAL's exercise of discretion, but its failure to meet the objective requirement.

**D.      The Commission Does Not Contend That Perfection Is Required**

Finally, Defendants protest that the Commission is demanding "perfect[ion]" in protecting MNPI, but that is not so.  The permissioning deficiency resulted from Defendants' conscious choices: they designed the direct-access method of using the FS Database; encouraged traders to use it; enabled the generic logins; and did not build capabilities to track access to the database or activities within it.  VAL was unreasonable not to revisit those decisions when circumstances changed following the KCG acquisition.

**CONCLUSION**

For the reasons stated above, Defendants' motion should be denied.


Dated: March 4, 2024                              Respectfully submitted,


                                                  /s/ Damon W. Taaffe
                                                  Damon W. Taaffe (admitted *pro hac vice*)
                                                  U.S. Securities and Exchange Commission
                                                  100 F Street, N.E.
                                                  Washington, DC 20549
                                                  Tel: (202) 551-7420
                                                  taaffed@sec.gov
Of counsel:

David A. Becker
Paul Kim
Alexandra M. Arango
David Bennett

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549

**CERTIFICATE OF COMPLIANCE**

I hereby state that the foregoing opposition was prepared using Microsoft Word. Pursuant to that program's word count, this opposition contains 6,984 words, excluding the caption, tables of contents and authorities, signature block, and this certification.


Dated: March 4, 2024                          __/s/ *Damon W. Taaffe*_____
                                              Damon W. Taaffe