0893secm

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  SECURITIES and EXCHANGE
   COMMISSION,

4
                 Plaintiff,              New York, N.Y.
5
            v.                           23 CV 8072 (JGK)
6
   VIRTU FINANCIAL, INC., et al.,
7
                 Defendants.
8
   ------------------------------x        Motion
9
                                          August 9, 2024
10                                         12:30 p.m.

11  Before:

12                    HON. JOHN G. KOELTL,

13                                        District Judge

14

15                        APPEARANCES

16

17

18  SECURITIES and EXCHANGE COMMISSION
        Attorneys for Plaintiffs
    BY:  DAMON W. TAAFFE
19       JAMES M. CARLSON

20

21  PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
        Attorneys for Defendants
22  BY:  LORIN . REISNER
            ANDREW G. GORDON
23          JESSICA S. CAREY
            MEGAN VINCENT
24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

0893secm

```
 1                (Case called)

 2                MR. TAAFFE:  Good morning.  Damon Taaffe for the

 3     Commission.  With me is James Carlson, also with the

 4     Commission.

 5                MR. REISNER:  Good afternoon, your Honor.  Lorin

 6     Reisner from Paul Weiss for Virtu.  And I'm with my colleagues

 7     Megan Vincent, Andrew Gordon, and Jessica Carey.

 8                THE COURT:  Good afternoon, all.

 9                I should point out at the outset that I know

10     Mr. Reisner.  We were colleagues together at Debevoise over 30

11     years ago.  Nothing about that affects anything that I do in

12     the case.

13                This is a motion to dismiss by the defendants.  I'll

14     listen to argument.

15                MR. REISNER:  Thank you, your Honor.  I'd like to

16     briefly review why all of the claims asserted in the amended

17     complaint, those under Section 17(a)(2) and (a)(3) of the

18     Securities Act, as well as those under Section 15(g) of the

19     Exchange Act, should be dismissed.

20                THE COURT:  There is no motion to dismiss Count Four,

21     17(a)(3) against VAL.

22                MR. REISNER:  That is correct, your Honor.  All of the

23     counts on which we have moved should be dismissed.

24                Let me start with the Section 17(a)(2) and (a)(3)

25     claims.  None of the statements that the SEC alleges were
```

0893secm

1    misleading are actionable as a matter of law for two

2    fundamental reasons:  First, the statements were true and

3    accurate based on the allegations of the amended complaint, and

4    documents referenced by and incorporated in the amended

5    complaint that the Court may properly consider on this motion.

6         Those allegations and those documents demonstrate that

7    Virtu had extensive written policies and procedures providing

8    for prohibitions on the misuse of sensitive information,

9    prohibitions on accessing non-permission data, physical

10   information barriers, and logical information barriers.

11        For example, the VAL compliance manual referenced in

12   paragraph 47 of the amended complaint and attached as Exhibit 1

13   to our moving declaration provides that the firm has

14   established information barrier processes that are intended to

15   segregate information within discrete business units.  The

16   information barriers include both physical and systematic

17   separation between business groups, so that the information

18   processed by one business group is not shared with other

19   business groups who do not have a need to know about the

20   information.

21        The compliance manual further provides that employees

22   are not permitted to access proprietary or client information

23   that is not necessary to carry out their job responsibilities.

24   And it states having physical access or systems access to this

25   type of information does not equate to being authorized to

0893secm

1    access information.

2            And I quoted from pages 18-19 of the compliance

3    manual.

4            Similarly, the Virtu confidential information policy

5    referenced in paragraph 47 of the amended complaint and

6    attached as Exhibit 2 to the moving declaration establishes

7    policies requiring logical barriers and a permissioning system,

8    and that's at pages 2-3 of that document.  The amended

9    complaint in this case itself acknowledges that employees

10   accessing the FS Database generally are required to "enter

11   their unique log-in credentials and could access only

12   information necessary for their role at the firm.  A process

13   typically known as permissioning."  Quoting paragraph 18 of the

14   amended complaint.

15           The amended complaint and documents referenced by and

16   incorporated in the complaint further demonstrate that Virtu

17   maintained and enforced those policies and procedures through

18   mandatory training for all employees, establishing supervisory

19   responsibility for allowing access to sensitive data, mandatory

20   annual compliance programs for all employees, and other

21   safeguards.  Employees were expressly trained not to access

22   data outside their job responsibilities.

23           As the Virtu financial sensitive information barriers

24   and client instruction training presentation referenced at

25   paragraph 57 of the amended complaint and attached as Exhibit 3

0893secm

1    to the moving declaration states, "just because you can access

2    it does not mean that you are authorized to access, use, or

3    share it." Quoting from page 7.

4         So for example, your Honor --

5         THE COURT:  The SEC alleges that, despite all of those

6    statements of control and training, there was the ability to

7    access the FS Database through direct access, and that method

8    was widely used.  So that all of the statements about the

9    restrictions on access were misleading.

10        MR. REISNER:  So, your Honor, I think that the

11   allegations of the complaint and the documents that are

12   referenced in the complaint demonstrate that, notwithstanding

13   the allegations in the complaint, all of the statements were

14   true and accurate, and could not be plausibly viewed as

15   misleading under the circumstances of this case.

16        THE COURT:  Hold on.  So the SEC says, or alleges,

17   that there is this other method of access in which the

18   individuals at the firm can use this other means of access,

19   which is more anonymous, to obtain direct access to the FS

20   Database so that all of the statements about all of the

21   particular restrictions are, at best, misleading.

22        Now, you say that's not fair, that's not accurate.

23   The specific statements about all of the barriers and training

24   and how seriously they're taken are true.  The SEC says, but

25   they're misleading.

0893secm

1              How can I decide a question of whether the statements

2    were misleading in view of the contrary allegations in the

3    complaint, on a motion to dismiss?

4              MR. REISNER:  Your Honor, for the same reason that

5    Judge Abrams in the *Philip Morris* and *Ferroglobe* cases, that

6    Judge Failla in the *Ong v. Chipotle* case, and that Judge Swain

7    in the *Barilli v. Sky Solar Holdings* case and Judge Oetken in

8    the *Menaldi* case, all cited in our brief, granted motions to

9    dismiss in like circumstances, because given the statements --

10             THE COURT:  Each case has to be decided --

11             MR. REISNER:  100 percent.

12             THE COURT:  -- on its own facts and on its own

13   allegations.

