UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

       v.

VIRTU FINANCIAL, INC. and
VIRTU AMERICAS LLC,

                Defendants.

Civil Action No. 1:23-cv-8072-JGK

## AMENDED ANSWER TO AMENDED COMPLAINT

Defendants Virtu Financial, Inc. ("VFI") and Virtu Americas LLC ("VAL") (together, "Virtu"), by and through their undersigned counsel, hereby respond to the Amended Complaint (the "Complaint") of Plaintiff Securities and Exchange Commission ("SEC") as follows.

Except as otherwise expressly admitted herein, Virtu denies each and every allegation contained in the SEC's Complaint and denies violating any provision of the federal securities laws. Virtu does not interpret the headings and subheadings in the Complaint as well-pleaded allegations of fact to which any response is required. To the extent a response is required, Virtu denies all allegations in each and every heading and subheading of the Complaint. Unless otherwise defined, capitalized terms used herein refer to the capitalized terms defined in the Complaint. Virtu's use of such terms is not an acknowledgement or admission of any characterization that the SEC may ascribe to defined terms. Virtu reserves all rights to amend or supplement this Amended Answer at a later stage of the litigation as permitted by the Federal Rules of Civil Procedure.

**SUMMARY**

1.      This matter relates to false and misleading statements by Defendant VFI and its subsidiary VAL, an SEC registered broker-dealer that processes approximately 25% of market orders placed by retail investors in the U.S., and VAL's associated failure to establish, maintain, and enforce policies and procedures reasonably designed to prevent the misuse of material, nonpublic information ("MNPI").

**ANSWER**:  Paragraph 1 purports to describe the nature of this action, to which no response is required.  To the extent any further response is required, Virtu denies the allegations contained in Paragraph 1.

2.      Defendants repeatedly – and falsely – told their institutional customers and the public that VAL used "information barriers" and "systemic separation between business groups" in order to safeguard these customers' MNPI. In fact, VAL did not place this information behind information barriers that safeguarded MNPI. During a 15-month period, virtually all employees at VAL and its affiliate broker-dealers could access MNPI regarding its customers' trades, which included the name of the customer, the name of the security purchased by the customer, the side (buy or sell), the execution price, and the execution volume.

**ANSWER**:  Virtu denies the allegations contained in the first sentence of Paragraph 2, except admits that: (1) Virtu truthfully stated that VAL used "information barriers" and "systemic separation between business groups"; and (2) the first sentence of Paragraph 2 purports to characterize and quote from certain Virtu statements, which are documents that speak for themselves and to which Virtu respectfully refers the Court for their complete and accurate contents and denies any allegations inconsistent therewith.  Virtu otherwise denies the allegations contained in Paragraph 2.

3.      Defendants provided access to this information, regardless of whether the employee had a valid business need for such information. Such trading information, when collected in this form, constitutes MNPI, and access to such MNPI could be valuable to a trader. For example, a trader could observe that VAL had executed the orders of a large institutional customer throughout the day, understand that the same customer may follow a similar trading pattern over the next day or days, and take advantage of such information by trading ahead of the customer's subsequent orders.

**ANSWER**:  Virtu denies the allegations contained in the first and third sentences of Paragraph 3.  The second sentence of Paragraph 3 purports to state legal conclusions to which no

2

response is required.  To the extent a response is required, Virtu denies the allegations contained in the second sentence of Paragraph 3 and specifically denies the allegation that the information in the FS Database constituted MNPI.

4.     Specifically, from at least January 2018 through April 2019 (the "Relevant Period"), VAL maintained a primary database for daily business operations and a backup database (collectively, the "FS Database") that contained all post-trade information generated from VAL's customer orders – including, among other things, specific customer-identifying information, the security name, the side (buy or sell), and the execution price and volume.

**ANSWER**:  Virtu denies the allegations contained in Paragraph 4, except admits that: (1) from January 2018 through April 2019, VAL maintained various databases including the FS Database; and (2) the FS Database housed certain post-trade, static, historical data related to trades that were already posted on the consolidated tape.

5.     Due to the lack of effective information barriers during the Relevant Period, anyone at VAL, including proprietary traders at VAL and its affiliates, was able to directly access the FS Database and its MNPI using a widely known and frequently shared generic username and password. This was so even though VAL purported to prohibit proprietary traders from accessing post-trade information from VAL's customers to prevent the risk of misconduct. Despite specific discussions of the deficiency occurring no later than August 13, 2018, VAL did not fix it until at least April 2, 2019.

**ANSWER**:  Virtu denies the allegations contained in the first and third sentences of Paragraph 5, except admits that: (1) in or around August 2018, VAL identified the possibility that non-permissioned post-trade data on the FS Database could hypothetically be accessed; and (2) after discovering this hypothetical possibility, VAL developers promptly began considering solutions before fully and successfully implementing a solution in April 2019.  The second sentence of Paragraph 5 purports to generally characterize VAL's policies and procedures reasonably designed to prevent the misuse of MNPI, including VAL's Compliance Manual, which is a document that speaks for itself and to which Virtu respectfully refers the Court for its complete

and accurate contents and denies any allegations inconsistent therewith. To the extent any further

response is required, Virtu denies the allegations contained in Paragraph 5.

6. During the Relevant Period, VAL made and disseminated materially misleading statements, and omissions which rendered other statements materially misleading, to at least six customers regarding the purported information barriers at VAL. VAL's parent, VFI, also made and disseminated similar materially misleading statements and omissions, which rendered other statements materially misleading, regarding purported information barriers in two public presentations and a press release.

**ANSWER**: Paragraph 6 purports to state legal conclusions to which no response is

required. To the extent a response is required, Virtu denies the allegations contained in

Paragraph 6.

7. Before VAL implemented appropriate information barriers in the FS Database in April 2019, Defendants also issued a letter to VAL customers falsely stating that VAL maintained procedures to segregate and protect sensitive customer data, when VAL did not do so. Throughout the Relevant Period, in addition to disseminating these materially misleading statements and omissions, which rendered other statements misleading, VAL and VFI took further steps described herein to engage in a practice or course of conduct that operated or would operate as a fraud or deceit upon purchasers. Their conduct violated Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(2) - (3)].

**ANSWER**: Virtu denies the allegations contained in the first sentence of Paragraph 7,

except admits that: (1) Virtu fully and successfully implemented a solution to a temporary issue

impacting the FS Database in April 2019; and (2) the first sentence of Paragraph 7 purports to

characterize and quote from a March 1, 2019 letter issued to VAL customers, which is a document

that speaks for itself and to which Virtu respectfully refers the Court for its complete and accurate

contents and denies any allegations inconsistent therewith. The remaining sentences in Paragraph

7 purport to state legal conclusions to which no response is required. To the extent a response is

required, Virtu denies the allegations contained in Paragraph 7.

8. VAL also failed to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the misuse of MNPI. This was particularly important given the nature of VAL's business. It operated both a proprietary trading business, in which it bought and sold securities in its own account and for its own benefit, as well as a trade execution business for

its large institutional customers, whereby it executed buy or sell orders from customers, typically for a commission.

**ANSWER**:  Virtu denies the allegations contained in the first and second sentences of Paragraph 8, including to the extent the sentences suggest that the FS Database contained MNPI. In response to the allegations contained in the third sentence of Paragraph 8, Virtu admits that VAL: (1) operates a proprietary trading business through which it buys and sells securities in its own account; and (2) is a registered broker-dealer that executes brokerage orders placed by institutional and retail customers.  Virtu otherwise denies the allegations contained in Paragraph 8.