14             MR. REISNER:  100 percent.

15             And in this case, when you look at the challenged

16   statements, and you look at the allegations in the complaint

17   and the materials attached to the complaint, there is no

18   plausible basis to conclude that the statements could be

19   misleading under these circumstances.  And let me tell you why.

20   There is no -- well, let me back up.

21             This hypothetical possibility that employees might be

22   able to access certain post-trade information in the FS

23   Database, which would have to overcome and violate the

24   company's policies and procedures, would have to be

25   inconsistent with the training offered, which would have to --

0893secm

| | |
|---|---|
| 1 | THE COURT:  They say it's not hypothetical. |
| 2 | MR. REISNER:  No, there is no -- it is hypothetical. |
| 3 | And that's because there is no allegation in the amended |
| 4 | complaint that proprietary traders saw any sensitive customer |
| 5 | post-trade data.  There is no allegation in the amended |
| 6 | complaint that proprietary traders were even aware that the FS |
| 7 | Database contained any sensitive customer post-trade data. |
| 8 | There is no allegation in the complaint that any proprietary |
| 9 | trader actually accessed sensitive customer post-trade data. |
| 10 | There is no allegation in the complaint of any misuse of |
| 11 | sensitive customer data.  There is no allegation in the amended |
| 12 | complaint of unauthorized access to sensitive customer |
| 13 | post-trade data.  It's entirely hypothetical. |
| 14 | And this hypothetical possibility that employees might |
| 15 | be able to access certain post-trade information in the FS |
| 16 | Database due to a temporary technological issue that was |
| 17 | self-identified by Virtu, and self-remedied by Virtu, as |
| 18 | acknowledged by the amended complaint, long before this SEC |
| 19 | investigation even started, cannot render untrue or misleading |
| 20 | Virtu's statements that it maintained and enforced information |
| 21 | barriers, policies, and procedures. |
| 22 | You have to look at the statements that are alleged to |
| 23 | be misleading in the complaint, such as in paragraph 29. |
| 24 | "Virtu has established policies and procedures designed to |
| 25 | safeguard sensitive client information, including technology |

1    access controls to segregate sensitive information and review

2    of approved personnel and permissions."  That is absolutely

3    true and accurate, based on the allegations in the complaint

4    and the documents referenced in the complaint.

5           And this hypothetical notion where there is no

6    allegation that any proprietary traders saw, were aware that

7    the FS Database contained any sensitive information, accessed

8    information, misused information, cannot overcome the fact that

9    those are true and accurate statements, incapable of plausibly

10   misleading any investor for the same reason that the judges in

11   the cases I just mentioned reached similar conclusions.

12          THE COURT:  Every case has to be decided on its own

13   facts.

14          MR. REISNER:  Absolutely.  And the facts here, based

15   on the statements in the amended complaint and the facts that

16   are set forth in the amended complaint and the documents

17   attached to the amended complaint, demonstrate that the

18   statements are true.

19          THE COURT:  Okay.  I have that argument.

20          MR. REISNER:  Okay.  And it's very much like the --

21   absolutely every case has to be decided on its own merits.

22   But, in each of the cases that I just mentioned, the same

23   principle has been applied to dismiss the allegations of

24   securities law violations in those cases on the same logic.

25          Here, based on the undeniable facts about what the

0893secm

1  amended complaint alleges and doesn't allege, the only

2  plausible conclusion is that no investor could be misled, just

3  like in the *Philip Morris* case where Judge Abrams ruled --

4          THE COURT:  Okay.  I have your argument on that.  Go

5  ahead.

6          MR. REISNER:  Just I was just going to refer to some

7  of the language used by Judge Abrams, Judge Failla, Judge

8  Oetken.

9          THE COURT:  I have that argument.  I heard the litany.

10          MR. REISNER:  Okay.

11          In addition to the statements being true and accurate,

12  the statements are also inactionable for the related reason

13  that they consist of generalized assertions of corporate policy

14  and practice that did not provide any guarantees or absolute

15  assurances regarding the efficacy of those policies and

16  practices.

17          I read paragraph 29 of the amended complaint.  That is

18  a classic generalized assertion of corporate policy and

19  procedure as are the allegations in paragraph 30 and 31, such

20  as paragraph 30: "Prior to merging, both Virtu and ITG each

21  maintained our own procedures to segregate and protect

22  sensitive client data."  That is indisputably a true, accurate

23  and generalized inactionable statement.

24          Same thing with paragraph 31.  The challenged

25  statement is: "Post-closing, Virtu intends to continue to

0893secm

1    maintain and enforce appropriate information barriers to

2    segment and protect sensitive client data."  There is no basis

3    to conclude that that's misleading based on the allegations in

4    the complaint.  And in addition, that, too, is a generalized

5    assertion of corporate policy and practice that's inactionable.

6    Just very similar to the statement in *ECA v. JPMorgan* found to

7    be inactionable that the company maintained risk management

8    processes that were highly disciplined and designed to preserve

9    the integrity of the risk management process.

10          The recent case by Judge Engelmayer last month in the

11   *Solar Winds* case reached a similar conclusion.  Judge

12   Engelmayer called statements non-actionable corporate puffery,

13   inactionable as a matter of law.  Statements are very similar

14   to the challenged statements here.  The statements there were

15   that the company "places a premium on the security of its

16   products and makes sure that everything is backed by sound

17   security processes, procedures and standards."  And also that

18   the company "equips technology professionals with tools to help

19   monitor, manage, and secure today's complex environment."

20          The statements challenged by the SEC here are

21   virtually identical in kind to the statements challenged by the

22   SEC in the *Solar Winds* case that were dismissed as inactionable

23   by Judge Engelmayer.  They are simply too generic to express

24   any objective fact as a matter of law.

25          So that's our argument, your Honor, with respect to

0893secm

1    the Section 17(a)(2) and (a)(3) claims.  True and accurate,

2    based on the allegations of the complaint, not capable of

3    plausibly being viewed as misleading, and of a generalized

4    matter, generalized assertion of corporate policy and practice

5    that are inactionable.

6         Unless there are any questions, I'll move on to our

7    Section 15(g) arguments.

8         THE COURT:  Go ahead.

9         MR. REISNER:  The Section 15(g) claim also should be

10   dismissed.  Because the only plausible inference from the

11   amended complaint and documents referenced in the amended

12   complaint is that Virtu established, maintained, and enforced

13   written policies and procedures reasonably designed to prevent

14   the misuse of sensitive information.