9.      Notwithstanding these dual businesses, VAL failed to establish, maintain, and enforce reasonably designed policies and procedures to ensure that proprietary traders at VAL and its affiliates could not access VAL customers' MNPI, including by failing to impose reasonable information barriers. Indeed, VAL did not track who logged into the system that stored its customers' MNPI, did not track what information was extracted from the database by proprietary traders, and ultimately cannot determine to this day whether its traders abused the trust placed in Defendants by customers who relied on them to handle their MNPI. By failing to establish, maintain, and enforce policies and procedures reasonably designed to prevent the misuse of material nonpublic customer information, VAL's conduct violated Section 15(g) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78o(g)].

**ANSWER**:  The first and third sentences of Paragraph 9 purport to state legal conclusions to which no response is required.  To the extent a response is required, Virtu denies the allegations contained in the first and third sentences of Paragraph 9.  Virtu denies the allegations contained in the second sentence of Paragraph 9.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this action pursuant to Exchange Act Sections 21(d) and 27 [15 U.S.C. §§78u(d) and 78aa] and Securities Act Sections 20(b) and 22(a) [15 U.S.C. §§77t(b) and 77v(a)]. In connection with the conduct alleged in this Amended Complaint, Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or the means or instruments of interstate commerce, or of the mails, or of any facility of any national securities exchange.

**ANSWER**: Paragraph 10 purports to state legal conclusions to which no response is required. To the extent a response is required, Virtu admits that this Court has jurisdiction over the subject matter of this action, and otherwise denies the allegations contained in Paragraph 10.

11. Venue is proper in this District pursuant to Exchange Act Section 27 [15 U.S.C. §78aa] and Securities Act Section 22 [15 U.S.C. §77v]. Certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Amended Complaint occurred within this District. As noted in the subsequent paragraphs, Defendants' executive offices are located within this District.

**ANSWER**: Paragraph 11 purports to state legal conclusions to which no response is required. To the extent a response is required, Virtu denies the allegations contained in Paragraph 11 except admits that: (1) Virtu's executive offices are located within this District; and (2) the SEC purports to base venue over this action on the statutes cited therein.

## DEFENDANTS

12. VFI is a Delaware corporation headquartered in New York, New York. VFI's common stock is registered pursuant to Section 12(b) of the Exchange Act. VFI's common stock trades on the NASDAQ.

**ANSWER**: Virtu admits the allegations contained in Paragraph 12.

13. VAL is a Delaware limited liability company with principal executive offices in New York, New York. It is a broker-dealer registered with the Commission. VAL is a subsidiary of VFI and was previously known as KCG Americas LLC prior to VFI's acquisition of KCG Holdings, Inc. in July 2017.

**ANSWER**: Virtu admits the allegations contained in Paragraph 13.

## FACTUAL ALLEGATIONS

### A. VAL and Affiliates' Proprietary Trading and Trade Execution Businesses

14. VAL and its affiliates were SEC-registered broker-dealers that operated two distinct types of businesses: (i) customer-facing trade execution services, which generate MNPI regarding customers' trade orders and executions; and (ii) proprietary trading operations, which must be prevented from misusing that same MNPI when trading on VAL's or its affiliates' behalf.

**ANSWER**: Virtu admits that: (1) VAL is a broker-dealer registered with the Commission; (2) VAL executes brokerage orders placed by institutional and retail customers; and (3) VAL

operates a proprietary trading business through which it buys and sells securities in its own account. Virtu otherwise denies the allegations contained in Paragraph 14.

15. Because the federal securities laws require broker-dealers to implement and maintain policies and procedures reasonably designed to prevent the misuse of MNPI, VAL purported to maintain information barriers, which are a standard method used by broker-dealers and other financial institutions to prevent the use of MNPI, by VAL and its associated persons. As detailed below, following an acquisition that required combining new trade execution services with existing proprietary trading operations, VAL's failure to implement reasonably designed information barriers meant that proprietary traders had essentially unfettered access to its customers' MNPI for approximately 15 months.

**ANSWER**: The first sentence of Paragraph 15 purports to assert legal conclusions about the federal securities laws, to which no response is required. To the extent a response is required, Virtu denies the allegations contained in the first sentence of Paragraph 15, except admits that Virtu designed and maintained information barriers to prevent the use of MNPI. Virtu denies the allegations contained in the second sentence of Paragraph 15.

## B. Relevant Background on and Operation of the FS Database

### 1. Pre-KCG Acquisition

16. In July 2017, VFI acquired KCG Holdings, Inc. ("KCG"), which owned a broker-dealer firm with a large trade execution business. Prior to the KCG acquisition, VFI's operating subsidiaries (collectively "Legacy Virtu") primarily bought and sold securities in Legacy Virtu's own account and for its own benefit. Legacy Virtu maintained the FS Database for its daily business operations, and it recorded information regarding its trades into the database seconds or milliseconds post execution.

**ANSWER**: Virtu denies the allegations contained in Paragraph 16 except admits that: (1) in July 2017, VFI acquired KCG Holdings, Inc. ("KCG"), which owned a broker-dealer firm with a trade execution business; (2) prior to the KCG acquisition, VFI's operating subsidiaries bought and sold securities, primarily for its own account; (3) prior to the KCG acquisition, Virtu

maintained the FS Database for various business purposes; and (4) the FS Database contained certain post-trade data related to trades already posted on the consolidated tape.

17.     Before the KCG acquisition (and continuing thereafter), Legacy Virtu's employees could access the FS Database through two means.

**ANSWER**:  Virtu denies the allegations contained in Paragraph 17.

18.     First, an employee could log into a graphical user interface ("GUI"). Employees accessing the FS Database via the GUI were required to enter their unique log-in credentials and could access only information necessary for their role at the firm – a process typically known as "permissioning."

**ANSWER**:  Virtu admits the allegations contained in Paragraph 18.

19.     Second, an employee could log into the FS Database directly using a username and password, a technique that allowed them to search the database. These usernames and passwords were not specific to individual employees; instead, employees used the generic "viewonly" as both username and password. Similarly, employees could access the backup FS Database using the generic "fsviewonly" as both username and password. Users accessing the FS Database this way could access all data in it, regardless of their role at the firm or business need. Before the KCG Acquisition, Legacy Virtu did not have a significant trade execution business, so the lack of information barriers did not result in the risk that Legacy Virtu's proprietary traders would access customer MNPI.

**ANSWER**:  With respect to the allegations contained in the first, second and third sentences of Paragraph 19, Virtu admits that, prior to the KCG acquisition, some Virtu employees could access the FS Database directly by using a username and a password through shared accounts with the username and password "viewonly" and "fsviewonly."  Virtu otherwise denies the allegations contained in Paragraph 19.

### 2.     Post-KCG Acquisition

20.     In July 2017, VFI acquired KCG and formed VAL, which mainly operated the customer-facing trade execution business acquired from KCG, and some of KCG's proprietary trading business. This newly acquired trade execution business meant that VAL bought and sold orders for large institutional customers. Customers typically paid a commission to VAL each time they executed a trade using its execution services. No later than January 2018, VAL began storing sensitive customer trade execution information in the FS Database, which also continued to house Legacy Virtu proprietary trade data.

**ANSWER**: Virtu denies the allegations contained in Paragraph 20 except admits that: (1) in July 2017, VFI acquired KCG and formed VAL; (2) VAL operates a trade execution business wherein VAL buys and sells securities for large institutional customers; (3) as a result of using VAL's execution services, customers pay certain commissions to VAL; and (4) VAL stored certain trade execution information in the FS Database.