15        Those allegations and documents, for the reasons I've

16   described, demonstrate that Virtu established, maintained, and

17   enforced policies providing for prohibitions on the misuse of

18   sensitive data, prohibitions on accessing non-permission data,

19   physical information barriers, and logical information

20   barriers.

21        The fact that Virtu, as acknowledged in the amended

22   complaint, self-identified and self-remedied the technological

23   issue demonstrates that the company established, maintained,

24   and enforced policies and procedures reasonably designed under

25   Section 15(g).

0893secm

1          Again, this hypothetical risk, backed up by no

2     specific allegations in the amended complaint, cannot refute

3     these expressed policies and procedures set forth in the

4     amended complaint, and the documents referenced in it the

5     amended complaint.

6          In fact, the failure of the SEC to allege in the

7     amended complaint any actual improper access or any misuse of

8     sensitive data also demonstrates the effectiveness of Virtu's

9     policies.  The SEC had more than 3 years to investigate this

10    case.  And they investigated this case for more than 3 years,

11    they obtained more than 30,000 documents.  They obtained

12    scripts or code from the traders to determine whether or not

13    that code contained any evidence of access to sensitive

14    information.  There was no evidence, and there is no

15    allegations of any such access in the amended complaint.

16         The SEC is not in a position to allege and has not

17    alleged any improper access.

18         THE COURT:  But the SEC alleges that the procedures

19    were not reasonably designed to assure that material,

20    non-public information is not accessed.  So, the issue is

21    whether as a matter of law the defendants can say no, the

22    allegations in the complaint are insufficient to show that we

23    didn't have procedures that were "reasonably designed."  That's

24    not a question of what the result of the procedures were.  It's

25    a question of whether the procedures were "reasonably designed"

0893secm

1  to assure what they were supposed to prevent.

2          What similar cases are there which say that similar

3  SEC allegations with respect to "reasonably designed" are

4  insufficient?  It's not a question of whether empirically they

5  do or do not result in the impermissible accesses to material,

6  non-public information.  It is a question of whether the

7  procedures were reasonably designed.  Reasonableness usually is

8  not something that can be decided on a motion to dismiss.

9          So, what cases are there under 15(g) where the Court

10  says that the allegations should be dismissed on a motion to

11  dismiss?

12          MR. REISNER:  So, there are no cases either way under

13  Section 15(g).  The case we cite in our brief that's most on

14  point is *Bassaw v. United Industries Corporation*, 482 F.Supp.3d

15  80, 87 (S.D.N.Y. 2020), in which the Court held where only one

16  inference may be drawn as to reasonableness, then it becomes a

17  question of law that can be resolved on a motion to dismiss and

18  in this case --

19          THE COURT:  But there are lots of other cases, once

20  it's conceded that there are no cases under 15(g), which

21  attempt to determine whether reasonableness is something that

22  can be decided on a motion to dismiss.  There are lots of other

23  cases in other areas of the law that say reasonableness is not

24  something that can be decided as a matter of law on a motion to

25  dismiss.

0893secm

1          So, you say there's one other case where

2    reasonableness as a matter of law was determined on a motion to

3    dismiss in another area.  That's not profoundly persuasive.

4          MR. REISNER:  I think there are two other cases that

5    we cite with *Bassaw* on the brief on the same page.  So, *Bassaw*

6    is not the only case that stands for this proposition.  And

7    there just isn't that much litigation under Section 15(g) in

8    general, so it's not surprising that this issue hasn't come up

9    in the context of 15(g).

10          But there are several cases in which courts have found

11    where only one inference may be drawn as to reasonableness,

12    then it becomes a question of law that can be resolved on a

13    motion to dismiss.  And here, based on the allegations and the

14    lack of allegations, the only reasonable inference based on the

15    materials set forth in the amended complaint --

16          THE COURT:  The 17(a)(3) claim proceeds against VAL in

17    any event.  So what's the practical effect of granting the

18    motion to dismiss?

19          MR. REISNER:  Oh, I think that the Court should

20    streamline the matter by --

21          THE COURT:  I should give a haircut to the case.

22          MR. REISNER:  Yeah.

23          THE COURT:  Will it have any practical effect?

24          MR. REISNER:  I think it will have substantial

25    practical effect.

0893secm

1           THE COURT:  Why?

2           MR. REISNER:  It will limit the claims available to

3    the SEC, and the scope of remedies available to the SEC based

4    on the --

5           THE COURT:  Sure.  But hold on.  Discovery would go

6    forward on the same issues for the same scope, and it would

7    follow as the night the day that at the end of discovery there

8    would be a motion for summary judgment, at which point all of

9    these arguments would be raised on a full factual record,

10   including what happened in terms of the alleged access to

11   material, non-public information, so, and it would be decided

12   on a full record, a full summary judgment record after

13   discovery.  And discovery I assume isn't going to be limited in

14   any way when there is a 17(a)(3) claim against VAL.

15          MR. REISNER:  Yeah.  So very practically, your Honor,

16   look, paragraph -- the statements challenged in paragraphs 29,

17   30, 31 in our view are just obviously inactionable for the

18   reasons I just described.  The other statements are

19   inactionable as well, but those are so obviously inactionable

20   they should be dismissed and that will have a real impact.

21   Because the SEC will know that those statements are not in the

22   case, and the SEC, I suspect, may view this case quite

23   differently if those statements are not in the case.

24          There is no reason not to, at the very least, dismiss

25   those statements, which are inactionable on their face, from

0893secm

1   this case, and we would view that as the proper outcome under

2   the law and of significant practical impact as this case moves

3   forward.  Maybe it won't narrow discovery, but it will narrow

4   the impact and potential remedies available in this case.

5          THE COURT:  Okay.  Go ahead.

6          MR. REISNER:  Thank you, your Honor.  That's all we

7   have, unless there are any further questions from the Court.

8          THE COURT:  No.  Thank you.

9          SEC.

10         MR. TAAFFE:  Thank you, your Honor.  I think many of

11  the points that I would have made in response to Mr. Reisner's

12  arguments are ones that the Court's own questions elicited.

13  So, I just like to respond briefly to a few things that he

14  said, but of course I'll respond to any questions that the

15  Court has in the meantime.

16         I think that the Court's questions really get to the

17  heart of the SEC's position here, which is that a lot of the

18  arguments that we've heard in the motion to dismiss are really

19  factual questions, best posed in the context of a summary

20  judgment motion or to a trier of fact.