21. Under VAL's policies and procedures at the time, proprietary traders were supposed to be walled off from access to certain customer trade details (from the trade execution business) to prevent them from having access to MNPI that could potentially provide them a trading advantage. But, despite its recognition of the need for such policies and procedures, VAL failed to implement and enforce them with respect to direct access to the FS Database, one of the primary means of accessing MNPI.

**ANSWER**: Virtu denies the allegations contained in the first sentence of Paragraph 21, except admits that: (1) in the Relevant Period, VAL had designed and established reasonable written policies and procedures that included prohibitions on the misuse of MNPI, prohibitions on accessing non-permissioned data and physical and logical information barriers; and (2) the first sentence of Paragraph 21 purports to characterize VAL's policies and procedures, including VAL's Compliance Manual, which are documents that speak for themselves to which Virtu respectfully refers the Court for their complete and accurate contents and denies any allegations inconsistent therewith. Virtu denies the allegations contained in the second sentence of Paragraph 21.

22. VAL's customer trade execution data that were entered into the FS Database constituted MNPI. The "consolidated tape," a high-speed electronic system that reports the latest price and volume data on sales of exchange-listed stocks, publicly reports in real-time a subset of the trade information contained in the FS Database. It does not, however, provide critical additional details that are in the FS Database, namely specific customer identifying information along with the side (buy or sell), the security, price, volume, and the trading algorithm used for each order.

**ANSWER**: Virtu denies the allegations contained in the first sentence of Paragraph 22. Virtu denies the allegations contained in the second and third sentences of Paragraph 22 except admits that: (1) the consolidated tape publicly reports in real-time the latest price and volume data

on sales of exchange-listed stocks; and (2) the FS Database contained post-trade information related to trades already posted on the consolidated tape, as well as housing certain other static, historical data.

23.    Despite compiling this sensitive customer data in its FS Database, VAL did not review or update the permissioning for direct access to the database to prevent access to customer post-trade information by employees who did not have a business need to access that data. Because the generic usernames and passwords for direct access were widely known and shared, virtually all employees, including VAL and Legacy Virtu proprietary traders, effectively had unrestricted access to the MNPI in the FS Database.

**ANSWER**:  Virtu denies the allegations contained in Paragraph 23.

24.    During the Relevant Period, proprietary traders at VAL and Legacy Virtu had expertise in creating trading algorithms, known as "strategies," that aim to improve trading revenues. Each trading strategy was typically automated to incorporate a series of instructions and data, some of which came from the FS Database. VAL and Legacy Virtu had hundreds of thousands of individual strategies or instances of strategies that ran on a daily basis as part of the proprietary trading business, and many relied on the direct-access method, with its generic "viewonly" or "fsviewonly" login credentials, to source data from the FS Database.

**ANSWER**:  Virtu admits the allegations contained in the first and second sentences of Paragraph 24 except to the extent the second sentence suggests that all strategies relied on or utilized the FS Database.  In response to the third sentence of Paragraph 24, Virtu admits that: (1) Virtu had hundreds of thousands of individual strategies or instances of strategies that ran on a daily basis as part of the Virtu's operations; and (2) many of Virtu's strategies relied on the direct-access method to source reference or configuration data from the FS Database that were essential to the strategies' operation.  Virtu otherwise denies the allegations contained in Paragraph 24.

25.    In approximately August 2018, VAL's database developers started to discuss a need to improve the inadequate permissioning for the FS Database, apparently as a result of the due diligence process for VFI's pending acquisition of Investment Technology Group, Inc. ("ITG"), another broker-dealer. On August 13, 2018, over 20 employees from different departments at Legacy Virtu received an email indicating that the FS Database needed a "revamp" to remediate the permissioning and thus were put on notice. In December 2018, the topic of remediating the database resurfaced and the main database developer commented, "I was going to start on it this week but have been side tracked."

**ANSWER**: Paragraph 25 purports to characterize and selectively quote from various documents provided to the SEC as part of its multi-year investigation, which are documents that speak for themselves and to which Virtu respectfully refers the Court for their complete and accurate contents and denies any allegations inconsistent therewith. To the extent any further response is required, Virtu denies the allegations contained in Paragraph 25.

26. Nevertheless, despite developers and others becoming aware no later than August 2018 that proprietary traders had access to customers' post-trade MNPI, VAL took no immediate steps to mitigate the risk of misuse of the MNPI. Instead, VAL continued for another eight months to enter customer post-trade information into the FS Database, continued to allow direct access to such information with the generic login credentials, and issued no statements, directives, or guidance to proprietary traders that they should cease or limit their direct access to the FS Database. During that period – in which VAL handled approximately 25% of all market orders placed by retail investors in the U.S. – its failure to fix the problem perpetuated the substantial risk (present since at least January 2018) that proprietary traders could access and misuse the MNPI.

**ANSWER**: Virtu denies the allegations contained in the first and second sentences of Paragraph 26, except admits that: (1) in or around August 2018, VAL identified the possibility that non-permissioned post-trade data on the FS Database could hypothetically be accessed; and (2) after discovering the technological issue, VAL developers promptly began considering solutions before fully and successfully implementing a solution in April 2019. Virtu denies the allegations contained in the third sentence of Paragraph 26.

27. The customer-specific, and virtually real-time, post-trade information contained in the FS Database would be valuable to a proprietary trader because it would, among other things, provide insights into which VAL customers were trading in the market (and in what securities) at present, as well as the direction and size of each customer's order flow. Additionally, because large orders by VAL's institutional customers could be broken up into smaller orders placed over one day or several days, such post-trade information could provide further material, nonpublic insight into orders that may be forthcoming in a particular security.

**ANSWER**: Virtu denies the allegations contained in Paragraph 27.

**C.    Defendants Made and Disseminated Materially False and Misleading Statements, and Omissions Which Rendered other Statements Materially Misleading, to Customers and the Public Regarding VAL's Information Barriers**

28.    Defendants made and disseminated a series of false and misleading statements and omissions, which rendered other statements materially misleading, to customers and the public regarding VAL's purported information barriers. These statements and omissions were material because a reasonable investor-customer would have relied on them when selecting VAL to execute its trades. Even after internal discussions about the need to remediate the permissioning deficiencies, Defendants failed to correct or clarify the false or misleading statements.

<u>**ANSWER**</u>:    Paragraph 28 purports to state legal conclusions to which no response is required.    To the extent a response is required, Virtu denies the allegations contained in Paragraph 28.

**1.    November 2018 and March 2019 Public Presentations**

29.    In presentations on November 7, 2018 and March 13, 2019, VFI made and disseminated materially misleading statements and omissions, which rendered other statements materially misleading, to actual and potential customers and investors. Both presentations stated that "Virtu has established policies and procedures designed to safeguard sensitive client information" including "[t]echnology access controls to segregate sensitive information" and "[r]eview of approved personnel and permissions." During the November 2018 earnings call and presentation, VFI's CEO reiterated these statements to the public:

> You see the importance we place on protecting client information in all aspects of our business. We take this obligation seriously and we recognize and appreciate the natural concerns customers will no doubt have. *Virtu has established policies and procedures* for our existing client and market-making businesses that are designed to safeguard sensitive client information and will continue to design our policies and procedures with our clients in mind. These safeguards include physical separation, *logical access control and entitlement reviews*.