21         We cite in our brief the *Strata Association* case that

22  generally it's not appropriate on a motion to dismiss to make

23  decisions about whether something is misleading, unless

24  reasonable minds couldn't differ.  And our amended complaint in

25  the first instance and then our opposition to the motion to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0893secm

1    dismiss goes paragraph by paragraph, statement by statement,

2    and says quite clearly why we believe a reasonable mind can

3    conclude that these statements are misleading.

4            If there are any specific questions, I'm happy to

5    address them, but I'll just take one that Mr. Reisner spoke to.

6    Which is he referred to the November 2018 and March 2019 public

7    presentations which were amended complaint paragraph 29, and he

8    talked about the broad language of having established policies

9    and procedures designed to safeguard sensitive information.

10           That's not the entirety of the statement.  The

11   statement then goes on to refer to technology access controls

12   to segregate sensitive information and review of approved

13   personnel and permissions.

14           And the heart of our complaint is that the

15   technological access controls in particular with respect to the

16   FS Database direct access method, that the technological access

17   controls, that phrase, does not mean what it sounds like.

18   Because what it sounds like is that each person gets access or

19   does not get access as a technological matter based on their

20   job description, and that wasn't true.  That's the whole

21   problem with the generic log-ins.

22           Similarly, they refer to review of approved personnel

23   and permissions, but we also allege that with respect to the

24   direct access method of the FS Database, there was no review of

25   approved personnel and permissions.

0893secm

1          So, we think that these are just black-and-white

2    false, but at the very least misleading, and we explain why

3    that's true with respect to each of the statements at issue.

4          THE COURT:  The gist of the defendants' position, not

5    to oversimplify, is that the SEC has been conducting an

6    investigation for years and hasn't come up with any specific

7    examples where the database was in fact misused.  So, it

8    ill-behooves the SEC to argue in its complaint that these

9    statements were misleading, because in fact, the procedures of

10   the defendants have been sufficient, otherwise the SEC would

11   have come up with examples where the procedures were abused.

12         Now, I fully understand the SEC's position that we're

13   talking about whether the procedures were reasonably designed.

14   But is there no other answer to that argument, other than the

15   question is whether they were reasonably designed?

16         Now, I mean, I can hypothesize about other answers,

17   including the ability to disguise or evade the use of material,

18   non-public information.  But I just want to make sure that I

19   understand the SEC's position.

20         MR. TAAFFE:  Sure.  It's a bit of a layered question.

21   I think it is an important one and it kind gets to 15(g) and

22   also the misstatements a little bit.

23         Starting with the misstatements, I mean, the

24   misstatements are either misleading or they're not.  We think

25   on their own merits, and we explain why each one we think is

0893secm

1    misleading, but moving to 15(g), this is something that is

2    really relied on quite extensively in the motion to dismiss,

3    this idea that the SEC hasn't been able to adduce evidence or

4    even allege actual misuse of the database.  And there are

5    several responses, we think each of which is just dispositive

6    in this context.

7        The first is, as a technical matter, 15(g) does not

8    have as an element -- a violation of 15(g) does not require

9    showing actual misuse.  It's just how the system is designed.

10   And we can all imagine systems, maybe not this one, but just in

11   life, in general, that could be egregiously flawed in design,

12   but they may not be exploited just by sheer luck.  Or maybe the

13   design flaw is such -- and this does get more to this case --

14   that the system could have been exploited, but the system

15   itself is incapable of determining that.

16       So, as we explain in our opposition, what we have here

17   is not an absence of allegations because we sifted through all

18   the evidence and we just couldn't point our finger to any.

19   There is no evidence.  In our investigation, it was lengthy,

20   and part of the reason it was lengthy was because we expended

21   so much effort trying to answer this very question, going back

22   and forth, seeking log-in information and anything else we

23   could find, that might show misuse.  But the problem is that

24   the way their system was designed, in part due to this generic

25   log-in, it didn't track who was logging in, or once they logged

0893secm

1    in, what they were doing with it.  Virtu doesn't know what

2    anybody viewed once they got into the FS Database.  And as a

3    result, they can't tell us -- we asked the questions as best we

4    could, and ultimately I think both parties agree that that

5    information just doesn't exist.

6         So, if their system did not track activity in their

7    database in a way that would preserve evidence of misuse, we

8    think it's a little cynical to fault the SEC for failing to

9    allege anything based on the absence of facts, especially in a

10   circumstance where the absence of misuses or the evidence of

11   misuse is not an element.

12        It's not an element of 15(g) for the further reason

13   that one could imagine a case where maybe evidence could be

14   found of misuse.  Not this case, because it can't be.  But a

15   different case where it could be, but the SEC could move

16   forward with a 15(g) allegation alleging unreasonable design

17   before that system's exploited.

18        That's the purpose of Section 15(g), is to enable us

19   to come in and ensure that we are able to take action where

20   necessary without waiting for something to go terribly wrong.

21        So all of those things together we think suggest that

22   this absence of misuse is just not relevant at this point.

23   Maybe it could be a factual point raised down the road.  That

24   wouldn't surprise me.  But it is certainly not dispositive.  It

25   can't be a basis to rule as matter of law we feel on this

0893secm

1    question.

2              So that's our 15(g) point.

3              THE COURT:  You also agree there are no cases?

4              MR. TAAFFE:  We definitely agree there are no cases.

5    We're in a bit of the unknown here, at least as far as

6    precedents go.  And certainly we know there are all sorts of

7    cases applying a reasonableness standard, and the take away we

8    have from those cases, which we cited in our opposition, is

9    that generally reasonableness is a question of fact.

10             And certainly in this case, at least we think that the

11   allegations are more than sufficient to allow a finder of fact

12   to develop the record and see whether they were actually

13   reasonable in practice.

14             We expect to have expert testimony on the question of

15   system design, and we expect that testimony to say this was not

16   a reasonable approach to the question.  But again, those are

17   all questions that we think can be developed through discovery

18   and are not appropriately addressed on a motion to dismiss.

19             Turning briefly to the Section (a)(2) and (a)(3)

20   questions.  Unless your Honor would like me to, I don't intend

21   to go through the statements point by point.  We do that in our

22   opposition, we do it in the amended complaint itself.  I would

23   simply say a couple of things.