(Emphasis added.) These statements were false and materially misleading because the assurances of "logical access control and entitlement reviews" failed to reference – and were wholly at odds with – the direct access permissioning issues for the FS Database, including Defendants' failure to review or update the permissioning for the FS Database to prevent access by employees who did not have a business need-to-know, as described in detail above. The statements misled Defendants' customers and the public into believing that Defendants' policies and procedures to safeguard customers' MNPI were effective, enforced, and applicable to all means of accessing the information. The statements were material because a reasonable investor would have relied on them when selecting VAL to execute its trades.

**ANSWER**: Virtu denies the allegations contained in the first through eighth sentences of Paragraph 29 except admits that the sentences purport to characterize and selectively quote from VFI presentations from November 2018 and March 2019 and a Q3 2018 VFI earnings call statement, which are documents that speak for themselves to which Virtu respectfully refers the Court for their complete and accurate contents and denies any allegations inconsistent therewith. The ninth and tenth sentences of Paragraph 29 contain legal conclusions to which no response is required. To the extent a response is required, Virtu denies the allegations contained in the ninth and tenth sentences of Paragraph 29.

### 2.    March 2019 Letter to Customers

30.    On or around March 1, 2019, Defendants made and widely disseminated materially misleading statements in a letter to existing VAL customers regarding the ITG merger. Certain customers received the letter from the CEO's "virtu.com" email address. Others received the letter as a PDF attachment to an email which contained the "Virtu Financial" logo. Both versions were signed by VFI's CEO and stated: "Prior to merging both Virtu and ITG each maintained our own procedures to segregate and protect sensitive client data." This statement was materially misleading because it omitted the availability of direct access to the FS Database by Defendants' proprietary traders without appropriate permissioning. At certain large customers, multiple employees received the same emailed letter. For example, at one customer, eight of its employees separately received the emailed letter.

**ANSWER**: Virtu denies the allegations contained in the first, second, third and forth sentences of Paragraph 30 except admits that the sentences purport to characterize and selectively quote from a March 2019 Letter to Customers, which is a document that speaks for itself and to which Virtu respectfully refers the Court for its complete and accurate contents and denies any allegations inconsistent therewith. The fifth sentence of Paragraph 30 purports to state legal conclusions to which no response is required. To the extent a response is required, Virtu denies the allegations contained in the fifth sentence of Paragraph 30. Virtu lacks knowledge or information sufficient to form a belief as to the accuracy of the allegations contained in the sixth

and seventh sentences of Paragraph 30. To the extent a response is required, Virtu denies those allegations.

### 3. January 2019 Press Release

31. In a January 25, 2019 press release, VFI made and disseminated a similar materially false and misleading statement. In providing an update regarding the acquisition of ITG, the press release stated, "Post closing, Virtu intends to continue to maintain and enforce appropriate information barriers to segment and protect sensitive client data." The statement was misleading because at the time, VAL failed to adequately implement and enforce its information barriers as to the direct access permissioning of the FS Database, allowing access to any employee with the widely shared generic username and password to access sensitive client data. The statement was material because a reasonable investor would have relied on it when selecting VAL to execute its trades.

**ANSWER**: Virtu denies the allegations contained in the first and second sentences of Paragraph 31 except admits that the sentences purport to characterize and selectively quote from a January 2019 Press Release, which is a document that speaks for itself and to which Virtu respectfully refers the Court for its complete and accurate contents and denies any allegations inconsistent therewith. The third and fourth sentences of Paragraph 31 contain legal conclusions to which no response is required. To the extent a response is required, Virtu denies the allegations contained in the third and fourth sentences of Paragraph 31.

### 4. Responses to Customer Due Diligence Questionnaires

32. Customers of VAL's execution services periodically sent VAL due diligence questionnaires for VAL to complete and return. Customers used these questionnaires to evaluate or reevaluate whether VAL should be an approved broker-dealer for executing their orders. Some of the questionnaires included specific questions about VAL's information barriers and access controls in place to protect customer trade information, including post-trade information. VAL's compliance department typically received input from multiple departments to respond to the questionnaires.

**ANSWER**: Virtu admits the allegations contained in the first and third sentences of Paragraph 32. Virtu lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of Paragraph 32. Virtu denies the allegations in the second sentence of Paragraph 32 on that basis. Virtu denies the allegations contained in the

fourth sentence of Paragraph 32, except admits that VAL's compliance department has received input from other departments in order to respond to customer due diligence questionnaires.

33.     During the Relevant Period, VAL made and disseminated materially false and misleading statements, and omissions which rendered other statements materially misleading, concerning its handling of customer information and information barriers when responding to at least six customer questionnaires. These statements were false and misleading because they failed to reference – and were wholly at odds with – the reality of the direct access permissioning described in detail above. They would mislead reasonable investors into believing that Defendants' policies and procedures were designed to safeguard MNPI and were effective, enforced, and applicable to all means of accessing the information.

**ANSWER**:  Paragraph 33 purports to state legal conclusions to which no response is required.  To the extent a response is required, Virtu denies the allegations contained in Paragraph 33.

34.     VAL's statements were material because as noted above, the questionnaires were used to evaluate or reevaluate whether VAL should be an approved broker-dealer to handle customer orders, and a reasonable investor would have relied on them when selecting VAL to execute its trades. Although VAL had identified the direct access permissioning issue on or before August 13, 2018, VAL did not take steps to inform its customers of that permissioning issue, even while it was in the process of being remediated.

**ANSWER**:  The first sentence of Paragraph 34 purports to state legal conclusions to which no response is required.  To the extent a response is required, Virtu denies the allegations contained in the first sentence of Paragraph 34.  Virtu denies the allegations in the second sentence of Paragraph 34.

35.     These misstatements were also material to customers' decision whether to route their orders to VAL. VAL's customers consider their post-trade information sensitive, nonpublic, and material, and are concerned that this information could be used to engage in trading abuses including front-running if their information is not adequately protected.

**ANSWER**:  The first sentence of Paragraph 35 purports to state legal conclusions to which no response is required.  To the extent a response is required, Virtu denies the allegations contained in the first sentence of Paragraph 35.  Virtu lacks knowledge or information sufficient to form a

belief as to the truth of the allegations contained in the second sentence of Paragraph 35 and denies them on that basis.

36.     In a January 2019 questionnaire, an investment adviser customer ("Customer A") asked VAL: "Do any cash traders, research sales and/or proprietary traders see electronic order flow information, whether this is intraday or post-trade? What safeguards do you have in place to maintain the confidentiality of our order flow?" VAL misleadingly responded: "No. The Firm employs information barrier processes and procedures as part of its oversight functions, such as procedures to approve and review systems entitlements for all of the Firm's business units, including Electronic Execution Services." These statements were materially false and misleading because VAL did not employ reasonable, meaningful information barrier processes with respect to direct access to the FS Database, and thus Defendants' proprietary traders (and others) in fact did have access to electronic post-trade order information. Moreover, the shared usernames and passwords, by their nature, bypassed any requirements to approve or review system entitlements.

**ANSWER**:  Virtu denies the allegations contained in the first sentence of Paragraph 36, except admits that the sentence purports to characterize and selectively quote from a January 2019 due diligence questionnaire, which is a document that speaks for itself to which Virtu respectfully refers the Court for its complete and accurate contents and denies any allegations inconsistent therewith.  The second sentence of Paragraph 36 contains legal conclusions to which no response is required.  To the extent a response is required, Virtu denies the allegations contained in the second sentence of Paragraph 36.  Virtu denies the allegations contained in the third sentence of Paragraph 36.