24             The first is that we've heard a lot of argument about

25   these statements being too general to be actionable.  We think

0893secm

1    that they're not.  I gave you the example of Section 29 where

2    it's one thing to say that we have intentions to safeguard

3    information or we have systems designed to do that.  Those

4    broad statements I think would be a harder argument, but it is

5    an argument we're not faced with because there are specific

6    statements in each misstatement that we allege that are

7    statements of fact.  Whether there are access controls, whether

8    there are entitlement reviews, whether there are password

9    permissioning.  Those are things that are true or false, and

10   they're things that the listener to a statement would have been

11   entitled to rely on in deciding whether to trust Virtu with

12   their sensitive information.

13           This case features in large part statements made in

14   response to questions that VAL's customers submitted.  And they

15   submitted very pointed questions that really get to why this

16   case is important.  They were concerned about what access

17   proprietary traders had and what measures existed to ensure

18   that their post-trade information could not be viewed by people

19   who shouldn't be viewing it.  That's the way they submitted

20   those questions.  And the language of Section 17(a)(2) speaks

21   to, in light of the circumstances under which the statements

22   were made, whether they're misleading.

23           The circumstance here is that these statements are

24   being made in response to very pointed questions with respect

25   to VAL on these issues, and with respect to VFI to the

0893secm

1    investing public as a whole on a very critical subject.

2           So, these are statements that you can identify as true

3    or false, that are capable of verification in the language of

4    *In re Ford*, and that are sufficiently specific that a

5    reasonable investor could interpret them as a basis to act.

6    And that's the *Suarez* case.

7           We would also note this is not a one-off conversation

8    between a couple of individuals.  These are repeated statements

9    to the public at large and to investors over the course of

10   months on a critical subject.  And we cite three cases, *BHP*,

11   *Petrobras*, and *Richman*, all Southern District.  Those

12   statements, even if they may be puffery or inactionable in

13   isolation, when they're repeated time and time again on the

14   same subject, that they can become material.

15          So we think they're material even in isolation here,

16   but certainly, in the aggregate, we think that a reasonable

17   mind can conclude these statements were materially misleading,

18   and that's why we brought this case.

19          Finally, I would on Section 17(a)(3), I think our

20   brief lays out our position on this, but I would just follow up

21   on one question the Court had which is what's the practical

22   effect here.  If we're moving forward on discovery with the

23   misstatements, and we think we should for the reasons we've

24   said, we are going to be asking questions in discovery about

25   everything to do with the misstatements, we'll find out how

0893secm

1    they were disseminated and all these things.

2            There are two cases, and these are not in our brief,

3    but I'll just tell you because they seem important given the

4    Court's question.  In the last year, *SEC v. Gallagher*, that's

5    21-8739 Judge Castel.  And then *SEC v. Rosenberger*, 22-3736,

6    that's Judge Cote.  In both of these case, there was a similar

7    situation where there were alleged misstatements, and those

8    statements were alleged to comprise part of a scheme under both

9    the scienter position and Section 17.  And in both cases the

10    Court allowed the misstatement provisions to go forward on a

11    motion to dismiss and said, look, because the misstatements are

12    going under (a)(2), we won't get into the weeds about whether

13    they're actionable under (a)(3) at this point.  We can take it

14    up in summary judgment context.

15            And we think that's an easy way to handle it here,

16    although for the reason we say in our brief, we think the

17    statements are actionable under 17(a)(3).  And I'm happy to

18    answer any questions the Court has.

19            THE COURT:  No.  Thank you.  All right.

20            No, if the defense wants to.

21            MR. REISNER:  Very briefly, your Honor.

22            Just looking at the paragraph 29 statement that the

23    SEC's counsel alluded to.  That is specifically Virtu has

24    established policies and procedures designed to safeguard

25    sensitive client information, including technology access

0893secm

1    controls to segregate sensitive information and review of

2    approved personnel and permissions.

3            That is indisputably accurate based on all of the

4    policies and procedures that I read at the beginning.  Virtu

5    has technology access controls.  Virtu segregates sensitive

6    information.  Virtu includes a review of approved personnel and

7    permissions.  It says it right in the amended complaint and the

8    documents referenced in the complaint.

9            The SEC's theory is that because Virtu omitted

10    information about this direct access to the FS Database,

11    without appropriate permissioning, that that somehow renders

12    false and misleading otherwise absolutely truthful statements.

13    That position is not defensible based on the allegations in the

14    complaint and the absence of allegations in this complaint.

15            It is really very much like -- absolutely every case

16    is its own facts -- but it's the same theory that was rejected

17    by Judge Failla in *Ong v. Chipotle* where Judge Failla ruled

18    that the allegations in the amended complaint do not conflict

19    with defendants' statements that were in place, which did not

20    amount to a guarantee --

21            THE COURT:  Okay.

22            MR. REISNER:  -- with regard to the efficacy of those

23    practices, and --

24            THE COURT:  Okay.  I mean, I have your argument on

25    that.

0893secm

1          MR. REISNER:  Okay.  Thank you, your Honor.

2          THE COURT:  Okay.  I'm prepared to decide.

3          The Securities and Exchange Commission ("SEC") brought

4   this action against Virtu Financial Inc. ("VFI") and Virtu

5   Americas LLC ("VAL"), alleging violations of Sections 17(a)(2)

6   and 17(a)(3), of the Securities Act of 1933, and violations of

7   Section 15(g) of the Securities Exchange Act of 1934.

8          The defendants now move to dismiss the first amended

9   complaint pursuant to Federal Rule of Civil Procedure 12(b)(6),

10  except for the claim pursuant to Section 17(a)(3) of the

11  Securities Act against VAL.

12         The following facts are taken from the first amended

13  complaint and are accepted as true for purposes of this motion.

14         The defendant VFI is a corporation headquartered in

15  New York that owns common stock that is registered pursuant to

16  Section 12(b) of the Exchange Act.  VFI's common stock trades

17  on the Nasdaq.  The second defendant, VAL, is a registered

18  broker-dealer and subsidiary of VFI.  VAL operates two types of

19  businesses:  (1) customer-facing execution services which

20  generate material, non-public information ("MNPI") regarding

21  customers' trade orders and executions; and (2) proprietary

22  trading operations.

23         The SEC alleges that in July 2017, VFI acquired KCG

24  Holdings Inc. which owned a broker-dealer firm with a large

25  trade execution business.  At the same time, VFI formed VAL

0893secm

which operated the customer-facing trade execution business

acquired from KCG and some of KCG's proprietary trading

business.  As a result of this acquisition, VAL bought and sold

orders for large institutional customers.