37.     In another January 2019 questionnaire, an investment adviser customer ("Customer B") asked what policies and procedures VAL had in place to protect "client confidential information." VAL misleadingly responded that it had "encryption/password protection" and "access controls" in place. These statements were materially false and misleading because, for the reasons described throughout, the confidential information in the FS Database did not have adequate password protection and there were no reasonable, meaningful access controls in place for direct access. Customer B received VAL's responses and used VAL's execution services thereafter, paying money to VAL.

**ANSWER**:  Virtu denies the allegations contained in the first and second sentences of Paragraph 37, except admits that the sentences purport to characterize and selectively quote from a January 2019 due diligence questionnaire, which is a document that speaks for itself to which

Virtu respectfully refers the Court for its complete and accurate contents and denies any allegations inconsistent therewith. The third sentence of Paragraph 37 contains legal conclusions to which no response is required. To the extent a response is required, Virtu denies the allegations contained in the third sentence of Paragraph 37. Virtu denies the allegations in the fourth sentence of Paragraph 37, except admits that Customer B used VAL's execution services after January 2019.

38. In a November 2018 questionnaire, an investment adviser customer ("Customer C") asked who at VAL had access to "real-time *and post trade*" information (emphasis added). In its response, VAL listed certain categories of employees who had access to Customer C's post-trade information, but failed to include others on that list, including proprietary traders, who could access the very same information through direct access to the FS Database: "Electronic Execution Services Sales and supervisory personnel as well as certain support personnel in technology, operations, finance, compliance and legal may have access to systems containing [Customer C's] post trade information."

**ANSWER**: Virtu denies the allegations contained in Paragraph 38, except admits that Paragraph 38 purports to characterize and selectively quote from a November 2018 due diligence questionnaire, which is a document that speaks for itself to which Virtu respectfully refers the Court to for its complete and accurate contents and denies any allegations inconsistent therewith.

39. Moreover, VAL responded to Customer C that it "employs information barrier processes and procedures as part of its oversight functions, which include processes to approve and review systems entitlements for the Firm's business units." VAL repeated the same sentence in a separate question that asked about "oversight" at VAL. These statements were materially misleading because they falsely implied that the systems entitlements for the FS Database were subject to ongoing review and approval, when in fact there were no reasonable, meaningful systems entitlements in place for direct access to the FS Database throughout the relevant period beyond the generic and widely shared "viewonly" credentials. Customer C received VAL's responses and continued to use VAL's execution services thereafter, paying money to VAL.

**ANSWER**: Virtu denies the allegations contained in the first and second sentences of Paragraph 39, except admits that the sentences purport to characterize and selectively quote from a November 2018 due diligence questionnaire, which is a document that speaks for itself to which Virtu respectfully refers the Court for its complete and accurate contents and denies any allegations inconsistent therewith. The third sentence of Paragraph 39 contains legal conclusions to which no

response is required.  To the extent a response is required, Virtu denies the allegations contained in the third sentence of Paragraph 39.  Virtu denies the allegations in the fourth sentence of Paragraph 39, except admits that Customer C used VAL's execution services after November 2018.

40.     In an August 2018 questionnaire, an investment adviser customer ("Customer D") asked VAL to confirm that "[o]nly employees with a need to access confidential information in order to provide required services have access to such confidential information." VAL falsely replied "Yes." This statement was materially false and misleading because virtually any employee, including proprietary traders, could access the FS Database via direct access. Customer D received VAL's responses and used VAL's execution services thereafter, paying money to VAL.

**ANSWER**:  Virtu denies the allegations contained in the first and second sentence of Paragraph 40, except admits that the sentences purport to characterize and selectively quote from an August 2018 due diligence questionnaire, which is a document that speaks for itself to which Virtu respectfully refers the Court for its complete and accurate contents and denies any allegations inconsistent therewith.  The third sentence of Paragraph 40 contains legal conclusions to which no response is required.  To the extent a response is required, Virtu denies the allegations contained in the third sentence of Paragraph 40.  Virtu denies the allegations contained in the fourth sentence of Paragraph 40, except admits that Customer D used VAL's execution services after August 2018.

41.     In a July 2018 questionnaire, an investment adviser customer ("Customer E") asked about changes or violations to the firm's privacy policy, to which VAL inaccurately answered that it "maintains information barrier policies and procedures that are designed to segregate client orders to those business units within the firm that have a need to know of the information." This statement was materially false and misleading because business units within VAL or Legacy Virtu that did not have a need to know of customer information nevertheless could access the information in the FS Database via direct access. Customer E received VAL's responses and used VAL's execution services thereafter, paying money to VAL.

**ANSWER**:  Virtu denies the allegations contained in the first sentence of Paragraph 41, except admits that the sentence purports to characterize and selectively quotes from a July 2018 due diligence questionnaire, which is a document that speaks for itself to which Virtu respectfully refers the Court for its complete and accurate contents and denies any allegations inconsistent

therewith. The second sentence of Paragraph 41 contains legal conclusions to which no response

is required. To the extent a response is required, Virtu denies the allegations contained in the

second sentence of Paragraph 41. Virtu denies the allegations contained in the third sentence of

Paragraph 41, except admits that Customer E used VAL's execution services after July 2018.

42. In a March 2018 questionnaire, an investment adviser customer ("Customer F") asked who at VAL had access to its information. VAL misleadingly responded, "Our policies provide that only personnel whose job function requires access to real time and historical order and execution information are permissioned to see this information." VAL stated that those personnel "currently consist[] of the business supervisors, client service personnel, risk management, sales coverage, compliance and other similar personnel with a bona fide business need to know such information." Customer F also asked about information barriers specifically, to which VAL responded, "We do maintain information barriers between our aggregation units which are designed to prevent the sharing of customer order and trade information with individuals who are not authorized to receive and/or who have not bona fide business purpose for accessing such data." Neither response was accurate with respect to direct access to the FS Database. VAL's answers were materially misleading because they would lead a reasonable investor to believe that other personnel, including proprietary traders, were not able to see customer trade execution information. Customer F received VAL's responses and used VAL's execution services thereafter, paying money to VAL.

**ANSWER**: Virtu denies the allegations contained in the first, second, third and fourth

sentences of Paragraph 42, except admits that the sentences purport to characterize and selectively

quote from a March 2018 due diligence questionnaire, which is a document that speaks for itself

to which Virtu respectfully refers the Court for its complete and accurate contents and denies any

allegations inconsistent therewith. Virtu denies the allegations contained in the fifth sentence of

Paragraph 42. The sixth sentence of Paragraph 42 contains legal conclusions to which no response

is required. To the extent a response is required, Virtu denies the allegations contained in the sixth

sentence of Paragraph 42. Virtu denies the allegations contained in the seventh sentence of

Paragraph 42, except admits that Customer F used VAL's execution services after March 2018.

**5.  Defendants Obtained Money or Property from the Materially False and Misleading Statements**

43.  VAL obtained money or property – in the form of (i) commissions it charged on the trades it executed on its customers' behalf during the Relevant Period, and (ii) money it obtained from customers by executing trades with those customers as principal – by means of its false or materially misleading statements discussed above. Had VAL not made and disseminated false and misleading statements about proprietary traders' unfettered access to the FS Database (which contained MNPI), and instead provided accurate disclosures regarding the access to and controls (or lack thereof) for this MNPI, current and prospective customers may reasonably have chosen to route their orders to a competitor for execution.

**ANSWER**:  Virtu denies the allegations contained in Paragraph 43 except Virtu admits that Virtu received commissions and other financial benefits in connection with certain of its business activities.