Pursuant to Section 15(g) of the Exchange Act, VAL was

required to establish, maintain, and enforce written policies

is and procedures to prevent the misuse of MNPI, see 15 U.S.C.

Section 78o(g).  The SEC alleges that VAL "purported to

maintain information barriers which are a standard method used

by broker-dealers and other financial institutions to prevent

the use of MNPI by VAL and its associated persons."

From January 2018 to April 2019, the SEC alleges that

VAL maintained a primary database for daily business operations

and a backup database (collectively the "FS Database"), that

contained all post-trade information generated from VAL's

customer orders, including, among other items,

customer-identifying information, the security name, the side

(buy or sell) and the execution price and volume.  VAL's

employees could access the FS Database either (1) by logging

into the graphical user interface ("GUI") using each employee's

unique credentials (the "permissioning method"), or (2) by

using a user name and password (the "direct access method").

When accessing the FS Database using the direct access method,

VAL employees used generic credentials that were widely shared,

regardless of the employee's role at the firm or the business

0893secm

1    need.

2           The SEC alleges that no later than January 2018, VAL

3    began storing sensitive customer trade execution information in

4    the FS Database which also housed the preexisting proprietary

5    trade data.  The SEC alleges that under VAL's policies and

6    procedures at the time, proprietary traders were supposed to be

7    walled off from access to certain customer trade details to

8    prevent them from having access to MNPI.  Despite these

9    policies, the SEC claims, that virtually all employees

10   effectively had unrestricted access to the MNPI in the FS

11   Database.  The SEC therefore complains that VAL failed to

12   implement and enforce effective policies and procedures with

13   respect to the direct access to the FS Database, one of the

14   primary means of accessing MNPI.

15          The SEC alleges that in approximately August 2018,

16   VAL's database developers started to discuss the need to

17   improve the safeguards to access the FS Database.  These

18   discussions included an e-mail that was sent on August 13,

19   2018, to over 20 VAL employees.  The SEC alleges that, despite

20   VAL's recognizing the need for improvements, VAL took no

21   immediate steps to mitigate the risk of misuse of the MNPI.

22   Instead, for another eight months, VAL allegedly continued to

23   enter customer post-trade information into the FS Database

24   without improving its protocols to access to the FS Database.

25   During that time period, VAL handled approximately 25 percent

0893secm

of all market orders placed by retail investors in the United

States, and during this time the SEC alleges that proprietary

traders could access and misuse the MNPI.

The SEC alleges that during this time period, the

defendants made and disseminated materially misleading

statements and omissions to customers and the public regarding

VAL's protocols to access the MNPI.  In presentations on

November 7, 2019 and March 13, 2019, VFI asserted that "Virtu

has established policies and procedures designed to safeguard

sensitive client information, including technology access

controls to segregate sensitive information, and review of

approved personnel and permissions."  VFI's CEO allegedly

reiterated these statements to the public in November 2018.  On

approximately March 1, 2019, the SEC alleges that the

defendants disseminated a letter to VAL customers describing

the procedures to "segregate and protect sensitive client

data," but omitting the availability of direct access to the FS

Database by VAL's proprietary traders.

Thereafter, in a January 25, 2019, press release,

regarding VFI's most recent acquisition, the SEC alleges that

the defendants asserted that Virtu would "continue to maintain

and enforce appropriate information barriers to segment and

protect sensitive client data."  The SEC also alleges that in

response to customer due diligence questionnaires, VAL did not

reveal that its employees could access MNPI through the direct

0893secm

1    access method.

2           The SEC alleges that the alleged creation and

3    dissemination of these misleading statements violated

4    Section 17(a)(2) and 17(a)(3) of the Securities Act of 1933.

5           The SEC alleges that during the relevant time period,

6    January 2018 to April 2019, VAL obtained money or property in

7    the form of commissions VAL charged on the trades it executed

8    on its customers' behalf, and money it obtained from customers

9    by executing trades with those customers "by means of its false

10   or materially misleading statements" regarding its employees'

11   access to the FS Database and VFI, as VAL's parent company, in

12   turn also received money or property from its false or

13   misleading statements.

14          The SEC alleges that, despite its public statements to

15   the contrary, VAL did not have policies or procedures in place

16   that addressed the FS Database and that VAL "provided no

17   training or other directives to its employees regarding the

18   expectations for use of that database and its highly sensitive

19   information."  The SEC complains that the direct access method

20   of interacting with the FS Database was "widely used," and that

21   traders complained in internal chat messages that they ran into

22   a alerts stating that the system had exceeded the number of

23   users allowed.  In response, VAL allegedly increased the

24   available number of simultaneous direct access log-ins from 75

25   in November 2019 to 125 users by the end of that month.

0893secm

1          The SEC alleges that VAL did not know which employees
2    were using the FS Database, or how the FS Database was being
3    used during this time.  The SEC maintains that VAL had
4    automated systems and policies in place during the relevant
5    period, including, among others, a database developed to
6    monitor the FS Database, lockdown systems designed to detect
7    abnormal trading activity, and employing training about access
8    to sensitive information.  But the SEC alleges that these
9    systems and policies were not designed to detect and prevent
10   other potential misconduct, and specifically the misuse of MNPI
11   in the FS Database.  As a result of this conduct, the SEC
12   alleges that VAL violated Section 15(g) of the Exchange Act.

13          The SEC filed a complaint in this court on
14   September 12, 2023.  The defendants moved to dismiss the
15   complaint on December 4, 2023.  Thereafter, upon consent of the
16   defendants, the SEC filed an amended complaint on January 12,
17   2024.

18          In the first amended complaint, the SEC asserts five
19   causes of action, namely:  (1) violations of Section 17(a)(2)
20   of the Securities Act against VFI; (2) violations of
21   Section 17(a)(2) of the Securities Act against VAL; (3)
22   violations of Section 17(a)(3) of the Securities Act against
23   VFI; (4) violations of Section 17(a)(3) of the Securities Act
24   against VAL; and (5) violation of Section 15(g) of the Exchange
25   Act against VAL.

0893secm

1          The defendants now move to dismiss all the claims

2     except the Section 17(a)(3) claim against VAL.

3          In deciding a motion to dismiss pursuant to Rule

4     12(b)(6), the allegations in the complaint are accepted as true

5     and all reasonable inferences must be drawn in the plaintiff's

6     favor.  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191

7     (2d Cir. 2007).  The Court's function on a motion to dismiss is

8     not to weigh the evidence that might be presented at a trial,

9     but merely to determine whether the complaint itself is legally

10    sufficient.  *Goldman v. Belden*, 754 F.2 1059, 1067 (2d Cir.