44.  VFI, as the parent company, also received money or property from its false or materially misleading statements. VFI reports its financials on a consolidated basis that includes VFI's equity interests in VAL and other subsidiaries. Consequently, VFI obtained money or property – in the form of (i) commissions VAL charged on the trades it executed on VAL's customers' behalf during the Relevant Period, and (ii) money VAL obtained from customers by executing trades with those customers as principal – by means of VFI's false or materially misleading statements discussed above. Had VFI not made and disseminated false and misleading statements about proprietary traders' unfettered access to the FS Database (which contained MNPI), and instead provided accurate disclosures regarding the access to and controls (or lack thereof) for this MNPI, current and prospective customers may reasonably have chosen to route their orders to a competitor for execution.

**ANSWER**:  Virtu denies the allegations contained in Paragraph 44, except admits that: (1) VFI is the parent company of VAL; and (2) VFI reports its financials on a consolidated basis that includes VFI's equity interests in VAL and other subsidiaries.  Virtu denies the allegations contained in the fourth sentence of Paragraph 44.

45.  As a result of the conduct described above, VAL and VFI violated Sections 17(a)(2) and 17(a)(3) of the Securities Act.

**ANSWER**:  Paragraph 45 purports to state legal conclusions to which no response is required.  To the extent a response is required, Virtu denies the allegations contained in Paragraph 45.

**D.      VAL Failed to Adequately Establish, Maintain, and Enforce Reasonably Designed Information Barriers to Prevent Proprietary Traders from Misusing Nonpublic Customer Post-Trade Information**

46.      Although VAL purported to establish and maintain certain policies and procedures to prevent the misuse of MNPI generally, during the Relevant Period it failed to establish, maintain, and enforce policies and procedures reasonably designed to do so. As discussed below, the controls VAL did have in place were not reasonably designed to detect or prevent the misuse of MNPI from the FS Database.

**ANSWER**: Virtu denies the allegations in the first sentence of Paragraph 46, except admits

that, in the Relevant Period, VAL established and maintained reasonable written policies and

procedures to prevent the misuse of MNPI, including prohibitions on the misuse of MNPI,

prohibitions on accessing non-permissioned data and physical and logical information barriers.

Virtu denies the allegations contained in the second sentence of Paragraph 46.

47.      VAL had no policies or procedures that directly addressed the FS Database and provided no training or other directives to its employees regarding the expectations for use of that database and its highly sensitive information, including during the time period VAL was working on remediating the system. VFI's Confidential Information Policy during the Relevant Period stated that customer confidential information included "information that has been entrusted to the Firm by clients with a reasonable expectation that the information will be kept confidential and only shared within the company for bona-fide business purposes." The same policy noted that such information could include "client orders, recently executed transactions, trading strategies, and other forms of data." VAL's Compliance Manual at the time provided that:

> The Firm has established information barrier processes that are intended to
> segregate information within discrete business units. The information barrier
> processes include both physical and systemic separation between business groups
> so that the information possessed by one business group is not shared with other
> business groups who do not have a need to know about the information.

During the Relevant Period, the information barriers described in these policies were not reasonably designed, nor were they adequately implemented or enforced.

**ANSWER**: Virtu denies the allegations contained in the first sentence of Paragraph 47.

The second, third and fourth sentences of Paragraph 47 purport to characterize and selectively

quote from VFI's Confidential Information Policy and VAL's Compliance Manual, which are

documents that speak for themselves and to which Virtu respectfully refers the Court for their

complete and accurate contents and denies any allegations inconsistent therewith. The fifth sentence of Paragraph 47 purports to state legal conclusions to which no response is required. To the extent a response is required, Virtu denies the allegations contained in the fifth sentence of Paragraph 47.

48.     Although Defendants may have implemented information barriers for the GUI means of accessing the FS Database, the virtually unfettered direct access method was widely used. Indeed, at times during the Relevant Period, the main FS Database became unresponsive because there were too many concurrent queries being run by employees using direct access. Due to the volume of these concurrent direct-access logins, traders complained in internal chat messages that they ran into alerts stating that the system had exceeded the number of users allowed. In a June 2018 chat conversation, one proprietary trader suggested to another that they would be less likely to run into the excessive-user message if they safeguarded the "fsviewonly" username and password for the backup database. That trader quipped about the prospect of selling "subscriptions" to the generic log-in credentials "for like a buck each."

**ANSWER**: Virtu denies the allegations contained in the first sentence of Paragraph 48, except admits that Virtu maintained information barriers to access the FS Database in part through the GUI system. Virtu denies the allegations contained in the second, third, fourth and fifth sentences of Paragraph 48, except admits that the fourth and fifth sentences purport to characterize and selectively quote from certain internal documents provided to the SEC as part of its multi-year investigation, which are documents that speak for themselves and to which Virtu respectfully refers the Court for their complete and accurate contents and denies any allegations inconsistent therewith.

49.     Rather than limiting the number of simultaneous logins using direct access or disabling direct access until appropriate permissioning was implemented, VAL *increased* the available number of simultaneous direct access logins in an attempt to mitigate the excessive-user issue. Specifically, as of November 2018, the main FS Database could be accessed simultaneously by 75 users using direct access. VAL increased the user limit to 125 later that month because of complaints by traders about the concurrent capacity limits. At that time, VAL was encouraging employees to use direct access to obtain data from the FS Database rather than other databases because of the merger with KCG, which significantly increased the number of employees accessing the FS Database and the number of queries running at any given time.

**ANSWER**:  Virtu admits that the FS development team increased the number of maximum sessions that could connect to the FS Database during the Relevant Period due to increased demand on the FS Database.  Virtu admits the allegations contained in the second, third and fourth sentences of Paragraph 49.  Virtu otherwise denies the allegations contained in Paragraph 49.

### 1.    VAL Did Not Know Who Was Using the FS Database through Direct Access

50.    During the Relevant Period, VAL did not know which employees were using the FS Database or in what way. As a result, VAL lacked necessary information to test for potential misuse of MNPI. For example, VAL had no system in place to log or track who, or what strategies, were querying the FS Database using direct access. Separately, VAL had a code repository that contained, among other things, scripts that were used to query the FS Database, but the FS Database did not automatically capture those scripts. Instead, the code repository effectively operated on an honor system: the only scripts in the code repository were those a VAL associated person actively and voluntarily deposited. VAL had no mechanism for reviewing, tracking, or otherwise knowing of scripts traders used but did not deposit.

**ANSWER**:  Virtu denies the allegations contained in the first, second and third sentences of Paragraph 50.  Further, Virtu denies the allegations contained in the fourth, fifth and sixth sentences of Paragraph 50, except admits that VAL had a code repository that contained, among other things, scripts that were used to query the FS Database.

### 2.    VAL's Automated Systems and Policies Were Not Reasonably Designed, Maintained, or Enforced to Detect or Prevent the Misuse of MNPI in the FS Database

51.    VAL had several automated systems and policies in place during the Relevant Period. However, these systems and policies were designed to detect and prevent other potential misconduct or erroneous trading. They were not designed, maintained, or enforced to detect and prevent the misuse of MNPI in the FS Database, and were insufficient to do so.

**ANSWER**:  Virtu admits the allegations in the first sentence of Paragraph 51.  Virtu denies the allegations in the second sentence of Paragraph 51.  The third sentence of Paragraph 51 purports to state legal conclusions to which no response is required.  To the extent a response is required, Virtu denies the allegations contained in the third sentence of Paragraph 51.

52.    For example, although VAL database developers had the ability to determine which computers were connecting to the FS Database through direct access, internal chat records demonstrate that developers sought to identify those connections only in instances when excessive

log-ins from the same computer were impacting system performance, not as a measure to detect or prevent misuse of MNPI. Not until the last day in February of 2019 did a VAL database developer create a program to monitor whether any employees were querying customer post-trade information in the FS Database – and even then, the program caused system disruptions and was quickly terminated, meaning that it was not maintained or enforced.