11    1985).  The Court should not dismiss the complaint if the

12    plaintiff has stated enough facts to state a claim to relief

13    that is plausible on its face.  *Bell Atl. Corp. v. Twombly*. 550

14    U.S. 544, 570 (2007).  "A claim has facial plausibility when

15    the plaintiff pleads factual content that allows the court to

16    draw the reasonable inference that the defendant is liable for

17    the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

18    (2009).

19         While the Court should construe the factual

20    allegations in the light most favorable to the plaintiff, the

21    tenet that a court must accept as true all the allegations

22    contained in the complaint is inapplicable to legal

23    conclusions.  When presented with a motion to dismiss pursuant

24    to Rule 12(b)(6), the Court may consider documents that are

25    referenced in the complaint, documents that the plaintiff

0893secm

relied on in bringing suit and that are either in the

plaintiff's possession or that the plaintiff knew of when

bringing suit or matters of which judicial notice may be taken.

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.

2002).

The SEC claims that VAL violated Section 15(g) of the

Exchange Act by failing to design and enforce reasonable

measures to safeguard the MNPI.  The SEC argues that the

defendants violated Sections 17(a)(2) and 17(a)(3) of the

Securities Act by making and disseminating false and misleading

statements about their systems for protecting customers' MNPI.

The defendants move to dismiss the Section 15(g) claim

because the defendants contend that the defendants complied

with statutory requirements and that the Section 17(a) claims

should be dismissed because the challenged statements were

accurate and thus not actionable.  The defendants also contend

that the SEC's Section 17(a)(3) claim against VFI should be

dismissed because the first amended complaint does not allege

that VFI engaged in conduct "beyond the challenged statements

themselves."

Section 15(g) of the Exchange Act provides that "every

registered broker or dealer shall establish, maintain, and

enforce written policies and procedures reasonably designed,

taking into consideration the nature of such broker's or

dealer's business to prevent the misuse of material, non-public

0893secm

1    information." 15 U.S.C. Section 78o(g).  The SEC alleges that

2    VAL violated Section 15(g) by failing to design, maintain, and

3    enforce reasonable measures to prevent the misuse of MNPI.

4              The defendants argue that the SEC has failed to show

5    that VAL's policies and procedures to safeguard the MNPI were

6    "unreasonable."  But the defendants misconstrue the proper

7    formulation of the statute.  The statute requires that VAL have

8    written policies and procedures that are "reasonably designed"

9    to prevent the misuse of MNPI.  And the SEC alleges that the

10   measures that VAL adopted to protect MNPI, including VAL's

11   training and its lockdown systems, were not reasonably designed

12   to prevent the misuse of MNPI.  The SEC has alleged why it

13   contends that VAL's procedures are not reasonably designed to

14   prevent the misuse of MNPI.

15             For purposes of a motion to dismiss, it is the

16   defendants' burden to show, as a matter of law, that the

17   plaintiff has failed to plead a plausible claim -- namely, that

18   the defendants in this case have failed to establish policies

19   and procedures that were "reasonably designed."  The defendants

20   ask the Court to find as a matter of law that VAL's procedures

21   were in fact reasonably designed to accomplish its purpose.

22   The parties agree that there is no similar case construing

23   Section 15(g) of the Securities Act.  But, reasonableness is

24   generally an issue of fact that cannot be decided on a motion

25   to dismiss, as courts have found in other cases, construing

0893secm

other laws, *see, e.g.*, *Benefield v. Pfizer, Inc.*, 103 F.Supp.3d 449, 462 (S.D.N.Y. 2015) (construing design defect and manufacturing defect claims); *Cooper v. Anheuser-Busch, LLC*, 553 F.Supp.3d 83, 95-97 (S.D.N.Y. 2021) (construing deceptive labeling claim laws); *Prysmian Cables & Systems U.S.A., LLC v. ADT Commercial, LLC,* 665  F.Supp.3d 266, 245 (D. Conn. 2023) (construing generally accepted practices and procedures).

In light of the allegations regarding the "unfettered" access to the FS Database, and the alleged gaps in VAL's safeguards to prevent misuse of the MNPI, the question of whether VAL's policies can be considered reasonable as a matter of law cannot be decided on a motion to dismiss.  The motion to dismiss the SEC's claim under Section 15(g) against VAL is therefore denied.

Section 17(a)(2) of the Securities Act forbids "any person in the offer or sale of securities" "to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made in light of the circumstances under which they were made not misleading." 15 U.S.C. Section 77q(a)(2).

The SEC alleges that the defendants violated the statute by making false and materially misleading statements regarding their policies and procedures to protect customers' MNPI.  The SEC claims that the defendants made these statements

0893secm

in the course of public presentations, a customer letter, a

press release, and responses to customers' questionnaires.

Each of these statements allegedly described the effectiveness

of the defendants' protections for confidential information,

none disclose any gap in these protections, and none reveal

that employees could access the FS Database through the direct

access method.

It is well-established that "literally true statements

that create a materially misleading impression will support

claims for securities fraud." *Set Capital, LLC v. Credit Suisse

Group AG*, 996 F.3d 64, 85, (2d Cir. 2021) (addressing alleged

violations of Section 10(b) of the Exchange Act); *Wilson v.

Merrill Lynch*, 671 F.3d 120, 130 (2d Cir. 2011) (discussing the

adequacy of disclosures in the context of other provisions of

the Exchange Act).  And, because reasonable minds could differ

"on the question of whether the statements alleged in the

complaint were misleading in light of the circumstances is

under which they were made," this Court cannot resolve this

question on a motion to dismiss.  *See S.S. Trade Association of

Baltimore International Longshoreman's Association Pension Fund

v. Olo, Inc*., 2023 WL 4744197, *4 (S.D.N.Y. July 25, 2023).

therefore, the defendants' motion to dismiss the SEC's

claims pursuant to Section 17(a)(2) against VAL and VFI is

denied.

To assert a claim under Section 17(a)(3) of the

0893secm

Securities Act against VFI, the SEC must allege that VFI
"through any means or instruments of transportation or
communication in interstate commerce or by use of the mails"
engaged in "any transaction, practice, or course of business
which operates or would operate as a fraud or deceit upon the
purchaser." 15 U.S.C. Section 77q(a)(3).  In the first amended
complaint, the SEC alleges that VFI violated Section 17(a)(3)
by repeatedly making and disseminating false and misleading
statements about the policies and procedures it adopted to
protect MNPI.