**ANSWER**: Virtu denies the allegations contained in the first sentence of Paragraph 52, except admits that VAL database developers had the ability to determine which computers were connecting to the FS Database through direct access. Virtu denies the allegations contained in the second sentence of Paragraph 52, except admits that the sentence purports to characterize certain internal documents provided to the SEC as part of its multi-year investigation, which are documents that speak for themselves and to which Virtu respectfully refers the Court for their complete and accurate contents and denies any allegations inconsistent therewith.

53. VAL also had "lockdown systems" designed to detect abnormal trading activity and stop strategies from trading when unexpected activity or potential logic errors were detected based on pre-set parameters (known as "caps"). The caps included, for example, the maximum number of open orders, the maximum quantity of any single order placed by the strategy, or the maximum gain or loss anticipated for the strategy. But these systems were not designed to detect or prevent the misuse of customers' post-trade information; instead, they were designed to manage risk by limiting the positions of various trading strategies and were created to address situations that usually represent coding or configuration errors (such as "fat-finger" errors). They did nothing to stop proprietary traders from accessing post-trade information, prevent them from using it as an input for trades in ways that complied with the caps, or prevent them sharing (and trading based on) the MNPI using accounts held outside the Defendants' operations.

**ANSWER**: Virtu admits the allegations contained in the first and second sentences of Paragraph 53, and otherwise denies the allegations contained in the third and fourth sentences of Paragraph 53.

54. VAL had two types of caps: (i) the "Firmwide Hardcaps," which were set by Virtu's senior trading personnel in consultation with Risk Management and were hard-coded into the trading system; and (ii) "Strategy-specific Softcaps," which were configured by traders and had more restrictive parameters for specific trading strategies (*i.e.,* lower thresholds). Once a trader hit a Strategy-specific Softcap, a lockdown was triggered, and the Firm's system generated an alert and automatically locked down the strategy, thus preventing the trade from occurring.

**ANSWER**:  Virtu admits the allegations contained in Paragraph 54.

55.     However, even if a cap triggered a lockdown, traders were permitted to manually unlock (or "reset") the strategy after reviewing the lockdown alert, and then could resume trading within Firmwide Hardcaps, which were higher. The frequency with which a trader could reset a strategy after triggering Strategy-specific Softcap lockdowns was established by individual trading supervisors. If a trader attempted to reset a strategy after that frequency was exceeded, an automated alert – called a Supervisory Lockdown Alert – was generated in the system for review by the applicable supervisor.

**ANSWER**:  Virtu admits the allegations contained in Paragraph 55.

56.     The Supervisory Lockdown Alerts were also ineffective to prevent the misuse of MNPI in the FS Database. For example, for the week of March 5-9, 2018, there were 1.5 million lockdowns and resets, yet those lockdowns and resets appear to have generated only two supervisory alerts. Indeed, during the Relevant Period there were many millions of lockdowns and resets, yet only 570 supervisory lockdown alerts were triggered. Of those, 65% were approved by the same proprietary trading supervisor, who also served as the chief compliance officer designee tasked to review those approvals on a monthly basis.

**ANSWER**:  Virtu denies the allegations contained in the first sentence of Paragraph 56. Virtu further denies the allegations contained in the second, third and fourth sentences of Paragraph 56, except admits that: (1) because, by design, a significant number of lockdown and resets are unassociated with and do not trigger a Supervisory Lockdown Alert, there are ordinarily more lockdowns and resets than Supervisory Lockdown Alerts; (2) Virtu's Chief Compliance Offer or a designee is tasked with reviewing the Strategy-specific Softcap reset log on a monthly basis to ensure that escalated items are properly investigated and documented; (3) the sentences otherwise purport to characterize certain internal documents provided to the SEC as part of its multi-year investigation, which are documents that speak for themselves and to which Virtu respectfully refers the Court for their complete and accurate contents and denies any allegations inconsistent therewith.

57.     VAL's trainings were insufficient to prevent misuse of MNPI and were not reasonably designed, maintained, or enforced based on the nature and scale of VAL's business. VAL provided a one-time training to certain employees in August 2018 on "Sensitive Information, Information Barriers and Client Instructions." Among other information, it discussed problematic conduct including "[u]sing common logins or shared passwords without authorization from your

supervisor," and noted that "[j]ust because you can access it does not mean that you are authorized to access/use/share it."

**ANSWER**:  The first sentence of Paragraph 57 purports to state legal conclusions to which no response is required.  To the extent a response is required, Virtu denies the allegations contained in the first sentence of Paragraph 57.  Virtu denies the allegations contained in the second and third sentences of Paragraph 57, except admits that the sentences purport to characterize and selectively quote from Virtu's 2018 Annual Compliance Meeting Presentation, which is a document that speaks for itself and to which Virtu respectfully refers the Court for its complete and accurate contents and denies any allegations inconsistent therewith.

58.     Similarly, at a December 2018 Annual Compliance meeting, VAL reminded employees that there is a duty to protect confidential information and discussed the importance of adjusting information barriers when a new business line is added to the company. Although these trainings mentioned information barriers and protecting customer confidential information generally, they did nothing to stop proprietary traders from accessing post-trade information if they attempted to do so, and they did not constitute policies and procedures reasonably designed to protect MNPI given the nature of VAL's business.

**ANSWER**:  Virtu admits the allegations contained in the first sentence of Paragraph 58. The second sentence of Paragraph 58 purports to state legal conclusions to which no response is required.  To the extent a response is required, Virtu denies the allegations contained in the second sentence of Paragraph 58.

59.     Because VAL failed to establish, maintain, and enforce policies and procedures reasonably designed to protect customers' confidential trade execution information, VAL had no effective way to prevent proprietary traders from accessing and using that MNPI.

**ANSWER**:  Virtu denies the allegations contained in Paragraph 59.

60.     As a result of the conduct described above, VAL violated Section 15(g) of the Exchange Act.

**ANSWER**:  Paragraph 60 purports to state legal conclusions to which no response is required.  To the extent a response is required, Virtu denies the allegations contained in Paragraph 60.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)(2) Against VFI

61.     The Commission realleges and reincorporates Paragraphs 1 through 60 as if fully set forth herein.

**ANSWER**:  Virtu incorporates by reference and reasserts its denials and other responses to the allegations contained in the foregoing paragraphs as if fully set forth herein.

62.     With respect to the acts described in Paragraphs 29-31 (November 2018 and March 2019 Public Presentations, March 2019 Letter to Customers, and January 2019 Press Release), VFI, directly or indirectly, by use of means or instruments of transportation or communication in interstate commerce or by use of the mails, in the offer or sale of securities, knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**ANSWER**:  Paragraph 62 purports to state legal conclusions to which no response is required.  To the extent a response is required, Virtu denies the allegations in Paragraph 62.

63.     By reason of the actions alleged herein, VFI violated, and unless enjoined will continue to violate, Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

**ANSWER**:  Paragraph 63 purports to state legal conclusions to which no response is required.  To the extent a response is required, Virtu denies the allegations in Paragraph 63.

## SECOND CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)(2) against VAL

64.     The Commission realleges and reincorporates Paragraphs 1 through 60 as if fully set forth herein.

**ANSWER**:  Virtu incorporates by reference and reasserts its denials and other responses to the allegations contained in the foregoing paragraphs as if fully set forth herein.