        The defendants move to dismiss this claim, arguing
that in the Second Circuit, misstatements or omissions --
without more -- cannot form the basis for liability under
Section 17(a)(3).  Rather, the defendants argue, it is
necessary for the SEC to plead that the defendant undertook a
scheme that went beyond mere representations.  The defendants
also proceed to argue that VFI's dissemination of its own
misrepresentations is insufficient to establish liability under
Section 17(a)(3), and that if dissemination of
misrepresentations is sufficient for scheme liability, the
defendant must disseminate misrepresentations made by others.
In support of this argument, the defendants rely on *SEC v. Rio
Tinto PLC*, 41 F.4th 47 (2d Cir. 2022).  In that case, the
Second Circuit Court of Appeals held that "misstatements and
omissions can form part of a scheme liability claim pursuant to

0893secm

Sections 17(a)(1) and 17(a)(3) of the Securities Act, and

Sections 10(b) of the Exchange Act, but an actionable scheme

liability claim also requires something beyond misstatements

and omissions, such as dissemination," *Id.* at 49.  But *Rio*

*Tinto* does not answer the question of whether a defendant's

dissemination of its own misstatements is insufficient for

liability under Section 17(a)(3).

        In this case, the SEC alleges that VFI disseminated

the misstatements that VFI allegedly made.  The defendants

contend that because VFI made the statements it disseminated,

VFI cannot be subject to liability under Section 17(a)(3).  The

defendants point to *Lorenzo v. SEC* 587 U.S. 71 (2019), in which

the Supreme Court considered whether "those who do not make

statements but who disseminate false and misleading statements

to potential investors with the intent to defraud can be found

to have violated related provisions of the securities laws"

including Section 17(a).  *Lorenzo* held that a defendant who

disseminated a false statement, but did not make it, could be

held liable under the scheme provisions.  Thus, *Lorenzo* also

did not answer the question of whether a defendant can be found

liable under Section 17(a)(3) for having disseminated false

statements made by the defendant.

        The defendants rely on two other cases, decided prior

to *Lorenzo* and *Rio Tinto*, that were decided by district judges

in this circuit, neither of which addressed the specific

0893secm

question presented here.  In *SEC v. Stoker*, 865  F.Supp.2d 457

(S.D.N.Y. 2012), the defendant moved to dismiss a claim under

Section 17(a)(3) for failing to allege a fraudulent or

deceptive scheme distinct from the misstatements and omissions

alleged in the SEC's Section 17(a)(2) claim.  The district

court in *Stoker* held that "a defendant may be liable under

Section 17(a)(2) and Section 17(a)(3) based on allegations

stemming from the same set of facts, as long as the SEC alleges

that the defendants undertook a deceptive scheme or course of

conduct that went beyond the misrepresentations." *Id.* at 467.

Because the complaint in that case plausibly alleged a course

of conduct "beyond the misrepresentations that are covered by

Section 17(a)(2)," the Court found that the SEC's allegations

were sufficient to state a claim under Section 17(a)(3).  *Id.*

at 467-68.  The district court in *Stoker* was not faced with a

factual situation where the defendant was sued under

Section 17(a)(3) for having disseminated statements that the

defendant made.  *Id.* at 467.

          In *SEC v. Kelly*, 817 F.Supp.2d 340 (S.D.N.Y. 2011),

the district court dismissed the SEC's claim under

Section 17(a)(2) of the Securities Act against two defendants

who had not made any allegedly misleading statements.  The

district court decision does not address the question of

whether an entity that makes misleading statements can be held

liable under Section 17(a)(3) for also disseminating those

0893secm

1    statements.

2          By contrast, the SEC points to two recent district

3    court decisions that support the conclusion that an entity that

4    makes false and misleading statements and then disseminates

5    those statements can be held liable under Section 17(a)(3).  In

6    *SEC v. Amah*, 21 CV 6694, 2023 WL 6383956 (S.D.N.Y. Sept. 28,

7    2023), the district court granted summary judgment in the SEC's

8    favor on a claim that the defendant violated Section 17(a)(3)

9    by disseminating its own misstatements.  *See Id.* at 11-14.

10   Judge Karas concluded "Defendant can be held liable for scheme

11   liability for directly disseminating statements as long as he

12   possessed the requisite scienter." *Id.* at 14.  The statements

13   at issue were statements that the defendant made.

14         And in *SEC v. Terraform Labs Pte Ltd.*, 23 CV 1346,

15   2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023), the district court

16   denied cross motions for summary judgment concluding that

17   material facts remained in dispute regarding the SEC's claims

18   of misstatement liability and scheme liability under

19   Section 17(a)(3) of the Securities Act, based on the

20   dissemination of allegedly misleading statements, among other

21   things.  The court permitted the SEC to proceed on its claim

22   that the defendants were liable under Section 17(a)(3) when

23   those defendants had, among other thing, allegedly "made and

24   disseminated" "numerous false and misleading statements" to

25   investors and the public.  *See Id.*

0893secm

1            In both *Amah* and *Terraform Labs*, the district court

2    judges found that dissemination by the defendant of the

3    defendant's own statements was sufficient to allege a violation

4    under Section 17(a)(3).  And although the Second Circuit Court

5    of Appeals has not addressed a case with facts comparable to

6    the allegations here, at this point the SEC has sufficiently

7    stated a claim against VFI under Section 17(a)(3) for allegedly

8    disseminating false and misleading statements to survive VFI's

9    motion to dismiss pursuant to Federal Rule of Civil Procedure

10   12(b)(6).

11           The Court has considered all of the arguments raised

12   by the parties.  To the extent not specifically addressed, the

13   arguments are either moot or without merit.  For the foregoing

14   reasons, the defendants' motion to dismiss is denied.  The

15   clerk is directed to close ECF Nos. 22 and 34.

16           So ordered.

17           I should add that I appreciated the briefs and the

18   argument.  I thought that the briefs were very well done.  So,

19   thank you all.

20           Is there a scheduling order yet?

21           MR. TAAFFE:  There's not, your Honor.

22           THE COURT:  Parties should submit a Rule 26(f) report

23   to me two weeks from today.  Okay.  Good afternoon, all.

24           MR. REISNER:  Thank you, your Honor.

25           (Adjourned)