65.     With respect to the acts described in Paragraph 30 (March 2019 Letter to Customers) and Paragraphs 37-42 (statements to Customers B, C, D, E, and F), VAL, directly or

indirectly, by use of means or instruments of transportation or communication in interstate commerce or by use of the mails, in the offer or sale of securities, knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**ANSWER**:  Paragraph 65 purports to state legal conclusions to which no response is required.  To the extent a response is required, Virtu denies the allegations in Paragraph 65.

66.     By reason of the actions alleged herein, VAL violated, and unless enjoined will continue to violate, Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

**ANSWER**:  Paragraph 66 purports to state legal conclusions to which no response is required.  To the extent a response is required, Virtu denies the allegations in Paragraph 66.

## THIRD CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)(3) Against VFI

67.     The Commission realleges and reincorporates Paragraphs 1 through 60 as if fully set forth herein.

**ANSWER**:  Virtu incorporates by reference and reasserts its denials and other responses to the allegations contained in the foregoing paragraphs as if fully set forth herein.

68.     VFI, directly or indirectly, by use of means or instruments of transportation or communication in interstate commerce or by use of the mails, in the offer or sale of securities, knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

**ANSWER**:  Paragraph 68 purports to state legal conclusions to which no response is required.  To the extent a response is required, Virtu denies the allegations in Paragraph 68.

69.     By reason of the actions alleged herein, VFI violated, and unless enjoined will continue to violate, Securities Act Section 17(a)(3) [15 U.S.C. § 77q(a)(3)].

**ANSWER**:  Paragraph 69 purports to state legal conclusions to which no response is required.  To the extent a response is required, Virtu denies the allegations in Paragraph 69.

## FOURTH CLAIM FOR RELIEF
### Violations of Securities Act Sections 17(a)(3) Against VAL

70. The Commission realleges and reincorporates Paragraphs 1 through 60 as if fully set forth herein.

**ANSWER**: Virtu incorporates by reference and reasserts its denials and other responses to the allegations contained in the foregoing paragraphs as if fully set forth herein.

71. VAL, directly or indirectly, by use of means or instruments of transportation or communication in interstate commerce or by use of the mails, in the offer or sale of securities, knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

**ANSWER**: Paragraph 71 purports to state legal conclusions to which no response is required. To the extent a response is required, Virtu denies the allegations in Paragraph 71.

72. By reason of the actions alleged herein, VAL violated, and unless enjoined will continue to violate, Securities Act Section 17(a)(3) [15 U.S.C. § 77q(a)(3)].

**ANSWER**: Paragraph 72 purports to state legal conclusions to which no response is required. To the extent a response is required, Virtu denies the allegations in Paragraph 72.

## FIFTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 15(g) Against VAL

73. The Commission realleges and reincorporates Paragraphs 1 through 60 as if fully set forth herein.

**ANSWER**: Virtu incorporates by reference and reasserts its denials and other responses to the allegations contained in the foregoing paragraphs as if fully set forth herein.

74. VAL did not establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of VAL's business, to prevent the misuse of material, nonpublic information by VAL or any person associated with VAL.

**ANSWER**: Paragraph 74 purports to state legal conclusions to which no response is required. To the extent a response is required, Virtu denies the allegations in Paragraph 74.

75. By reason of the actions alleged herein, VAL violated, and unless enjoined will continue to violate, Exchange Act Section 15(g) [15 U.S.C. §78o(g)].

**ANSWER**:   Paragraph 75 purports to state legal conclusions to which no response is required.  To the extent a response is required, Virtu denies the allegations in Paragraph 75.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

a. finding that each Defendant violated the aforementioned provisions of the federal securities laws as alleged herein;

b. permanently enjoining each Defendant from violating Securities Act Sections 17(a)(2) and 17(a)(3);

c. permanently enjoining VAL from violating Exchange Act Section 15(g);

d. ordering each Defendant to disgorge all ill-gotten gains, plus prejudgment interest thereon, wrongfully obtained as a result of the violations it committed;

e. ordering each Defendant to pay civil penalties pursuant to Exchange Act Section 21(d) [15 U.S.C. § 78u(d)] and Securities Act Section 20(d) [15 U.S.C. § 77t(d)]; and

f. granting such other relief to the Commission as the Court may deem just and proper.[1]

**ANSWER**:  The SEC's prayer for relief and its accompanying footnote contains a request to this Court for relief to which no response is required.  To the extent a response is required, Virtu denies that the SEC is entitled to any relief against Virtu.  Virtu further denies violating any provision of the federal securities laws.

---

[1]    Because VFI alone executed a tolling agreement, the Commission seeks disgorgement and civil penalties – relief categories (d) and (e) – from VFI for all violations alleged against it, and from VAL for all violations alleged against it occurring after September 12, 2018. The Commission seeks injunctive relief – categories (b) and (c) – for all alleged violations against each Defendant.

## DEFENSES

Virtu alleges and asserts the following defenses which apply to each and every cause of action asserted in the Complaint against Virtu to which such defense is or may be applicable. By asserting these defenses, Virtu does not assume any burden of proof, persuasion or production not otherwise legally assigned to it. Virtu does not concede that facts contrary to one or more of the assertions or allegations that follow would support any liability as to Virtu. Virtu reserves all rights to assert other and additional defenses as appropriate.

### FIRST DEFENSE

The Complaint fails to state any claim upon which relief can be granted.

### SECOND DEFENSE

The SEC's claims are barred, in whole or in part, because the alleged false or misleading statements identified in the Complaint are true and accurate and did not omit any material facts.

### THIRD DEFENSE

The SEC's claims are barred, in whole or in part, because the alleged misstatements constitute inactionable generalizations and aspirational statements.

### FOURTH DEFENSE

The SEC's claims are barred, in whole or in part, for lack of causation.

### FIFTH DEFENSE

The SEC's claims are barred, in whole or in part, because Virtu did not "obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading" as required for liability under Section 17(a)(2).

## SIXTH DEFENSE

The SEC's claims are barred, in whole or in part, because Virtu did not have the requisite state of mind required to impose liability under Section 17(a)(2) or Section 17(a)(3).

## SEVENTH DEFENSE

The SEC's claims are barred, in whole or in part, because Virtu did not engage in any "transaction, practice, or course of business that operated or would operate as fraud or deceit upon any purchaser" as required for liability under Section 17(a)(3).

## EIGHTH DEFENSE

The SEC's claims are barred, in whole or in part, because Virtu established, maintained and enforced "reasonably designed" written policies and procedures in accordance with Section 15(g).

## NINTH DEFENSE

The SEC's claims are barred, in whole or in part, because the post-trade information in the FS Database is not material non-public information.

## TENTH DEFENSE

The SEC's claims are barred, in whole or in part, because VFI is not liable for statements or actions made by VAL, and vice versa.

## ELEVENTH DEFENSE

The SEC's claims are barred, in whole or in part, by the applicable statutes of limitations.

Dated: October 7, 2024
New York, New York

Respectfully submitted,

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP

By:  /s/ *Lorin L. Reisner*
      Lorin L. Reisner
      Andrew G. Gordon
      Jessica S. Carey
      Daniel H. Levi
      Emily M. Hoyle
      1285 Avenue of the Americas
      New York, New York 10019
      Tel.: (212) 373-3000
      lreisner@paulweiss.com

      Paul D. Brachman
      2001 K Street, NW
      Washington, DC 20006-1047
      United States
      Tel.: (202) 223-7300

      *Attorneys for Virtu Financial, Inc. and*
      *Virtu Americas LLC*